UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARISTOCRAT LEISURE LIMITED,

       Plaintiff,

- against -

DEUTSCHE BANK TRUST COMPANY
AMERICAS, as Trustee,

       Defendant,

KBC FINANCIAL PRODUCTS UK LTD,
KBC ALPHA MASTER FUND SPC KBC
CONVERTIBLE OPPORTUNITIES
FUND, KBC ALPHA MASTER FUND
SPC KBC MULTI-STRATEGY
ARBITRAGE FUND, KBC ALPHA MASTER
FUND SPC KBC CONVERTIBLE
ARBITRAGE FUND,
AMARANTH LLC,
ALEXANDRA GLOBAL MASTER FUND,
LTD., UFJ INTERNATIONAL PLC,
DEEPHAVEN INTERNATIONAL
CONVERTIBLE TRADING, LTD.,
CALAMOS ADVISORS LLC ON BEHALF
OF CALAMOS GROWTH AND INCOME
FUND, CALAMOS GLOBAL GROWTH
AND INCOME FUND AND CERTAIN
OTHER INSTITUTIONAL CLIENTS,
CQS CONVERTIBLE AND
QUANTITATIVE STRATEGIES
MASTER FUND LTD., D.E. SHAW
INVESTMENT GROUP, LLC, D.E. SHAW
VALENCE INTERNATIONAL, INC, and
QVT FUND LP,

       Intervening Defendants.

**OPINION AND ORDER**

04 Civ. 10014 (PKL)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5 31 06

## APPEARANCES

KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C.
Mark C. Hansen, Esq.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Michael K. Kellogg, Esq.
Mark L. Evans, Esq.
Antonia M. Apps, Esq.

Attorneys for the Plaintiff

CAHILL GORDON & REINDEL L.L.P.
Charles S. Gilman, Esq.
80 Pine Street
New York, New York 10005
Oreste P. McClung, Esq.

Attorneys for the Defendant Trustee

CLEARY GOTTLIEB STEEN & HAMILTON L.L.P.
Evan A. Davis, Esq.
One Liberty Plaza
New York, New York 10006

Attorneys for the Intervening Defendants

## LEISURE, District Judge:

This case was set in motion by a scrivener's error in a convertible bond indenture that transposed a currency exchange rate that set the stock-price trigger for the issuer's right to redeem the bonds. Plaintiff Aristocrat Leisure Limited ("Aristocrat"), the issuer, brought this action seeking reformation of the indenture (the "Indenture") and a declaration of its immediate right to call the bonds for redemption. In an Opinion and Order dated August 12, 2005, the Court reformed the Indenture to correct the exchange rate to conform to the parties' intentions, but denied Aristocrat's motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams., No. 04 Civ. 10014, 2005 WL 1950116 (S.D.N.Y. Aug. 12, 2005). The intervening defendant bondholders (the "Bondholders"), who contend that they have delivered valid notices of conversion and are entitled to receive newly-issued shares of stock from Aristocrat, now move for summary judgment. For the reasons set forth below, the Bondholders' motion is granted in part and denied in part. [1]

## BACKGROUND

The relevant facts have been set forth at length in the Court's prior decisions, with which the Court assumes familiarity. See Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams., No. 04 Civ. 10014, 2005 WL 3440701 (S.D.N.Y. Dec. 14, 2005); Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams., No. 04 Civ. 10014, 2005 WL 1950116 (S.D.N.Y. Aug. 12, 2005); Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams., No. 04 Civ. 10014, 2005 WL 751914 (S.D.N.Y. Mar. 31, 2005). Plaintiff Aristocrat, an Australian corporation, is a supplier of gaming machines and video gaming machines. Aristocrat Leisure, 2005 WL 1950116, at *1.

---

[1] The Court also has filed a separate Opinion and Order under seal because it contained references to certain information designated as confidential by the Bondholders pursuant to a Stipulation and Order Governing Confidential Material filed on November 22, 2005.

Defendant Deutsche Bank Trust Company Americas ("Trustee") defends the action on behalf of all convertible bondholders and is an affiliate of one of the lead underwriters and managers of the bond offering at issue. Id. The Bondholders, which own a substantial majority of the outstanding bonds, comprise various corporations organized in England, the Caribbean, and the United States. Id. On May 31, 2001, plaintiff issued US$130,000,000 of 5% convertible bonds, due May 2006, to qualified institutional buyers. Id. The bonds were issued under the Indenture, which sets forth the rights and obligations of the issuer (Aristocrat), the Trustee, and the Bondholders. Id. As noted above, the Indenture contained a scrivener's error regarding the proper exchange rate, which was mistakenly transposed throughout the Indenture to read "A$0.514 = US$1.00" rather than "US$0.514 = A$1.00."[2] Id.

Pursuant to the Indenture's terms, the Bondholders may convert principal due under the bonds to newly-issued ordinary shares of Aristocrat stock. (Compl. Ex. A § 13.01.) This conversion right terminates "immediately upon, and simultaneously with, any call by the Issuer for the redemption of the Bonds in accordance with Article 12." (Compl. Ex. A § 13.01.) Any bonds "not validly redeemed by the Issuer pursuant to such redemption shall regain" their conversion rights. (Compl. Ex. A § 13.01.) The bonds are redeemable at Aristocrat's option on or after May 31, 2004, provided that, prior to the notice of redemption, the closing price of Aristocrat's ordinary shares exceeds 140% of the conversion price of the bonds for twenty of thirty trading days. (Compl. Ex. A § 12.02(a).)

Because this stock-price trigger was skewed by the scrivener's error, Aristocrat's right to redeem the bonds did not materialize. However, as corrected, the right was triggered on November 22, 2004. Aristocrat Leisure, 2005 WL 1950116, at *2. Realizing the error, plaintiff attempted to give notice of redemption and call the bonds for redemption on December 20, 2004.

---

[2] "A$" denotes Australian dollar currency.

Id. Aristocrat filed this suit against the Trustee on that same day, seeking a declaratory judgment that Aristocrat's right of redemption came into being on November 22, 2004, and that Aristocrat called the bonds for redemption on December 20, 2004, thus terminating the Bondholders' right to convert and requiring the Trustee to redeem the bonds. Id. at *3. The Trustee and Bondholders sought a declaratory judgment that Aristocrat's alleged December 20, 2004 notice and call were not sufficient under the Indenture and therefore did not terminate the Bondholders' right to convert their bonds into stock. Id. at *1. The Trustee and Bondholders also sought declaratory judgment that the Bondholders had submitted valid and effective notices of conversion, and that Aristocrat was liable for any diminution in the value of its common stock effective after Aristocrat refused to honor the Bondholders' notices of conversion. Id.

The parties concurrently moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). In its August 12, 2005 Opinion and Order, the Court reformed the Indenture so that the exchange rate was reversed to read "US$0.514 = A$1.00," but otherwise denied Aristocrat's motion, finding that Aristocrat had not called the bonds for redemption and that Aristocrat's December 20, 2004 communication did not constitute effective notice.[3] Id. at *4-7. As to the Bondholders' motion for judgment on the pleadings, the Court declined to resolve whether specific performance or damages were appropriate, as this question "require[d] a determination of whether the Bondholders presented valid notices of conversion." Id. at *7. The

---

[3] Aristocrat had argued that the proper definition of the term "call" was the noun definition: "[a] demand for the presentation of a security (esp[ecially] a bond) for redemption before the maturity date." Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams., No. 04 Civ. 10014, 2005 WL 1950116, at *5 (S.D.N.Y. Aug. 12, 2005) (internal quotation marks omitted). Aristocrat thereby claimed that it "called" the bonds for redemption, thus terminating the Bondholders' conversion rights on December 20, 2004 by issuing several demands for redemption. Id. The Court found that the verb definition of "call" was more appropriate: "[t]o redeem (a bond) before maturity." Id. (internal quotation marks omitted). Further, the Court found that redemption required Aristocrat to complete a multi-step process that culminates in the surrender of and payment for the bonds, rather than simply to issue a demand for the bonds. Id. at *5-6. In an Opinion and Order dated December 14, 2005, the Court denied Aristocrat's motion to certify the August 12, 2005 Opinion and Order for interlocutory appeal to the United States Court of Appeals for the Second Circuit pursuant to 28 U.S.C. 1292(b). Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams., No. 04 Civ. 10014, 2005 WL 3440701 (S.D.N.Y. Dec. 14, 2005)

5

Court therefore "defer[red] its decision on what remedies are due the Bondholders based on Aristocrat's erroneous interpretation of the Indenture until the facts are sufficiently culled and this issue receives the full benefit of the parties' legal analysis." Id. The Bondholders, joined by the Trustee, now move for summary judgment, seeking a declaratory judgment on the issues of both breach (i.e., that they have submitted valid conversion notices and evidence of tender) and remedy. With respect to the issue of remedy, the Bondholders seek a declaration that they are entitled to (1) specific performance through Aristocrat's issuance and delivery of new shares; (2) compensation for dividends that they would have received had Aristocrat not breached; and (3) prejudgment interest. (Bondholders' Mem. Law Supp. Mot. Sum. J. 3.)

## **DISCUSSION**

### 1. Summary Judgment Standard

Summary judgment is a tool used by district courts "to pierce the pleadings to flush out those cases that are predestined to result in a directed verdict." Lightfoot v. Union Carbide Corp., 110 F.3d 898, 907 (2d Cir. 1997); accord United Nat'l Ins. Co. v. Tunnel, Inc., 988 F.2d 351, 355 (2d Cir. 1993) ( "Summary judgment is a tool to winnow out from the trial calendar those cases whose facts predestine them to result in a directed verdict."). To that end, district courts are directed to issue summary judgment where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Where, as here, the party moving for summary judgment is the party against whom a claim has been asserted, it may move for summary judgment at any time. Fed. R. Civ. P. 56(e).

A court may grant summary judgment "'only if it can be established that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Opals on Ice Lingerie v. Body Lines Inc., 320 F.3d 362, 367-68 (2d Cir. 2003) (quoting Int'l Bus. Machs. Corp. v. Liberty Mut. Fire Ins. Co., 303 F.3d 419, 423 (2d Cir. 2002)). Of course, "'the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'" Id. at 368 (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 247-48 (1986)); accord N.Y. Stock Exchange, Inc. v. New York, N.Y. Hotel LLC, 293 F.3d 550, 554 (2d Cir. 2002) ("A dispute is not 'genuine' unless 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" (quoting Anderson, 477 U.S. at 248)). The relevant substantive law will demonstrate whether a fact is material for the purposes of summary judgment. Anderson, 477 U.S. at 248. ("As to materiality, the substantive law will identify which facts are material.").

When considering a summary judgment motion, a district court "must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought, with the burden on the moving party to demonstrate the absence of any material factual issue genuinely in dispute." Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1320 (2d Cir. 1975) (Kaufman, C.J.) (citing Adickes v. Kress & Co., 398 U.S. 144, 157 (1970); United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); accord LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 171 (2d Cir. 1995) ("'The inferences to be drawn from the underlying facts revealed in materials such as affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion.'" (quoting Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994))); Patrick v.

LeFevre, 745 F.2d 153, 158 (2d Cir. 1984) (Kaufman, J.). If there exists "*any* evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper." Holt v. KMI-Continental, Inc., 95 F.3d 123, 129 (2d Cir. 1996) (emphasis added).

## II. Whether Aristocrat Has Breached the Indenture

### A. The Validity of the Conversion Notices and Tenders of Interest

As stated above, the Indenture provides that the Bondholders may convert principal due under the bonds to newly-issued ordinary shares of Aristocrat stock.[4] (Compl. Ex. A § 13.01; Bondholders' 56.1 ¶ 1.) In order to convert, bondholders must give effective irrevocable notice to the Trustee in accordance with the provisions of section 13.02 of the Indenture. (Compl. Ex. A § 13.02; Bondholders' 56.1 ¶1.) Specifically, section 13.02 of the Indenture provides:

> In order to effect a conversion, the Holder of any Bond must complete, execute and deliver . . . a fully executed (and manually signed) irrevocable written notice ("Conversion Notice"), in substantially the form set forth on the reverse of the Bond . . . . The Conversion Notice shall contain the name, address, nationality of the person to be registered as the Holder of the Ordinary Shares upon conversion of the Bonds and the total number of Ordinary Shares the person to be registered as the Holder of the Ordinary Shares upon conversion of the Bonds has acquired prior to the date of conversion through conversion of the Bonds.

(Compl. Ex. A § 13.02.) The bonds are held under what is known as a "book-entry system." (Bondholders' 56.1 ¶ 3; Pl.'s 56.1 ¶ 3.) The Bondholders' interests in the bonds are represented

---

[4] Several of the "facts" that the Bondholders submit in their Local Rule 56.1 statement as material and as to which there is no genuine issue to be tried are quotations and citations of the language of the Indenture. (See Bondholders' 56.1 ¶¶ 1-3, 6.) By the same token, at various points in its 56.1 statement, Aristocrat has referenced different language from the Indenture without disputing either the meaning or the accuracy of the language of those portions of the Indenture called to the Court's attention in the Bondholders' 56.1 statement. (Pl.'s 56.1 ¶¶ 1-2, 6.) At any rate, the Court is perfectly competent to construe the plain language of the Indenture as a matter of law. See Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992) ("When the question is a contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity."); Tokio Marine & Fire Ins. Co., Ltd. v. McDonnell Douglas Corp., 617 F.2d 936, 940 (2d Cir. 1980) (stating that the district court, when deciding a summary judgment motion, is "required to determine as a question of law whether the terms of the contract were sufficiently ambiguous to permit any proof concerning the subjective intent of the parties").

by interests in the Global Bond held by the Depository, which is defined in the Indenture as the Depository Trust Company ("DTC"). (Bondholder's 56.1 ¶3; Pl's 56.1 ¶3; Compl. Ex. A § 1.01.) Section 13.02 of the Indenture sets forth the procedure by which a bondholder may convert an interest in the Global Bond:

> In order to exercise the conversion right with respect to any interest in a Global Bond, the Holder must complete the appropriate instruction form for conversion pursuant to the Depository's book-entry conversion program, deliver by book-entry delivery an interest in such Global Bond, furnish appropriate endorsements and transfer documents if required by the Issuer or the Trustee or conversion agent, and pay the funds, if any, required by this Section 13.02 and any stamp, issue, registration and similar taxes if required pursuant to this Section 13.02.

(Compl. Ex. A § 13.02.) The tender of interests in the Global Bond for conversion is widely referred to as a "DWAC," an acronym for Deposit/Withdrawal at Custodian. (Pl.'s Mem. Law Opp'n Bondholder's Mot. Summ. J. 1.)

The Bondholders and Trustee have provided the Court with copies of conversion notices submitted by every one of the Bondholders except QVT Fund LP. (See Bondholder Decls. ¶ 3; Singh Decl. Ex. A, Attachs. 2-8, 11, 15-18, 20-24, 28.) The Trustee also has provided the Court with copies of the DWAC requests that DTC made available to the Trustee evidencing the tender of interests in the Global Bond for conversion with respect to every one of the Bondholders except QVT Fund LP. (See Singh Decl. Ex. B, Attachs. 32-38, 41, 45-48, 50-54, 58.) In addition, the Trustee has supplied copies of conversion notices, (see Singh Decl. Ex. A, Attachs. 9-10, 12-14, 19, 25-27), and DWAC requests, (see Singh Decl. Ex. B, Attachs. 39-40, 42-44, 49, 55-57), with respect to additional nonparty bondholders. All together, the record includes evidence of conversion notices and DWAC requests submitted by bondholders holding an aggregate principal amount of bonds totaling $122,740,000. (See Singh Decl. Ex. A, Attachs. 2-28; Singh Decl. Ex. B, Attachs. 32-58.) The Bondholders, in their Local Rule 56.1 statement,

9

assert that "[o]n or about December 20, 2004 . . . each of the Intervening Defendants . . .

submitted a request for conversion." (Bondholder's 56.1 ¶ 4.) The Bondholders also state that

each notice, in compliance with section 13.02 of the Indenture, contains the aggregate principal

amount of bonds to be converted and the name, address, and nationality of the person to be

registered as the holder of the ordinary shares upon conversion. (Bondholder's 56.1 ¶ 4.) The

Bondholders state that the conversion notices and DWAC requests "were forwarded to brokers

and on through the DTC participants up the chain until they reached the Trustee and DTC."

(Bondholder's 56.1 ¶ 4.) Finally, the Bondholders state that none of the Bondholders have

received any newly-issued shares from Aristocrat. (Bondholder's 56.1 ¶ 4.) Each of these

assertions were supported by citations to admissible evidence. (See Bondholder's 56.1 ¶ 4.)

The Bondholders correctly point out that Aristocrat, in its response to the Bondholders'

statement of facts pursuant to Local Rule 56.1, fails to comply with the rule's requirement that

each factual statement be followed by a citation to admissible evidence. (Bondholder's Reply

Mem. Law Supp. Mot. Summ. J. 1 n.2.) Rule 56.1 states that each numbered paragraph in the

moving party's 56.1 statement "will be deemed admitted *for purposes of the motion* unless

*specifically* controverted" by the non-movant's 56.1 statement. S.D. & E.D. N.Y. R. 56.1(c).

The Rule further states that "*each statement controverting any statement of material fact* . . .

must be followed by citation to evidence which would be admissible, set forth as required by

Federal Rule of Civil Procedure 56(e)." Id. 56.1(d). "[D]istrict courts in the Southern and

Eastern Districts of New York have interpreted current Local Rule 56.1 to provide that 'where

there are no[] citations or where the cited materials do not support the factual assertions in the

Statements, the Court is free to disregard the assertion." Holtz v. Rockefeller & Co., Inc., 258

F.3d 62, 73 (2d Cir. 2001) (quoting Watt v. N.Y. Botanical Garden, No. 98 Civ. 1095, 2000 WL

193626, at \*1 n.1 (S.D.N.Y. Feb. 16, 2000); see also Am. Nat. Fire Ins. Co. v. Mirasco, Inc., 265 F. Supp. 2d 240, 246-47 (S.D.N.Y. 2003) (noting, in denying motion for reconsideration, that any "56.1 Statements that the Insurers specifically denied but failed to support such denial with specific evidence, were deemed admitted for purposes of the summary judgment motion"); Cooper v. Gottlieb, No. 95 Civ. 10543, 2000 WL 1277593, at \* 4 (S.D.N.Y. Sept. 8, 2000) (finding that plaintiffs' "conclusory denial" was "wholly inadequate" under Local Rule 56.1(d) where "[i]n their response to the defendants' 56.1 Statement the plaintiffs state that they 'deny' the defendants' assertion that the defendants never voted the shares, although the plaintiffs cite no evidence at all to support the denials").[5]

Aristocrat's 56.1 statement contains several paragraphs that include language stating that the corresponding paragraph in the Bondholders' 56.1 statement is "disputed," often providing no reason for the dispute. (See Pl.'s 56.1 ¶¶ 1-4, 6-8.) Because this conclusory language is not supported by citation to any admissible evidence, the Court will disregard it. However, on a more fundamental level, Aristocrat has failed to controvert any of the Bondholders' 56.1 statements concerning the validity of the conversion notices, whether by citation to admissible evidence—none of Aristocrat's 56.1 statements regarding the conversion notices cite to any evidence whatsoever—or otherwise. Aristocrat admits that each of the conversion notices, in compliance with section 13.02 of the Indenture, contains the aggregate principal amount of bonds to be converted, as well as the name, address, and nationality of the person to be registered as the holder of the ordinary shares to be received upon conversion. (Pl.'s 56.1 ¶ 4 ("Each notice

---

[5] At the same time, the Court is mindful that, notwithstanding the Court's admission of any uncontroverted facts, the Bondholders' motion is not automatically granted, because "'[t]he local rule does not absolve the party seeking summary judgment of the burden of showing that it is entitled to judgment as a matter of law.'" Giannullo v. City of N.Y., 322 F.3d 139, 140 (2d Cir. 2003) (quoting Holtz v. Rockefeller & Co., 258 F.3d 62, 74 (2d Cir. 2001)). Because "'a Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record,'" id. (quoting Holtz, 258 F.3d at 74), the Bondholders remain obligated to demonstrate that no genuine issue of material fact exists to warrant a trial, id.

11

attached to the discovery requests served by the Trustee on Aristocrat contained the aggregate principal amount of Bonds to be converted, the name, address, and nationality of the person to be registered as the Holder of the Ordinary Shares.").) Aristocrat admits that all Bondholders except QVT Fund LP, as well as the additional nonparty bondholders mentioned above, have submitted conversion notices to the Trustee and DWAC instructions to the DTC. (Pl.'s 56.1 ¶ 4 ("Based on as-yet unauthenticated documents[6] which the Trustee has attached to discovery requests served on Aristocrat, it appears that . . . bondholders holding US $122,740,000 million in aggregate principal amount of the Bonds submitted conversion notices to the Trustee and DWAC instructions to the Depository Trust Company ('DTC').").) Aristocrat admits that these conversion notices were received by the Trustee.[7] (Pl.'s 56.1 ¶ 4 ("However, Aristocrat does not dispute that the Trustee at some point received these notices.").) Finally, Aristocrat admits that it "has not issued any shares to any bondholder who has submitted any conversion notice to the Trustee." (Pl.'s 56.1 ¶ 5.)

Aristocrat states that, even though it does not dispute "that the Trustee at some point received these notices," it lacks sufficient information as to the question of whether the conversion notices "were forwarded to brokers and through DTC Participants to the Trustee." (Pl.'s 56.1 ¶ 4.) Again, because Aristocrat has failed to cite any admissible evidence in support of this statement, the Court will disregard it and consider the corresponding statement in the Bondholder's 56.1 statement as admitted for purposes of this motion. In any case, Aristocrat has

---

[6] Here the Court notes that Aristocrat has not shown that the authenticity of the conversion notices is in dispute by its glancing characterization of the notices as "as-yet unauthenticated documents." (Pl.'s 56.1 ¶ 4.) If Aristocrat wanted to contest the authenticity of the notices served on it in discovery by the Trustee, it could have done so in its 56.1 statement by citing to admissible evidence, such as an affidavit by an officer of the corporation. Aristocrat chose not to do so, and the Court will disregard any suggestion that the notices are inauthentic.

[7] For its part, the Trustee, in its 56.1 statement, admits that it received each conversion notice "from, or on behalf of, Holders of the Bonds" (Trustee's 56.1 ¶ 4), and that "it received, through its link with The Depository Trust Company, corresponding withdrawal instructions for the conversion of Bonds into Ordinary Shares of Aristocrat, thereby effecting delivery by book-entry delivery of an interest in such Bonds" (Trustee's 56.1 ¶ 4.) The Court observes that the Trustee has supported each of these statements by citations to admissible evidence.

12

not made clear how the precise route by which conversion notices ultimately reach the Trustee is a material fact. The relevant language in the Indenture regarding the conditions precedent to the Bondholders' exercise of conversion rights simply states that "the Holder must complete the appropriate instruction form for conversion pursuant to the Depository's book-entry conversion program, delivery by book-entry delivery an interest in such Global Bond, furnish appropriate endorsements and transfer documents if required by the Issuer or the Trustee or conversion agent, and pay [any other required funds or taxes]." (Compl. Ex. A § 13.02.) The Bondholders, in their memorandum of law, argue that "[w]hile the details of how a request for conversion passes up the chain in the book-entry system may be of interest as an intellectual matter, what matters for present purposes is the initiation of the process at the level of the [Bondholders] and other bondholders and the conclusion of the process at the level of the Trustee and DTC." (Bondholders' Mem. Law Supp. Mot. Sum. J. 7.) The Court agrees with the Bondholders' position, which Aristocrat has not addressed anywhere in its papers.

As the Court noted, the Indenture requires that Aristocrat deliver newly issued shares to bondholders who timely and validly have sought to exercise their conversion rights. (See Compl. Ex. A § 13.01 (stating "at the option of the Holder thereof, any Bond may be converted during the Conversion Period . . . for newly-issued Ordinary shares paid up in full"); see also Compl. Ex. A. § 4.09 ("[T]he right of any Bondholder . . . to receive the Ordinary Shares when such Ordinary Shares are required to be delivered following conversion of a Bond held by such Holder . . . shall not be impaired or adversely affected without such Holder's consent.").) There is no question that every one of the Bondholders but QVT Fund, as well as each of the nonparty bondholders on whose behalf the Trustee has provided evidence of conversion notices and DWAC requests, has satisfied the Indenture's requirements regarding the submission of

13

conversion notices and tender of interests. Aristocrat admits that it has not issued or delivered

any shares to any bondholder. (Pl.'s 56.1 ¶ 5.) Therefore, the Court finds that Aristocrat is in

breach with respect to every one of the Bondholders but QVT Fund, as well as each of the

aforementioned nonparty bondholders.[8]

## B.    QVT Fund LP

As stated above, the Bondholders and Trustee have not provided the Court with any

conversion notice or DWAC request with respect to bondholder QVT Fund. QVT Fund owns

$4,548,000 principal amount of bonds issued under the Indenture. (Fu Decl. ¶ 2.) The

Bondholders concede that QVT Fund did not submit a valid conversion notice; rather, QVT

Fund's investment manager submitted two e-mail requests for conversion through the broker for

QVT Fund, Deutsche Bank Securities, Inc., on December 22, 2004, and December 23, 2004.[9]

(Fu Decl. ¶¶ 2-3.) However, the Bondholders state that "it appears that the request may not have

been forwarded, nor a tender effected, due to the belief that Aristocrat was rejecting

conversion.[10] (Bondholders Mem. Law Supp. Mot. Sum. J. 1 n.1.) The Bondholders argue that,

---

[8] In its reply brief, the Bondholders also request that the Court declare that Aristocrat's breach was willful, arguing that Aristocrat acted in bad faith regarding its position that it had the immediate right to call the bonds for redemption and terminate the Bondholders' conversion rights. (Bondholder's Reply Mem. Law Supp. Mot. Summ. J. 2.) The Bondholders cite to a memorandum dated November 15, 2004 from Deutsche Bank AG, Sydney, Australia, one of the two managers of the bond offering, to John Carr-Gregg, Company Secretary for Aristocrat. (See Davis Decl. Ex. B.) The memorandum states that Mr. Carr-Gregg had "informed us that the legal advice received by Aristocrat is that . . . the conversion right error was unintended and would be contrary to market custom and the legitimate expectation of Aristocrat bondholders." (Davis Decl. Ex B. at 3.) Because the Bondholders make this argument for the first time in its reply, the Court will disregard it. See Sigmon v. Parker Chapin Flattau & Klimpl, 901 F. Supp. 667, 677 (S.D.N.Y. 1995) (Leisure, J.) ("Arguments may not be made for the first time in a reply brief." (citing United States v. Gigante, 39 F.3d 42, 50 n.2 (2d Cir. 1994); NLRB v. Star Color Plate Serv., Div. of Einhorn Enters., Inc., 843 F.2d 1507, 1510 n.3 (2d Cir. 1988))). Therefore, the Court declines to find that Aristocrat's breach was willful.

[9] These requests were sent on behalf of QVT Fund and nonparty Deutsche Bank AG London, owner of $1,202,000 principal amount of bonds. (Fu Decl. ¶ 2.)

[10] The declaration of Tracy Fu, a managing member of QVT Fund's investment manager, includes as an attachment the two e-mail requests for conversion sent to Deutsche Bank Securities, as well as the following response to the second conversion request:

> As you are aware, there are a number of issues regarding the conversion of this stock and we are currently uncertain whether we will be able to process this. We already have a number of queries pending with the issuing company who are proving very ellusive [sic]. One of these queries is to

14

because Aristocrat's own conduct caused the confusion that prevented QVT Fund from submitting valid notice of conversion and tender, and because Aristocrat has not been prejudiced by any possible failure to receive notice of conversion and tender, the Court should deem Aristocrat in breach on a *nunc pro tunc* basis. The Bondholders have devoted a total of one sentence in a footnote to this argument, and offer no authority for this use of *nunc pro tunc*. Nor was the Court able to find any such authority. Therefore, until this issue has been presented properly, the Court declines to render a decision on whether Aristocrat is in breach with respect to QVT Fund.

## III. Whether the Bondholders Are Entitled to Specific Performance

In addition to requesting summary judgment on the issue of breach, the Bondholders request that the Court declare that they are entitled to have Aristocrat specifically perform by issuing and delivering new shares. (Bondholders' Mem. Law Supp. Mot. Summ. J. 2.) The Court now will proceed to address this issue.

### A. Specific Performance: Legal Standard

There is no question that a legal remedy—damages to compensate the Bondholders for Aristocrat's breach—exists in this case. However, the existence of a remedy at law does not preclude the granting of specific performance. See Leasco Corp. v. Taussig, 473 F.2d 777, 786 (2d Cir. 1972) (citing Dailey v. City of N.Y., 156 N.Y.S. 124, 128 (App. Div. 1915)). Rather, the Second Circuit has noted that "before the 'extraordinary' equitable remedy of specific performance may be ordered, the party seeking relief must demonstrate that remedies at law are

confirm the conversion rate and we also have an open investigation with Euroclear to get this information. However, despite chasing regularly, it is unlikely that we will be able to get an answer anytime soon.
(Fu Decl. ¶ 3 Attach.)

15

incomplete and inadequate to accomplish substantial justice."[11] Lucente v. Int'l Bus. Mach. Corp., 310 F.3d 243, 262 (2d Cir. 2002); see also Leasco, 473 F.2d at 786; Samuel Williston & Richard A. Lord, Williston on Contracts § 67:8 (4th ed. 2003); Joseph M. Perillo, Calamari & Perillo on Contracts § 16-1 (5th ed. 2003). A party seeking specific performance "'must show equitable factors in its favor . . . and must also demonstrate that its risk of injury, *if* the injunction is denied, is one that after balancing the equities entitles it to relief.'" Laurus Master Fund, Ltd. v. Versacom Int'l., Inc., No. 02 Civ. 5340, 2003 WL 21219791, at *3 (S.D.N.Y. May 21, 2003) (quoting Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp., 992 F.2d 430, 433 (2d Cir. 1993)). Because "'[t]he decision whether or not to award specific performance is one that rests in the sound discretion of the trial court,'" Laurus Master Fund, 2003 WL 21219791, at *3 (quoting Sokoloff v. Harriman Estates Dev. Corp., 754 N.E.2d 184, 188 (N.Y. 2001)), a district court's denial of specific performance is reviewed for abuse of discretion, Nemer Jeep-Eagle, 992 F.2d at 433.

"In general, specific performance will not be ordered where money damages 'would be adequate to protect the expectation interest of the injured party.'" Sokoloff, 754 N.E.2d at 188 (quoting Restatement (Second) of Contracts § 359(1) (1981)). Rather, specific performance is a proper remedy "where 'the subject matter of the particular contract is unique and has no established market value.'" Id. (citing Van Wagner Adv. Corp. v. S & M Enters., 492 N.E.2d

---

[11] The Court found in its August 12, 2005 Opinion and Order that New York law applies to this action. Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams., No. 04 Civ. 10014, 2005 WL 1950116, at *4 n.4 (S.D.N.Y. Aug. 12, 2005). Under New York law, a party seeking specific performance must demonstrate that (1) there is a valid contract; (2) the moving party has substantially performed under the contract and is willing and able to perform its remaining obligations; (3) the opposing party is able to perform its obligations; and (4) the moving party has no adequate remedy at law. See Laurus Master Fund, Ltd. v. Versacom Int'l, Inc., No. 02 Civ. 5340, 2003 WL 21219791, at *3 (S.D.N.Y. May 21, 2003); see also Hadcock Motors, Inc. v. Metzger, 459 N.Y.S.2d 634, 636-37 (App. Div. 1983). No party asserts that the Indenture is not a valid contract or that Aristocrat is not able to perform its obligations under the Indenture. Meanwhile, there is no question that all bondholders who have communicated valid conversion notices and tenders of interest have substantially performed under the Indenture, and there are no remaining obligations that these bondholders are unwilling or unable to perform. Consequently, the Court's analysis will focus on whether an adequate remedy at law exists for the Bondholders.

16

756, 760 (N.Y. 1986)). In making the determination whether money damages are an adequate remedy, "a trial court must consider, among other factors, the difficulty of proving damages with reasonable certainty and of procuring a suitable substitute performance with a damages award." Id. (citing Restatement (Second) of Contracts § 360 (1981)); see also La Mirada Prods. Co., Inc. v. Wassall PLC, 823 F. Supp. 138, 141 (S.D.N.Y. 1993) (stating that "when a court cannot arrive at a legal measure of damages with a sufficient degree of certainty, no adequate remedy at law exists and specific performance may be granted"). Damages are not adequate where a contract involves goods that "'are unique in kind, quality or personal association' where suitable substitutes are unobtainable or unreasonably difficult or inconvenient to procure." Sokoloff, 754 N.E.2d at 188 (citing Restatement (Second) of Contracts § 360(1981)).

### B. Application to the Case at Bar

The instant action does not fall within the heartland of cases where specific performance is a proper remedy. The subject matter of the Indenture—the underlying Aristocrat shares—has an established market value, and, therefore, there would be no difficulty proving damages with reasonable certainty. The Indenture requires the delivery of shares of widely available, publicly-traded stock, a fungible item that is not "unique in kind, quality or personal association." Id. (internal quotation marks omitted). Suitable substitutes for this item are easily obtainable in the open market.[12] It is for these reasons that courts have found damages to be an adequate and appropriate remedy when specific performance would involve the delivery of shares that are freely available on the open market. See Lucente v. Int'l Bus. Mach. Corp., 310 F.3d 243, 262

---

[12] The Bondholders argue that the Indenture calls for the delivery of newly-issued shares and note that "newly-issued shares cannot be purchased in the market until Aristocrat issues them." (Bondholders' Mem. Law Supp. Mot. Summ. J. 11.) However, the Bondholders make no attempt to argue that newly-issued shares are "unique in kind, quality, or personal association" such that suitable substitutes could not be obtained in the open market. Moreover, Aristocrat points out, and the Bondholders do not contest, that the new-share requirement exists because Australian companies are prohibited from holding treasury stock (see Carr-Gregg Decl. ¶3), and therefore must promise new stock to converting bondholders (Pl.'s Mem. Law Opp'n Bondholders' Mot. Summ. J. 12).

17

(2d Cir. 2002) (finding "simply no reason why, assuming a jury finds IBM liable for breach of contract, money damages would not adequately compensate [plaintiff] for IBM's breach" of contract to deliver publicly-traded shares upon exercise of stock option (citing Simon v. Electrospace Corp., 269 N.E.2d 21, 26 (N.Y. 1971)); Simon, 269 N.E.2d at 26 (finding specific performance not available for agreement to deliver stock that was "property not unique and available on a public market"); Goddard v. Gladstone, 137 N.Y.S.2d 393, 395 (Sup. Ct. 1955) ("As a general rule, of course, one entitled to the transfer to him of the stock of a business corporation is denied the remedy of specific performance, since such securities can normally be bought on the public market."); cf. Matter of Fontana D'Oro Foods, Inc., 482 N.E.2d 1216, 1217 (N.Y. 1985) (affirming award of specific performance of an agreement to convey stock in a close corporation); Haymarket LLC v. D.G. Jewellery of Canada Ltd., 736 N.Y.S.2d 356, 358 (App. Div. 2002) (awarding specific performance of agreement to purchase additional shares of stock where trading in the issuer's stock was too thin to allow the purchaser to purchase the shares on the open market and nearly half of the outstanding shares were held by insiders or members of their families).

The Court is not aware of a single case where a court in this jurisdiction has held that specific performance is available for breach of an agreement to deliver stock that was available in the open market. Although the Bondholders have cited a number of cases where courts have awarded specific performance of agreements to deliver stock, all involve stock that was not freely available, as it is in this case. In Laurus Master Fund, Ltd. v. Versacom International, Inc., for example, the court awarded specific performance of a defendant's contractual commitment to convert notes into common stock based on a finding that the plaintiff lacked an adequate remedy at law "[b]ecause there [were] insufficient outstanding shares for [plaintiff] to purchase all of the

shares owing to it under the financing agreements on the open market." No. 02 Civ. 5340, 2003 WL 21219791, at *4 (S.D.N.Y. May 21, 2003). Specifically, the defendant issuer in Laurus had 29,803,286 shares outstanding, while plaintiff claimed a right to 34,000,000 shares. Id. at *4 & n.1. By contrast, as of December 20, 2004, Aristocrat Leisure had more than 475 million shares outstanding on the Australian stock exchange (see Carr-Gregg Decl. ¶ 2), while the total number of shares to which all bondholders would be entitled to is approximately 31.6 million (see Trustee's Mem. Law Supp. Bondholders' Mot. Summ. J. 3; Pl.'s Mem. Law Opp'n Bondholders Mot. Summ. J. 5 n.7), less than seven percent of the company's total outstanding shares (see Carr-Gregg Decl. ¶ 2). Likewise, in Goddard v. Gladstone, 137 N.Y.S.2d 393, 395 (Sup. Ct. 1955), cited by the Bondholders, a court denied defendant's motion to dismiss an equity action for specific performance of a contract to deliver 12,500 shares of common stock because plaintiff properly had alleged that "the 25,000 shares of the common stock of [the stock at issue] are not marketable, have no known or ascertainable market value and cannot be traded on the American Stock Exchange—and thus that he has no adequate remedy at law." Here, Aristocrat's shares are marketable, have an easily ascertainable market value, and can be traded on the Australian stock exchange.[13]

---

[13] The Bondholders also cite Van Gemert v. Boeing Co., 520 F.2d 1373 (2d Cir. 1975), where the Second Circuit reversed a trial court's determination that the issuer of a convertible bond gave adequate notice of the issuer's call for conversion. The Bondholders cite a footnote in which the Court stated:

> On the remand for a determination of damages, it might be appropriate for the district court to allow Boeing to meet the liability resulting from this case by issuing stock. That is what the plaintiffs would have had if they had received notice of the redemption call, and one of the purposes of the redemption was to enable the company to exchange debt for equity capital. It would thus seem appropriate for Boeing to be able to issue stock to meet all or part of this liability, with, of course, the shares being valued according to their market value at date of issuance.

Id. at 1385 n.23. In making this observation, the Van Gemert Court was not engaging in an analysis of specific performance. Ultimately, on remand, the district court awarded money damages, fixed as of the last date on which conversion rights could have been exercised. Van Gemert v. Boeing Co., No. 06 Civ. 1820, 1976 U.S. Dist. LEXIS 12401, at *8 (S.D.N.Y. 1976).

19

Nevertheless, the Bondholders contend that damages are an inadequate and inappropriate remedy in this case. They offer four reasons: (1) because the Indenture, on its face, makes clear that the parties agreed that the Bondholders are entitled to newly-issued shares; (2) because a damages remedy would result in the unequal treatment of bondholders, and thus unfairly prejudice them; (3) because an award of damages would create an incentive for issuers of convertible bonds to breach their obligation to convert; and (4) because, due to the fact that most of the Bondholders hedged against their interest in the underlying stock of the issuer, the Bondholders cannot be compensated fully by purchasing Aristocrat shares in the open market. (Bondholders' Mem. Law Supp. Mot. Summ. J. 11-15.) The Court will address these arguments *in seriatim.*

To begin with, although it is true that the Indenture expressly gives the Bondholders the right to receive newly issued shares, it does not follow that this right is enforceable by specific performance. Section 13.01 of the Indenture provides that "[s]ubject to and upon compliance with the provisions of this Article . . . at the option of the Holder thereof, any Bond may be converted during the Conversion Period . . . for newly-issued Ordinary Sahres paid in full." (Compl. Ex. A § 13.01.) Section 4.09 also states that "the right of any Bondholder . . . to receive the Ordinary Shares when such Ordinary Shares are required to be delivered following conversion of a Bond held by such Holder . . . shall not be impaired or adversely affected without sueh Holder's consent." (Compl. Ex. A § 4.09.) Neither party disputes this language. However, that the Indenture gives Bondholders the right to receive newly issued shares does not mean that the Indenture provides that the obligation to deliver shares is specifically enforceable upon breach, because the Indenture contains no language indicating that the parties desired such a remedy. Cf. Alpha Capital Aktiengesellschaft v. Advanced Viral Research Corp., No 02 Civ.

10237, 2003 WL 328302, at \*5 (S.D.N.Y. Feb. 11, 2003) (remedies provision in contract to deliver stock warrants provided that "*[t]he Issuer stipulates that the remedies at law . . . will not be adequate and that, to the fullest extent permitted by law, such terms may be specifically enforced by a decree for the specific performance of any agreement contained herein or by an injunction*") (emphasis in original); Cuomo v. Cahill, Larkin & Co., No. 87 Civ. 7873, 1989 U.S. Dist. LEXIS 665, at \*4 (S.D.N.Y. Jan. 9, 1989) (stockholder's agreement provided that "[i]n the event of any controversy concerning the purchase or sale of shares hereunder, such purchase or sale shall be enforceable in a court of competent jurisdiction by a decree of specific performance").[14]

Also without merit is the argument that an award of damages will unfairly result in the different treatment of bondholders who have tendered, or may tender, conversion notices at different points in time. The Bondholders submit that section 4.08 of the Indenture provides that the enforcement of any right under the Indenture must be for the "equal, ratable and common benefit of all Bondholders." (Compl. Ex. A. § 4.08.) According to the Bondholders, because Aristocrat's stock has trended upward during the period in question, fixing damages at time of breach penalizes those who submitted conversion notices early, thus violating section 4.08's requirement of equal treatment. (Bondholders' Reply Mem. Law Supp. Mot. Summ. J. 6.) Leaving aside the question whether the Bondholders' reading of section 4.08 is correct,[15] this

---

[14] As evidence that the parties expected that the Indenture would be enforceable by specific performance in case of breach, the Bondholders point to an opinion delivered at closing by Skadden, Arps, Slate, Meagher & Flom LLP, Aristocrat's U.S. counsel, stating that "[t]he Indenture is a valid and binding agreement of [Aristocrat], enforceable against [Aristocrat] in accordance with its terms." (Evans Decl. Ex. H at ALL002677.) This lone document, in light of the absence of any language regarding the remedy of specific performance and the fact that the Court must resolve all ambiguities and draw all reasonable inferences in favor of Aristocrat for purposes of summary judgment, cannot support an inference that the parties intended specific performance to the remedy for an impairment of the Bondholders' conversion rights.

[15] Section 4.08 of the Indenture carries the header, "Limitations on Suits by Bondholders," and provides that Bondholders may not sue under the Indenture unless a number of requirements have been satisfied, including that written notice is provided to the Trustee and holders of at least 25% of the aggregate principal amount of the bonds

21

argument is premature, given that the Court here makes no decision regarding how damages should be calculated, as the Bondholders have not presented such a request here and the issue has not been briefed. The Bondholders also argue that a denial of specific performance would unfairly benefit any bondholders who tender a notice of conversion following the Court's August 12, 2005 Opinion and Order by allowing those bondholders to receive shares rather than damages. (Bondholders' Mem. Law Supp. Mot. Summ. J. 12.) This alleged unfairness is entirely theoretical: The time to convert bonds under the Indenture has now expired (see Compl. Ex. A § 1.01 ("'Conversion Period' means on any Business Day during any time on or after August 29, 2001 and up to and including May 16, 2006.")), and the Bondholders have presented no evidence that any of the small minority of those bondholders that have not yet attempted to convert have tendered conversion notices after August 12, 2005.

Third, the Court is not moved by the claim that an award of damages would lead issuers to breach their obligation to convert bonds whenever they believe their stock is undervalued. Because the record contains no evidence that Aristocrat believed its stock was undervalued at the time of breach, this argument strikes too broadly, as it would apply to any action for breach of an agreement to deliver anything with a value that fluctuates over time. The argument is particularly unpersuasive with respect to agreements to deliver securities that trade publicly on major exchanges, where sophisticated market participants and disclosure requirements generally work to minimize the difference between a security's true value and the price at which it trades. In addition, as Aristocrat notes, the premise is simply illogical: A rational issuer, believing that

---

have asked the Trustee to bring the suit. (Compl. Ex. A. § 4.08.) Aristocrat argues that "section 4.08's purpose is to prevent rogue bondholders from bringing worthless suits that would undermine the Bonds' value for Bondholders as a whole," and that the section's language regarding equal treatment "means nothing more than that Bondholders who take the same steps toward conversion should be treated equally." (Pl.'s Mem. Law Opp'n Bondholders' Mot. Summ. J. 13.) Because it finds that a damages remedy does not present a risk of unequal treatment, the Court need not resolve the question of section 4.08's proper interpretation.

22

its shares were undervalued, would allow conversion, issue the shares, and then repurchase the shares in the open market with the money it otherwise would have used to pay breach damages, thereby avoiding the attendant legal expenses and uncertainty. (See Pl.'s Mem. Law Opp'n Bondholders' Mot. Summ. J. 14.) Similarly illogical is the Bondholders' assertion that issuers would prefer to breach rather than suffer the dilution that would accompany the issuance of new shares. In such a situation, any benefit a breaching issuer would reap from the lack of dilution would be directly offset by the damages, based on *undiluted* shares, that the issuer would pay. Put differently, because any newly-issued shares themselves would suffer from the very dilution-effect that they caused, issuing new shares would be less expensive than paying damages based on undiluted shares, thus compensating a non-breaching issuer for any dilution it suffered.[16]

The Bondholders' most substantial argument is that specific performance is necessary to protect the expectation interests of Bondholders who have hedged against their investment in the bonds by selling Aristocrat's stock short. The Bondholders have presented evidence that it is common practice for purchasers of convertible bonds to hedge their positions by taking short positions in the underlying stock of an issuer.[17] (Bondholder's 56.1 ¶ 8; Carter Decl. ¶ 3.) The Bondholders have also presented evidence that many of the Bondholders did, in fact, assume substantial short positions in Aristocrat's stock.[18] If the Court permits Aristocrat to pay only damages based on the market price of its stock at the time of conversion, the Bondholders argue, those bondholders with short positions will be forced to purchase shares of Aristocrat stock in the open market. (Bondholders' Mem. Law Supp. Mot. Summ J. 14-15.) Because Aristocrat's

---

[16] Again, in this example, the issuer who chose to issue shares rather than breach would avoid legal expenses and uncertainty as well.

[17] Aristocrat, in its 56.1 statement, states with conclusory language that it disputes that this practice is common in the convertible bond market (Pl.'s 56.1 ¶ 8), but again fails to cite to any admissible evidence. Therefore, the Court will deem the assertion admitted for purposes of this motion.

[18] The relevant details are included in this Court's Opinion and Order, dated May 30, 2006, and filed under seal.

stock has risen since December 2004,[19] it is clear that those bondholders would lose money covering their short positions.

Although the Bondholders make much of the need for equal treatment of all bondholders, an award of specific performance would make equal treatment impossible because the Bondholders do not stand in identical positions. First, not every one of the Bondholders hedged its position by selling short Aristocrat shares. Second, even among the Bondholders who did have short positions, it appears that not all Bondholders are hedged to the same extent.[20] If, as the Bondholders submit, it is the general practice for holders of convertible bonds to hedge their positions by selling short the underlying stock, awarding specific performance would provide windfalls to un-hedged and "under-hedged" bondholders, putting them in a better position than they would occupy had Aristocrat fully performed.[21] Specific performance effectively would convert these bondholders' cause of action "into carrying a market 'call' or 'warrant' to acquire the stock if the price rose" during the pendency of the litigation.[22] Simon v. Electrospace Corp., 269 N.E.2d 21, 26 (N.Y. 1971). Such a result would run counter to the fundamental principle of contract law that courts should attempt to place the non-breaching party in the same position it would have occupied if the breach had never occurred. See Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 495 (2d Cir. 1995) (stating that the general measure of damages "is the amount necessary to put the plaintiff in the same economic position he would have been in had the

---

[19] On December 20, 2004, shares of Aristocrat closed at A$9.419 on the Australian Stock Exchange. (Gorskie Decl. Ex. A.) On Jan. 3, 2005, the day that the Bondholders moved to intervene in this case, Aristocrat shares closed at A$9.546. (Gorskie Decl. Ex. A.) On August 12, 2005, the day the Court issued its Opinion and Order denying Aristocrat's motion for judgment on the pleadings, Aristocrat shares closed at A$13.08. (Gorskie Decl. Ex. A.)

[20] The relevant details are included in this Court's Opinion and Order, dated May 30, 2006, and filed under seal.

[21] The Court notes that the record includes no evidence that any of the nonparty bondholders who have submitted valid conversion notices and DWAC requests, and who would benefit from a declaration that Aristocrat must specifically perform by issuing and delivering shares, have taken any short positions.

[22] It is doubtful that the Bondholders would be requesting specific performance if Aristocrat's stock had fallen since December 2004, as newly-issued Aristocrat shares would be worth less than damages fixed at the time of breach and the Bondholders' short positions may have become profitable.

24

defendant fulfilled his contract" (quoting Adams v. Linblad Travel, Inc., 730 F.2d 89, 92 (2d Cir. 1984) (internal quotation marks omitted)); cf. Williston & Richard A. Lord, Williston on Contracts § 64:1 (4th ed. 2003) (stating that "as a corollary to this rule, ordinarily a plaintiff may recover no more than is necessary to provide what he or she would have obtained had both parties fully performed their respective promises").

Ultimately, the Court is not convinced that the short positions taken by certain Bondholders suffice to remove this case from the general rule that specific performance is not available for breach of an agreement to delivery publicly-traded shares. This case is not one "where 'the subject matter of the contract is unique and has no established market value,'" Sokoloff v. Harriman Estates Dev. Corp., 754 N.E.2d 184, 188 (N.Y. 2001) (citing Van Wagner Adv. Corp. v. S & M Enters., 492 N.E.2d 756, 760 (N.Y. 1986)), or where "suitable substitutes" for the newly-issued Aristocrat shares cannot be obtained by the Bondholders, id. (citing Restatement (Second) of Contracts § 360 (1981))). The Bondholders are free, as they have been all along, to purchase shares of Aristocrat, close out their short positions, and collect damages.[23] See Simon v. Electrospace Corp., 269 N.E.2d 21, 26 (N.Y. 1971) ("If plaintiff were anxious to own the shares rather than obtain their value, he was free to purchase them in the market."). The Bondholders assert that if the Court, by denying specific performance, requires them to purchase shares on the open market, this swell of demand would cause a "short squeeze," that is, a

---

[23]  The Bondholders assert that they should not be required to cover their potential short sale losses by purchasing Aristocrat stock on the open market at the time of breach to mitigate damages, citing Fisher v. First Stamford Bank & Trust Co., 751 F.2d 519, 524 (2d Cir. 1984) (stating that "[defendant] cannot case a duty upon [plaintiff], at the expense of his own interests, to make an expenditure in order to minimize [defendant's] damages"). (Bondholders' Mem. Law Supp. Mot. Summ. J. 15 n.8.) In Fisher, the Second Circuit was addressing whether a trial court, in its computation of damages, had erred by failing to consider a plaintiff's duty to mitigate damages under Connecticut law. Id. at 523-24. In the case at bar, the Court does not address the issue of how damages should be computed or whether the Bondholders had a duty to mitigate, but rather limits its decision to the availability of specific performance as a remedy. Put another way, although a relevant factor in the Court's decision to deny specific performance is that the Bondholders *could* have covered short positions by purchasing stock in the open market, the Court makes no finding on whether the Bondholders were in fact obligated to do so.

25

temporary increase in the price of Aristocrat shares. (Bondholders' Mem. Law Supp. Mot. Summ. J. 15.) Even assuming this premise is correct, it does not follow that the newly-issued shares bargained for under the Indenture are "unique in kind, quality or personal association," or that the substitute for that bargain—Aristocrat shares purchased in the open market—are "unobtainable or unreasonably difficult or inconvenient to procure." Sokoloff, 744 N.E.2d at 188 (citing Restatement (Second) of Contracts § 360). It merely raises the possibility that the substitute may be more expensive. If the cost of that substitute can be documented with certainty, which surely is the case here, damages are an adequate remedy. As the New York Court of Appeals has written: "The point at which breach of a contract will be redressable by specific performance . . . must lie not in any inherent physical uniqueness of the property but instead in the uncertainty of valuing it." Van Wagner Advertising Corp. v. S & M Enters., 492 N.E.2d 756, 760 (N.Y. 1986) (Kaye, J.); accord Restatement (Second) of Contracts §360(a) (1981) (listing "the difficulty of proving damages with reasonable certainty" as the first of the factors affecting adequacy of damages). Therefore, the Court finds, as a matter of law, that a damages remedy is adequate to compensate the Bondholders, and consequently denies the Bondholders' motion for summary judgment for a declaration that they are entitled to have Aristocrat specifically perform by issuing and delivering new shares. Because the Bondholders are not entitled to receive shares, the Court also denies the Bondholders' motion for summary judgment for a declaration that they are entitled to all dividends they would have received had Aristocrat performed, as such a declaration would depend on a determination of how a damages remedy should be calculated.[24]

---

[24] The Bondholders, in their memorandum of law, request that if the Court concludes that specific performance is not available, "the appropriate damage remedy should take account of the fact that Aristocrat's breach is continuing during the entire period of Aristocrat's failure to issue and deliver shares and that damages must compensate bondholders for all losses suffered due to delay in conversion," including missed dividend payments, the costs of

26

## IV. Pre-Judgment Interest

Finally, the Bondholders request a declaration that they are entitled to receive statutory interest granted from the date of Aristocrat's breach pursuant to section 5001 of the New York Civil Practice Law and Rules. (Bondholders' Mem. Law Supp. Mot. Summ. J. 18.) Section 5001(a) provides that "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract . . . except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion." N.Y. C.P.L.R. § 5001(a) (McKinney 2001). It should be clear that the Court views this action as grounded in law rather than equity. In such cases, New York law provides that "[i]nterest shall be at the rate of nine per centum per annum, except where otherwise provided by statute." Id. § 5004. The Bondholders infer from this provision that an award of nine percent, granted from the date of Aristocrat's breach, is mandatory. (See Bondholders' Mem. Law Supp. Mot. Summ. J. 18.) However, Aristocrat asserts that section 4.03 of the Indenture provides that the default rate for breaches of the issuer's duty to convert is seven-and-one-half percent (Pl.'s Mem. Law Opp'n Bondholders' Mot. Summ. J. 19 n.21; Compl. Ex. A § 4.03.), and that where a contract provides for a specified rate of interest upon default, such provision trumps section 5004. See, e.g., Brady v. Zambrana, 633 N.Y.S.2d 139, 139 (App. Div. 1995) (applying statutory rate of nine percent in action for default on loan because "no provision was made for a default interest rate"); Hayduk v. Rent-All Uniforms Co., Inc., 610 N.Y.S.2d 35, 36 (App. Div. 1994) ("Since the promissory note Budgewood gave Rent-All provides for interest at the rate of 10%, not 9%, interest on the award of damages attributable to the note should have been at the rate of 10%."). However, by

---

carrying both bond positions and short positions in the stock, and the "loss of the ability to unwind transactions or sell the shares at the highest market price of the shares during the period of delay." (Bondholders' Mem. Law Supp. Mot. Summ. J. 16 n.9.) The Court notes again that this decision makes no determination on how damages should be computed, and the Bondholders are free to take up each of these arguments and properly present them to the Court at a later date.

its clear terms, section 4.03 of the Indenture sets the default interest rate that shall apply in instances where Aristocrat defaults on payments of interest or principal under the Indenture:

> The Issuer covenants that *in case there shall be a default in the payment of all or any part of the principal, interest or premium* (if any) of any Bonds when the same shall have become due and payable, whether upon maturity or by declaration or otherwise . . . *the Issuer will pay* to the Trustee for the benefit of the Holders of such Bonds *the whole amount then due and payable on all such Bonds* at the time Outstanding for principal, interest or premium (if any), as the case may be, *plus interest on overdue principal, interest or premium (if any), at the rate of 7.5% per annum* . . . .

(Compl. Ex. A § 4.03 (emphasis added).) Section 4.03 does not purport to set an interest rate with respect to a failure to deliver shares, which is defined as one of several "Event[s] of Default" in section 4.01(c) of the Indenture. (Compl. Ex. A § 4.01(c) (defining as an "Event of Default" the "failure of the Issuer to deliver Ordinary Shares as and when such Ordinary Shares are required to be delivered following conversion of a Bond").) Defaults in payment of principal and interest are defined separately under section 4.01(c) as "Event[s] of Default." (See Compl. Ex. A § 4.01(a), (b)). Therefore, the absence of any reference to the failure to deliver shares in section 4.03 is a clear indication that the default interest rate set forth in that section does not apply to damages from any breach of Aristocrat's duty to deliver shares. See Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992) ("When the question is a contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity."). The Court thus finds that the statutory interest rate of nine percent, pursuant to sections 5001 and 5004 of the New York Civil Practice Law and Rules, shall apply to damages stemming from Aristocrat's breach in this action.

## CONCLUSION

For the foregoing reasons, the Court grants the Bondholders' motion for summary judgment for a declaration that Aristocrat is in breach of its obligation to deliver shares with

28

respect to every Bondholder but QVT Fund, as well as each of the nonparty bondholders on whose behalf the Trustee has provided evidence of valid conversion notices and DWAC requests. The Court denies the Bondholders' motion for summary judgment for a declaration that they are entitled to have Aristocrat deliver newly-issued shares of stock. The Bondholders' motion for summary judgment for a declaration that they are entitled to all dividends they would have received had Aristocrat performed is also denied. Finally, the Court grants the Bondholders' motion for summary judgment for a declaration that the statutory interest of nine percent shall apply to damages, however ultimately calculated, from Aristocrat's breach. The parties are ordered to appear before this Court at the United States Courthouse, 500 Pearl Street, Courtroom 18B, New York, New York, on Thursday, June 29, 2006, at 11 a.m. for a pre-trial conference.

## SO ORDERED.

New York, New York
May 30 , 2006

_____
U.S.D.J.

29

Copies of this Opinion and Order have been mailed to:

Mark C. Hansen, Esq.
Kellog, Huber, Hansen, Todd, Evans, & Figel, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036

Charles S. Gilman, Esq.
Cahill Gordon & Reindel L.L.P.
80 Pine Street
New York, New York 10005

Evan A. Davis, Esq.
Cleary Gottlieb Steen & Hamilton L.L.P.
One Liberty Plaza
New York, New York 10006