

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/30/09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARISTOCRAT LEISURE LIMITED,

       Plaintiff,

  - against -

DEUTSCHE BANK TRUST COMPANY
AMERICAS, as Trustee,

       Defendant,

KBC FINANCIAL PRODUCTS UK LTD,
KBC ALPHA MASTER FUND SPC KBC
CONVERTIBLE OPPORTUNITIES
FUND, KBC ALPHA MASTER FUND
SPC KBC MULTI-STRATEGY
ARBITRAGE FUND, AMARANTH LLC,
ALEXANDRA GLOBAL MASTER FUND,
LTD., UFJ INTERNATIONAL PLC,
DEEPHAVEN INTERNATIONAL
CONVERTIBLE TRADING, LTD.,
CALAMOS ADVISORS LLC ON BEHALF
OF CALAMOS GROWTH AND INCOME
FUND, CALAMOS GLOBAL GROWTH
AND INCOME FUND AND CERTAIN
OTHER INSTITUTIONAL CLIENTS,
CQS CONVERTIBLE AND
QUANTITATIVE STRATEGIES
MASTER FUND LTD., D.E. SHAW
INVESTMENT GROUP, LLC, D.E.
SHAW VALENCE INTERNATIONAL,
INC, QVT FUND LP, LEHMAN
BORTHERS INTERNATIONAL
(EUROPE), DEUTSCHE BANK AG,
LONDON BRANCH,

      Intervening Defendants.

**FILED UNDER SEAL**

**OPINION AND ORDER**

04 Civ. 10014  (PKL)

**APPEARANCES**

KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C.
Mark C. Hansen, Esq.
Michael K. Kellogg, Esq.
Antonia M. Apps, Esq.
Bertrand-Marc Allen, Esq.
Robert A. Klink, Esq.
1615 M Street, N.W., Suite 400
Washington, D.C.  20036

Attorneys for the Plaintiff


CLEARY GOTTLIEB STEEN & HAMILTON L.L.P
Evan A. Davis, Esq.
One Liberty Plaza
New York, New York 10006

Attorneys for the Intervening Defendants, other than Deutsche
Bank AG, London Branch


DAVIS POLK & WARDWELL
James P. Rouhandeh, Esq.
James I. McClammy, Esq.
450 Lexington Avenue
New York, New York 10017

Attorneys for the Intervening Defendant, Deutsche Bank AG,
London Branch

**LEISURE, District Judge:**

In the context of a dispute considered to be unprecedented in the convertible bond market, this Court is faced with three motions for summary judgment on damages. Each movant asks the Court to determine what damages will appropriately compensate the owners of convertible bonds (the "Bondholders")[1] for the bond issuer's failure to convert the bonds into shares as required by the governing indenture agreement. Specifically, the parties ask this Court to resolve (i) the date of breach; (ii) whether the Bondholders are entitled to consequential damages; (iii) whether the Bondholders failed to mitigate their damages; and (iv) what prejudgment interest, if any, should be included in the damage award. For the reasons set forth below, the respective motions for summary judgment filed by Aristocrat Leisure Limited, the Intervening Defendants, and Deutsche Bank AG, London Branch, are GRANTED IN PART, and DENIED IN PART.

## BACKGROUND

The Court assumes familiarity with the facts and allegations as stated in the Court's many prior decisions in this action. See Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams., No. 04 Civ. 10014, 2007 U.S. Dist. LEXIS 9521 (S.D.N.Y. Feb. 5, 2007) (Leisure,J.); Aristocrat Leisure Ltd. v.

---

[1] Unless otherwise noted, the term "Bondholders" is used in this Opinion and Order to refer to all of the bondholders that intervened in this action, including Deutsche Bank AG, London Branch ("DBAGL"), which is represented by separate counsel and brought its own motion for summary judgment on damages.

Deutsche Bank Trust Co. Ams., No. 04 Civ. 10014, 2007 U.S. Dist.

LEXIS 9517 (S.D.N.Y. Feb. 5, 2007) (Leisure,J.); Aristocrat

Leisure Ltd. v. Deutsche Bank Trust Co. Ams., No. 04 Civ. 10014,

2006 U.S. Dist. LEXIS 80055 (S.D.N.Y. Nov. 2, 2006) (Leisure,

J.); Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.,

No. 04 Civ. 10014, 2006 U.S. Dist. LEXIS 34709 (S.D.N.Y. May 30,

2006); Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.,

426 F. Supp. 2d 125 (S.D.N.Y. 2005); Aristocrat Leisure Ltd. v.

Deutsche Bank Trust Co. Ams., No. 04 Civ. 10014, 2005 U.S. Dist.

LEXIS 16788 (S.D.N.Y. Aug. 12, 2005); Aristocrat Leisure Ltd. v.

Deutsche Bank Trust Co. Ams., No. 04 Civ. 10014, 2005 U.S. Dist.

LEXIS 5378 (S.D.N.Y. Mar. 30, 2005). As such, the Court only

discusses those facts that are germane to resolving the instant

motions for summary judgment on damages.

## I.    Relevant Factual[2] and Procedural History

On May 31, 2001, plaintiff Aristocrat Leisure Limited

("Aristocrat") issued US$130,000,000 of 5% convertible bonds,

due May 2006, to qualified institutional buyers. (Aristocrat

56.1 ¶ 2.)[3]  The convertible bonds were issued pursuant to an

---

[2] The Court has ascertained the facts from the pleadings, motion papers, statements of material facts pursuant to Local Civil Rule 56.1, and affidavits and supporting evidence submitted in connection with these motions for summary judgment. Unless otherwise indicated, the facts referenced in this Opinion and Order are undisputed, and the Court only cites to one source for that information.

[3] To avoid confusion, the Court will use short citations to refer to the various statements of facts submitted in connection with these motions for summary judgment. Citations to "Aristocrat 56.1" refer to Aristocrat Leisure Limited's Statement of Material Facts Pursuant to Local Rule 56.1, dated

indenture agreement (the "Indenture")[4], which sets forth the rights and obligations of the issuer (Aristocrat), the Trustee, and the Bondholders. Aristocrat filed this suit as a declaratory action on December 20, 2004, alleging that but for a scrivener's error regarding the exchange rate in the Indenture, which mistakenly read "A$0.514 = US$1.00" [5] rather than "US$0.514 = A$1.00," Aristocrat would have been able to redeem the bonds on November 22, 2004, its notice and call would have been effective on December 20, 2004, and Aristocrat would have terminated the Bondholders' right to convert. (See Compl. ¶¶ 1-2, 19-22.) In its August 12, 2005 Opinion and Order, this Court reformed the Indenture so that the exchange rate was reversed to read "US$0.514 = A$1.00," but found that Aristocrat's December 20, 2004 communication did not constitute an effective call for

_____

February 10, 2007. Citations to "Int. Defs.' Counter 56.1" and "DBAGL Counter 56.1" refer, respectively, to the Rule 56.1 Counter-Statement of the Intervening Defendants (Other Than Deutsche Bank AG, London Branch) and the Counter Statement of Deutsche Bank A.G., London Branch To Aristocrat's Statement of Facts Pursuant to Local Rule 56.1, both of which are dated March 5, 2007. Citations to "Aristocrat SODF" refer to Aristocrat Leisure Limited's Statement of Disputed Facts Pursuant to Local Rule 56.1, dated March 5, 2007. Citations to "Int. Defs.' Counter SODF" refer to the Intervening Defendants' Response to Aristocrat's Statement of Disputed Facts, dated March 16, 2007. Citations to "Int. Defs.' 56.1" refer to the Statement of Material Facts Pursuant to Local Civil Rule 56.1, dated February 12, 2007, submitted by the Intervening Defendants, other than Deutsche Bank AG, London Branch. Citations to "Aristocrat Counter 56.1" refer to Aristocrat Leisure Limited's response to the Intervening Defendants' Statement of Material Facts Pursuant to Local Civil Rule 56.1, dated March 5, 2007. Citations to "DBAGL 56.1" refer to Deutsche Bank AG, London Branch's Statement of Material Facts Pursuant to Local Rule 56.1, dated February 12, 2007.
[4] The May 31, 2001 Indenture was attached as Exhibit 2 to the Declaration of Bertrand-Marc Allen, sworn to on February 10, 2007 ("Allen Decl."). The Indenture was also attached to the complaint as Exhibit A. For ease of reference, the Court will cite to the Indenture directly.
[5] "A$" denotes Australian dollar currency.

redemption, and the Bondholders' conversion rights were not terminated. See Aristocrat Leisure, 2005 U.S. Dist. LEXIS 16788, at *12, *20-22. In addition to filing the instant lawsuit on December 20, 2004, on that day Aristocrat also issued a press release to the Australian Stock Exchange announcing that it had called the bonds, and explaining that it believed the conversion rights were terminated. (Aristocrat 56.1 ¶ 41.)

After Aristocrat's actions on December 20, 2004, the Bondholders submitted conversion notices in an effort to convert their bonds into Aristocrat stock. (See Aristocrat 56.1 ¶¶ 55-66.) By Opinion and Order dated May 30, 2006, this Court found that because the Bondholders presented evidence that they submitted conversion notices and tendered their interests in the bonds, demonstrating that they exercised their rights to convert under the Indenture, and because Aristocrat had not issued or delivered any shares to any Bondholders, Aristocrat is in breach of the Indenture with respect to each Bondholder who submitted evidence to the Court. See Aristocrat Leisure, 2006 U.S. Dist. LEXIS 34709, at *22; see also Aristocrat Leisure, 2007 U.S. Dist. LEXIS 9521, at *6-7 (holding that Aristocrat is in breach with respect to DBAGL); Aristocrat Leisure, 2006 U.S. Dist. LEXIS 80055, at *10-11 (holding that Aristocrat is in breach with respect to QVT Fund, LP). The Court, however, denied the Bondholders' request for specific performance, holding that

4

monetary damages were sufficient, and refusing to order Aristocrat to issue shares to the Bondholders. See Aristocrat Leisure, 2006 U.S. Dist. LEXIS 34709, at *47.

## II. Interest Coupon Payments and Principal Payments

As this suit has proceeded, interest coupon payments, and eventually the principal payment, have come due pursuant to the Indenture. Aristocrat concedes that it owes the Bondholders interest coupon payments that were due prior to the date of breach. (Aristocrat 56.1 ¶ 67.) Aristocrat offered to make these coupon payments to the Bondholders, but the Bondholders refused to accept the payments. (Id. ¶¶ 68-69.) Aristocrat contends that "[t]wo witnesses expressly stated that they did not accept the interest payments because the contract was not 'viable.'" (Aristocrat 56.1 ¶ 72 (citing testimony of Nick Calamos and Andrew Preston).) In particular, Nick Peter Calamos testified on behalf of Calamos Advisors LLC that accepting coupon payments might imply acceptance of a contract, and there was no viable contract after Aristocrat breached the Indenture by not converting the bonds into Aristocrat share. (See Calamos Dep. 253, Oct. 13, 2006.)[6] Similarly, Andrew Preston, testifying on behalf of KBC, explained that the Bondholders thought it

---

[6] Portions of deposition transcripts from the same deponent were attached as multiple exhibits to the parties' submissions. Therefore, throughout this Opinion and Order the Court will cite to deposition testimony using the deponent's last name, the relevant transcript cite, and the date of the deposition, without referencing an exhibit number.

5

would weaken their positions if they accepted coupon payments since after converting they should have owned shares and not bonds. (Preston Dep. 151:18-152:4, Oct. 28, 2006 ("We have put these bonds in for conversion, we believe that is local [sic] and you have to honour it.  If we accept a coupon it suggests that the bonds still exist and there is still an obligation, and that would seem to contradict our point.").)

After the Bondholders refused the coupon payments, Aristocrat paid all the coupon payments to the Trustee, and the Trustee deposited the payments with the Court. (Aristocrat 56.1 ¶¶ 73-74.)  The Bondholders admit that since the coupon payments were deposited with the Court, no Bondholder has petitioned the Court to obtain its share of the interest, despite having the right to do so. (Int. Defs.' Counter 56.1 ¶ 75.)

In addition to interest coupon payments, Aristocrat has made payments for the principal of the bonds, which came due on May 31, 2006, the Maturity Date of the bonds under the Indenture. (See Aristocrat 56.1 ¶ 247.)  The Bondholders acknowledge that they initially refused Aristocrat's offer to pay the principal on the bonds. (Int. Defs.' Counter 56.1 ¶¶ 244-45.)  Thereafter, with the assistance of Magistrate Judge Peck, the parties were able to reach an agreement where the Bondholders accepted their portion of the principal, and the

                                                    .

6

parties executed "Receipt and Release Agreements." (Id. at ¶ 245.)

The parties dispute whether the Bondholders are entitled to prejudgment interest on the coupon and principal payments.  The Bondholders argue that their damage awards should include interest coupon payments, plus interest at the rate of 7.5 percent, which is the default rate specified in the Indenture.[7] (Int. Defs.' Mot. 26; DBAGL Mot. 22.)  The Bondholders further contend that it is not practical for the Bondholders to collect their coupon payments from the funds deposited with the Court, since the Trustee has asserted a lien on the deposited amounts.[8] (Int. Defs.' Reply 7.)  Aristocrat contends that because the interest payments were deposited with the Court in interest-bearing accounts, and because the Bondholders did not seek their portion of the coupon payments, there is no basis for including

---

[7] Section 4.03 provides in relevant part, "The Issuer covenants that in case there shall be a default in the payment of all or any part of the principal, interest or premium (if any) of any Bonds when the same shall have become due and payable . . . the  Issuer will pay to the Trustee for the benefit of the Holders of such Bonds the whole amount then due and payable on all such Bonds at the time Outstanding for principal[,] interest or premium (if any), as the case may be, plus interest on overdue principal, interest or premium (if any), at the rate of 7.5% per annum. (Indenture § 4.03.)

[8] The Indenture provides that "[t]he obligations of the Issuer under this Section to compensate and indemnify the Trustee . . . shall be a senior claim and lien to that of the Bonds upon all property and funds held or collected by the Trustee as such, expect funds previously deposited and held in trust for the benefit of the Holders of particular Bonds, and the Bonds are hereby subordinated to such senior claim." (Indenture § 5.06; see also Indenture § 4.06 ("[a]ny monies collected by the Trustee with respect to the Bonds pursuant to [Article 4] shall be applied in the following order . . . FIRST: To the payment of all amounts due to the Trustee under Section 5.06.").)

7

any award for coupon payments in the judgment against
Aristocrat. (Aristocrat Opp'n 34.)

Similarly, because Aristocrat purportedly made a non-
prejudicial offer to all the Bondholders to pay them their
shares of the principal amount, and because the Bondholders
initially refused those principal payments (Aristocrat 56.1 ¶
243), Aristocrat contends that there is no reason to award any
prejudgment interest to the Bondholders for the principal
payments. (Aristocrat Opp'n 35.)  By contrast, the Bondholders
contend that Aristocrat's offer was prejudicial to their
positions, and therefore interest continued to accrue until the
date of the Receipt and Release Agreements. (Int. Defs' Mot.
29.)

III. Selling Short

Central to the disposition of the instant motions for
summary judgment on damages are the facts surrounding the
Bondholders' decisions to hedge their positions.  The
Bondholders, other than Calamos Advisors LLC, hedged their long
position in the convertible bonds by borrowing stock and selling
that borrowed stock, thereby holding a short position in the
stock. (See Aristocrat 56.1 ¶ 76.)  When stock is sold short,
the shares are borrowed from someone who already owns them (the
"lender"), and the share borrower commonly pays the lender
payments in lieu of dividends in the amount equal to the

8

dividends paid by the company that issued the stock. (Int. Defs'
56.1 ¶ 13.)   The parties agree that it is common for a
convertible bondholder who engages in short selling to deliver
the shares it receives on conversion to close out its short
positions. (Aristocrat Counter 56.1 ¶ 11.)   In other words, a
convertible bondholder who short sells by borrowing shares from
a lender and selling those shares to another entity will give
shares received on conversion back to a lender to close out a
short position.

In addition, Bondholders engaged in different investment
strategies with respect to their short positions. (See generally
Aristocrat 56.1 ¶¶ 79-242.)   Specifically, while some
Bondholders maintained their hedge ratios at a constant level,
other Bondholders changed the proportion of shares hedged
against the bonds since this suit was filed on December 20,
2004. (See id.)   Further, the Bondholders made different
determinations as to when, or if, they should close out an open
short position by purchasing Aristocrat shares in the market.
(See id.)

Primarily, the parties dispute two issues surrounding the
Bondholders' short position.   First, there is disagreement as to
what Aristocrat knew, expected, and communicated as to who could
purchase the convertible bonds offered in May 2001, and whether
those purchasers could or would short sell the stock underlying

9

Aristocrat's convertible bond. In particular, Aristocrat asserts that it expressly instructed Deutsche Bank AG ("DBAG")[9] to place the convertible bonds exclusively with long-term holders and not with hedge funds or other traders who might hedge their positions. (See Aristocrat SODF ¶¶ 1- 24; Declaration of Frank Whitaker Edgell Bush, sworn to on February 8, 2007 ("Bush Decl."), ¶ 6.) Aristocrat further contends that DBAG committed to issue the bonds consistent with Aristocrat's goal of seeking high-quality long-term holders. (See Aristocrat SODF ¶¶ 10-12, 14-17, 19, 22.)

The Bondholders acknowledge that Aristocrat expressed a preference for long-term holders and that Aristocrat was concerned both about allocating bonds to hedge funds and about the possibility of short selling in the initial allocation of the bonds. (Int. Defs.' 56.1 ¶¶ 18-19.) Yet the Bondholders contend that there is no evidence that corroborates Aristocrat's position that it directed DBAG not to issue bonds to hedge funds or funds that would short sell the stock underlying the convertible bond. (See Int. Defs.' Counter SODF ¶¶ 1, 3, 5-8, 10-13.) Moreover, the Bondholders emphasize that original purchasers of the bonds were free to sell their bonds in the

---

[9] While DBAG acted as the lead manager and underwriter in the issuance of the convertible bonds at issue, DBAG is not a party to this action. There are, however, two Deutsche Bank entities that are parties to this dispute, namely Deutsche Bank Trust Company Americas as Trustee ("Trustee") and Deutsche Bank AG, London Branch ("DBAGL") as an intervening defendant.

secondary market regardless of whether the secondary purchaser was likely to hedge its position. (See id. ¶¶ 1, 3, 5-8, 10-13, 25, 27.)

Second, the parties strenuously dispute the reasonableness of the Bondholders' decisions to hold open their short positions after Aristocrat's breach, rather than purchasing shares in the market to close out those positions. Aristocrat contends that the Bondholders' failures to purchase shares to cover their short positions on or shortly after December 20, 2004, when it is undisputed that the Bondholders were financially capable of purchasing those shares, constitutes an unreasonable failure to mitigate damages that bars recovery for any losses. (Aristocrat Mot. 17, 21.) Aristocrat further asserts that the Bondholders are precluded from recovering consequential damages associated with the short positions because the Bondholders' decisions to remain hedged were based upon their erroneous belief that they could force Aristocrat to deliver shares. (Id. at 17-18.) In response, the Bondholders contend that Aristocrat's argument is based upon the faulty assumption that the Bondholders knew that Aristocrat's shares would increase in value after Aristocrat's breach. (Int. Defs.' Mot. 23-25; Int. Defs.' Opp'n 16-18; DBAGL Mot. 20-22.) According to the Bondholders, if Aristcrat's shares had decreased in value after the Bondholders covered their short positions, their damages would have increased rather

11

than decreased. (Id.)  The Bondholders further suggest that

pursuing specific performance was entirely reasonable since it

was the most efficient and costless remedy for Aristocrat's

breach. (Int. Defs.' Mot. 24.)

Finally, the Bondholders offer the report of their proposed

expert, Charles M. Jones, in support of their argument that

their actions with respect to the short positions were

reasonable.[10]  Specifically, Dr. Jones opines that it was

reasonable for a Bondholder to maintain a short position because

it minimizes market risk, trading costs, and the possibility

that the Bondholder could impact the issuer's stock price. (See

Jones Report at 7-8.)  Dr. Jones further concludes that it was

reasonable for the Bondholders to maintain, or alternatively to

reduce, their hedge ratio, and that it was reasonable for the

Bondholders to hold open, or to close, their short positions,

depending on each Bondholder's subjective assessments of the

movements in Aristocrat's stock price and of the likelihood that

the Bondholders would receive Aristocrat shares. (See id. at 10-

14, 15-17.)  By contrast, Aristocrat's proposed expert, David M.

Ross, concludes that the Bondholders should not recover any

---

[10] Charles M. Jones's report, dated December 20, 2006, ("Jones Report")  is
attached as Exhibit G to the Declaration of James I. McClammy In Support of
Deutsche Bank AG, London Branch's Motion for Summary Judgment, sworn to on
February 12, 2007.  Dr. Jones is a Professor in the Finance and Economics
Division of the Graduate School of Business Administration at Columbia
University, and his research focuses on the study of financial markets,
including short sales of equity securities. (Jones Report at 2.)

12

damages for losses on the short positions.[11]  Mr. Ross opines
that because the Bondholders were not required to hedge their
positions, and because they could have closed out their short
positions by purchasing shares in the market, any losses the
Bondholders incurred on their short positions are a consequence
of the Bondholders' decisions to establish and continue to hold
these short positions, not Aristocrat's termination of their
conversion rights. (Ross Report ¶¶ 19-20.)

## DISCUSSION

The Court begins by addressing the standards applicable to
resolving these motions for summary judgment.  The Court then
discusses the general principles that govern a determination of
damages in a breach of contract case.  Next, the Court resolves
the parties' dispute concerning the breach of contract date.
Finally, the Court turns to the types of damages the Bondholders
are entitled to collect as damages for Aristocrat's breach.

I.    Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure allows for
the entry of summary judgment where "the pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and

---

[11] David J. Ross's report, dated December 21, 2006, ("Ross Report") is
attached as Exhibit 31 to the Allen Declaration.  Mr. Ross is a Senior Vice
President at Lexecon, a consulting firm that specializes in the application
of economics to a variety of legal and regulatory issues. (Ross Report ¶ 1.)
He specializes in the areas of financial economics and the economics of
corporate law. (Id.)

13

that the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c). The party moving for summary judgment
bears the "heavy burden" of demonstrating that no genuine issue
as to any material fact exists and that it is therefore entitled
to judgment as a matter of law. Nationwide Life Ins. Co. v.
Bankers Leasing Ass'n, Inc., 182 F.3d 157, 160 (2d Cir. 1999);
accord Atl. Mut. Ins. Co. v. CSX Lines, L.L.C., 432 F.3d 428,
433 (2d Cir. 2005) ("'The burden of showing that no genuine
factual dispute exists rests on the party seeking summary
judgment . . . .'" (quoting Sec. Ins. Co. of Hartford v. Old
Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004)));
Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994)
(Kearse, J.).

In assessing whether the moving party has met its burden, a
district court "must resolve all ambiguities and draw all
inferences in favor of the non-moving party," such that "[i]f
there is any evidence in the record from which a reasonable
inference could be drawn in favor of the non-moving party on a
material issue of fact, summary judgment is improper."
Westinghouse Credit Corp. v. D'Urso, 278 F.3d 138, 145 (2d Cir.
2002); accord Brown v. Cara, 420 F.3d 148, 152 (2d Cir. 2005)
("We will affirm the District Court's grant of summary judgment
to defendants only if, based on facts not in genuine dispute and
drawing all inferences in favor of plaintiffs, defendants are

14

entitled to judgment on the merits as a matter of law."). Of
course, "'the mere existence of some alleged factual dispute
between the parties will not defeat an otherwise properly
supported motion for summary judgment; the requirement is that
there be no *genuine* issue of *material* fact.'" Lang v. Ret.
Living Publ'g Co., 949 F.2d 576, 580 (2d Cir. 1991) (quoting
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).
"A dispute as to a material fact is 'genuine,' and hence summary
judgment is not appropriate, under this standard, only 'if the
evidence is such that a reasonable jury could return a verdict
for the nonmoving party.'" Id. (quoting Anderson, 477 U.S. at
248); accord N.Y. Stock Exch., Inc. v. New York, N.Y. Hotel LLC,
293 F.3d 550, 554 (2d Cir. 2002).

Where, as here, the Court is simultaneously considering
multiple motions for summary judgment, the Court applies the
same summary judgment standard as that used for deciding
individual motions for summary judgment. See Penguin Group (USA)
Inc. v. Steinbeck, 537 F.3d 193, 200 (2d Cir. 2007) (explaining
that facts must be construed in the light most favorable to the
non-moving party for each cross-motion for summary judgment);
Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir.
2001) ("[E]ach party's motion must be examined on its own
merits, and in each case all reasonable inferences must be drawn
against the party whose motion is under consideration.").

Moreover, a district court is not compelled to find summary judgment merely because all parties are moving for summary judgment. Morales, 249 F.3d at 121 ("[E]ven when both parties move for summary judgment, asserting the absence of any genuine issue of material fact, a court need not enter judgment for either party.").

II. Applicable Law Concerning Breach of Contract Damages

"It is a well-established rule in this Circuit that the 'interpretation of Indenture provisions is a matter of basic contract law.'" Jamie Sec. Co. v. The Limited, Inc., 880 F.2d 1572, 1576 (2d Cir. 1989) (citing Sharon Steel Corp. v. Chase Manhattan Bank, N.A., 691 F.2d 1039, 1049 (2d Cir. 1982), cert. denied, 160 U.S. 1012 (1983)).[12] As such, like all breach of contract disputes, damages in this case are to be calculated at the time of breach. See Boyce v. Soundview Tech. Group, Inc., 464 F.3d 376, 384 (2d Cir. 2006) ("It is settled Second Circuit law that in a breach of contract case, damages are calculated at the time of the breach."); Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 196 (2d Cir. 2003) ("New York courts are clear that breach of contract damages are measured from the date of breach."); Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 262

---

[12] Pursuant to the Indenture, New York law governs this dispute. (See Indenture § 14.06 ("This Indenture and the Bonds shall be construed in accordance with and governed by the laws of the State of New York without giving effect to applicable principles of conflicts of law to the extent that the application of the law of another jurisdiction would be required thereby.").)

16

(2d Cir. 2002) (same); Sharma v. Skaarup Ship Mgmt Corp., 916
F.2d 820, 825 (2d Cir. 1990) ("It is a fundamental proposition
of contract law, including that of New York, that the loss
caused by a breach is determined as of the time of breach.").
It is equally well-established that the purpose of damages in a
breach of contract dispute is to put the non-breaching party in
the same economic position it would have been in had the
breaching party performed its contractual obligations. Boyce,
464 F.3d at 384-85; Oscar Gruss, 337 F.3d at 196; Lucente, 310
F.3d at 262.

There are two categories of damages available in a breach
of contract case, (1) general or market damages, and (2) special
or consequential damages. Schonfeld v. Hilliard, 218 F.3d 164,
175 (2d Cir. 2000). The Second Circuit explains that "[a]
plaintiff is seeking general damages when he tries to recover
the value of the very performance promised[,]" whereas
consequential damages "seek to compensate a plaintiff for
additional losses (other than the value of the promised
performance) that are incurred as a result of the defendant's
breach." Id. at 175-76 (internal citations and quotations
omitted). Once the fact of damages is established, a plaintiff
is entitled to the general damages that are the natural and
probable consequence of the breach. Kenford Co., Inc. v. County
of Erie, 73 N.Y.2d 312, 319, 537 N.E.2d 176, 178 (N.Y. 1989).

17

To collect consequential damages, however, a plaintiff must demonstrate that the parties contemplated those special damages as the probable result of the breach at the time of or prior to contracting. Id.

Finally, since the parties seek damages to be determined on summary judgment, is important to note that "[a]lthough the amount of recoverable damages is a question of fact, 'the measure of damages upon which the factual computation is based is a question of law.'" Oscar Gruss, 337 F.3d at 196 (internal citations omitted).

III.     Determination of the Date of Breach

In order to resolve the pending motions for summary judgment on damages, the Court must first determine as a matter of law the date on which Aristocrat breached the Indenture. While the parties suggest different dates as the appropriate date of breach, they only dispute the legal significance of, and not the circumstances or events on, each proposed date.  As such, because there are no genuine issues of material fact relating to the date of breach, the parties correctly argue that this issue can be resolved by the Court on summary judgment.

Aristocrat contends that based on the theory of anticipatory repudiation, the date of breach for the majority of the Bondholders should be December 20, 2004, the date on which Aristocrat announced that it did not intend to convert the

18

bonds. (Aristocrat Mot. 22-23.) For those Bondholders that completed the necessary steps to convert their bonds before intervening in this action, however, Aristocrat argues that the date of breach should be set at the day after those Bondholders completed the necessary steps for conversion. (Aristocrat Mot. 23.) By contrast, the Bondholders propose two alternative dates for the Court to set as the breach date: (1) August 12, 2005, when this Court reformed the exchange rate in the Indenture, or (2) May 31, 2006 which, based on a theory of continuing breach, is the last possible date that Aristocrat could have converted the bonds. (DBAGL Mot. 13; Int. Defs.' Mot. 7.)

The Court recognizes that the factual circumstances surrounding this case undoubtedly color the parties' positions on the date of breach issue. The Court notes that after Aristocrat announced its intention to call the bonds and not to allow the Bondholders to convert, Aristocrat's stock prices continued to rise. As such, using any method for calculating damages, the Bondholders are primed to collect more damages if the Court applies the later proposed breach dates, namely August 12, 2005 or May 31, 2006, than if it uses the earlier proposed date of December 20, 2004. Nonetheless, while noting these realities, the Court is cognizant of the fact that "New York courts have rejected awards based on what the actual economic conditions and performance were in light of hindsight." Lucente,

310 F.3d at 262 (internal citations and quotations omitted);
accord Sharma, 916 F.2d at 826.

A. Conversion Date[13] Is The Breach Date

Aristocrat and the Bondholders implicitly concede that,
besides the dates they propose, another possible breach date is
the date upon which each Bondholder completed the conversion
process. (See Int. Defs.' Mot. 5. ("The date of breach can be no
earlier than the date on which Aristocrat was bound to deliver
shares pursuant to valid notices of conversion and tenders of
Bonds for conversion. This date is referred to in the Indenture
as the "Conversion Date.'" (citing Indenture § 13.02));
Aristocrat Mot. 23 ("[F]or those Bondholders that completed the
necessary steps for conversion prior to the time they intervened
in the action on January 3, 2005, the date of breach is the day
after they completed the necessary steps for conversion.").) In
fact, the date each Bondholder completed the steps to convert
the bonds as set forth in the Indenture is the only breach date
that is appropriate as a matter of law. See, e.g., Hermanowski
v. Acton Corp., 580 F. Supp. 140, 143-44 (E.D.N.Y. 1983)
(finding that the date of breach was the date defendant rejected
plaintiff's exercise of his stock options), aff'd, 729 F.2d 921,

---

[13] Section 13.02 of the Indenture defines the Conversion Date as the day
following the date on which the Bondholder deposits the Conversion Notice
with any required payments with the Conversion Agent. (Indenture § 13.02.)
In other words, the Conversion Date is the day after a Bondholder completes
the conversion process as detailed in the Indenture. The Court notes that
the Conversion Date will vary for each Bondholder.

922 (2d Cir. 1984) (affirming district court's determination on the date of breach); Oscar Gruss, 337 F.3d at 197 (explaining that breach of contract damages for failing to deliver warrants must be the value of those warrants on the date defendant failed to deliver them). While the parties propose creative legal arguments that stretch legal principles beyond their intended purpose, the most obvious date on which Aristocrat breached the Indenture is when Aristocrat refused to deliver the shares to the Bondholders after the Bondholders completed the necessary steps to convert their bonds.

The question of the breach date was not before this Court when it determined Aristocrat's liability; however, using the Conversion Date as the date from which damages should be calculated is consistent with this Court's May 30, 2006 decision on liability. Specifically, this Court held that because the Bondholders provided evidence that they satisfied the Indenture's requirements regarding the submission of conversion notices and tender of interests, and because Aristocrat admitted that it did not issue shares to any Bondholders, Aristocrat was in breach of the Indenture. Aristocrat Leisure, 2006 U.S. Dist. LEXIS 34709, at *22. It follows that Aristocrat breached the agreement when it did not deliver the shares as required by the Indenture.

21

Moreover, recognizing the Conversion Date as the date of breach is consistent with well-established Second Circuit and New York case law on contract damages. If the purpose of damages is to put the non-breaching party in the same economic position as if the breaching party performed its contractual duties, see Boyce, 464 F.3d at 384-85; Oscar Gruss, 337 F.3d at 196; Lucente, 310 F.3d at 262, damages should be calculated from the date that the non-breaching party expected to receive the benefit of the contract. Here, the Indenture provides that Aristocrat will register the Bondholder as the owner of the shares on the Conversion Date. (Indenture § 13.02.) Therefore, to give the Bondholders the benefit of their bargain, damages should be calculated from the Conversion Date, which is the day they expected to receive, but did not actually receive, Aristocrat shares.[14]

## B. Aristocrat's Proposed Breach Date Is Not the Breach Date

According to Aristocrat, on December 20, 2004, the date Aristocrat filed this suit, Aristocrat unequivocally indicated that it would not deliver shares to Bondholders seeking to

---

[14] The Court rejects the Bondholders' argument that the breach date cannot be earlier than thirty days after the Conversion Date. (Int. Defs.' Mot. 5.) While the Indenture allows Aristocrat thirty days to cure a failure to deliver shares before the Trustee calls an Event of Default (Indenture § 4.01(c)), this suit is not premised on the Trustee's declaration of an Event of Default. In fact, the Trustee did not declare an Event of Default until June 1, 2006 (see Exhibit H to the Declaration of Jordana E. Lambert in Support of the Intervening Defendants' Motion for Summary Judgment On the Issue of Damages, sworn to on February 12, 2007 ("Lambert Decl.")), after the Bondholders moved for summary judgment on the issue of Aristocrat's breach.

22

convert. (Aristocrat Mot. 6.) Therefore, Aristocrat contends that the date of breach for those Bondholders who did not complete the necessary steps for conversion prior to intervening in this action is December 20, 2004, based upon a theory of anticipatory repudiation. (Aristocrat Mot. 23.) "Anticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty." Lucente, 310 F.3d at 258. After a repudiation, the non-repudiating party must elect to either (a) "treat the repudiation as an anticipatory breach and seek damages for breach of contract, thereby terminating the contractual relation between the parties," or (b) "continue to treat the contract as valid and await the designated time for performance before bringing suit." Id. The Second Circuit further explains that "[i]n determining which election the non-repudiating party has made, the operative factor is whether the non-breaching party has taken an action (or failed to take an action) that indicated to the breaching party that he had made an election." Id. at 259 (internal citations and quotations omitted).

Even assuming that Aristocrat's actions on December 20, 2004 were an unequivocal statement of Aristocrat's decision not to fulfill its obligations under the Indenture, Aristocrat's argument fails as a matter of law. In support of its argument,

Aristocrat contends "the Bondholders' witnesses uniformly testified that they interpreted Aristocrat's actions on or about December 20, 2004 as a breach of the Indenture." (Aristocrat Opp'n 3.)   Although the Bondholders did, in fact, testify that they considered Aristocrat's actions on December 20, 2004 to be a "breach" of the Indenture (see, e.g., Uy Dep. 196, Oct. 11, 2006; Blanc Dep. 120, Oct. 19, 2006; Preston Dep. 91, Oct. 28, 2006; Fuchs Dep. 278-79, Nov. 22, 2006), such layperson testimony is not dispositive of the legal question of when Aristocrat breached the contract.   Similarly, this testimony is not indicative of whether the Bondholders elected to treat the Indenture as terminated, or whether they continued to treat the contract as valid after December 20, 2004.[15]   Rather, this evidence shows that the Bondholders disagreed with Aristocrat's reading of the Indenture, as articulated in Aristocrat's December 20, 2004 statements.

Aristocrat also relies upon the Bondholders' refusal to accept Aristocrat's offers to pay interest and principal in support of its argument that the Bondholders considered the date of breach to be December 20, 2004. (Aristocrat Opp'n 3.) Specifically, Aristocrat argues that the Bondholders refused the

---

[15] At least one Bondholder testified that it did not consider Aristocrat's actions on December 20, 2004 to be a breach of the Indenture. (Lally Dep. 253, Oct. 25, 2006.)   Mr. Lally testified on behalf of DBAGL that he considered Aristocrat's December 2004 actions to be an attempt by Aristocrat not to fulfill its obligations, but Mr. Lally considers the breach to be ongoing because Aristocrat has not delivered shares. (Id. at 253-54.)

24

interest payments based upon legal advice, or because the Bondholders were concerned with prejudicing their position in the lawsuit, or because the Bondholders believed their bonds did not exist at the time because the bonds were validly converted to shares. (Aristocrat 56.1 ¶¶ 70-72.)  The Court is not persuaded that this evidence indicates that the Bondholders elected to treat the Indenture as void.[16]  Instead, the Court finds that the evidence supports this Court's determination that the Bondholders expected Aristocrat to perform its contractual obligations to honor the Bondholders' conversions.

Despite Aristocrat's arguments to the contrary, the undisputed evidence demonstrates that the Bondholders completed the conversion process after Aristocrat's purported repudiation, thus demonstrating that the Bondholders continued to treat the Indenture as a valid contract. Compare Hermanowski, 580 F. Supp. at 144 (holding defendant liable for breach of contract from the date defendant failed to perform its contractual obligations

---

[16] The Court's conclusion is not altered by Aristocrat's reliance on the testimony of two Bondholders who indicated that they did not accept the coupon payments because the contract was not "viable." (See Aristocrat 56.1 ¶ 72 (citing testimony of Nick Calamos and Andrew Preston).)  Rather than supporting Aristocrat's position that the Bondholders treated the actions of December 20, 2004 as a repudiation that terminated the contract, this testimony demonstrates that the Bondholders relied on the fact that they converted their bonds in refusing the interest coupon payments.  Both Mr. Calamos and Mr. Preston testified that the Bondholders refused the coupon payments because they considered their conversions to be effective, and because they believed Aristocrat was in breach of the Indenture for not delivering shares to the converting Bondholders. (See Calamos Dep. 202, Oct. 13, 2006; Preston Dep. 151:18-152:4, Oct. 28, 2006.)  As such, the Bondholders considered Aristocrat's failure to deliver shares, and not Aristocrat's December 20, 2004 actions, to be the breach of contract that discouraged them from accepting the coupon payments.

25

where plaintiff sought to exercise his option after defendant's repudiation) with Argonaut P'ship L.P. v. Grupo Sidek, S.A de C.V., No. 96 Civ. 1967, 1996 U.S. Dist. LEXIS 15925, at *16-17 (S.D.N.Y. Oct. 24, 1996) (holding defendant liable for breach of contract where defendant anticipatorily repudiated the contract by issuing a press statement that it would not pay any noteholder who exercised its put option and the noteholders therefore never completed the procedures to exercise that option), aff'd, 141 F.3d 1151 (2d Cir. 1998).

Moreover, the Court is not persuaded that the Bondholders' decisions to intervene in this action demonstrate that they elected to treat Aristocrat's December 20, 2004 actions as a repudiation. (See Aristocrat Opp'n 13.) Instead, the Court considers the posture of this case on January 3, 2005, when the Bondholders filed their motion to intervene. In particular, the Court notes that Aristocrat commenced the instant litigation as a declaratory action to clarify whether the Indenture allowed Aristocrat to call the bonds without allowing the Bondholders to convert. Thereafter, the Bondholders intervened in order to challenge Aristocrat's reading of the Indenture, but they did not allege that Aristocrat's December 20, 2004 statements entitled them to damages. See contra Lucente, 310 F.3d at 259 (holding that plaintiff elected to treat defendant's cancellation letter as a breach, and not as a repudiation that

plaintiff ignored, where plaintiff "expressly stated in his Original Complaint that [defendant's] cancellation letter was a breach of contract that entitled him to damages.")   While the Bondholders' intervention in the declaratory action clearly demonstrated that they disputed Aristocrat's reading of the Indenture, this does not overcome the undisputed evidence that, subsequent to Aristocrat's purported repudiation, the Bondholders universally proceeded to complete the conversion steps pursuant to the Indenture, thereby demonstrating their intent to treat the contract as valid. See Bigda v. Fischbach Corp., 898 F. Supp. 1004, 1013 (S.D.N.Y. 1995) ("Caselaw is clear . . . that where a party merely objects to an alleged breach but continues to perform and to accept the benefits of the breaching party's performance under the contract, he will have elected to continue the contract."), aff'd, 101 F.3d 108 (2d Cir. 1996).   As such, this Court finds as a matter of law that the Bondholders did not bring this action based upon a theory of anticipatory repudiation, and the date of the alleged repudiation is not the appropriate date of breach for damages calculations.

C. Bondholders' Proposed Dates Are Not The Breach Date

The Court is similarly unconvinced by the Bondholders' suggestions that August 12, 2005 or May 31, 2006 should be considered the date of breach.

1. August 12, 2005

The Bondholders suggest that August 12, 2005 should be considered the date of breach because the Court reformed the scrivenor's error in the Indenture on that date. In support of their argument, the Bondholders contend that "Aristocrat has consistently taken the position that it had valid reason not to honor conversion notices and share tenders completed prior to the correction of the Exchange Rate." (Int. Defs.' Mot. 8; see also DBAGL Mot. 13-14.) As such, the Bondholders argue that Aristocrat is estopped from now changing its position to try to reduce the amount of damages it will have to pay. (Int. Defs.' Mot. 9; DBAGL Mot. 13-14.) This argument fails as a matter of law.

Under New York law, to establish the defense of equitable estoppel, a party must show (1) an act constituting a concealment of facts or a false misrepresentation; (2) an intention or expectation that such acts will be relied upon; (3) actual or constructive knowledge of the true facts by the wrongdoers; (4) reliance upon the misrepresentations which causes the innocent part to change its position to its substantial detriment. Gen. Elec. Capital Corp. v. Eva Armadora, S.A., 37 F.3d 41, 45 (2d Cir. 1994). Here, even assuming that Aristocrat falsely reported to the Bondholders that the reason it was refusing to convert the bonds was because of the

28

scrivenor's error in the Exchange Rate, and assuming that

Aristocrat communicated this misrepresentation to all the

Bondholders,[17] the Bondholders have provided absolutely no

evidence that this information induced them to change their

position to their detriment.[18] The failure to offer any evidence

of detrimental reliance is fatal to the Bondholders' estoppel

argument.[19]

---

[17] The Court notes that Aristocrat communicated to some Bondholders that
Aristocrat believed conversion notices could not be accepted until the
Indenture was corrected. (See Lambert Decl. Exs. C, D, E, X.) However, the
Bondholders have not demonstrated how these communications were detrimentally
relied upon by the specific Bondholders who received that information, let
alone how those communications were determinately relied upon by the rest of
the Bondholders.

[18] The Bondholders assert that relying on Aristocrat's position was part of
the explanation as to why some Bondholders did not perfect their conversions
in December 2004 or January 2005. (Int. Defs.' Mot. 9.) Even assuming this
is true, the Bondholders do not explain how this was to the "substantial
detriment" of any of these Bondholders, as is required to establish equitable
estoppel. Gen. Elec., 37 F.3d at 45.

[19] The Bondholders cite Holt Marine Terminal, Inc. v. U.S. Lines, 472 F. Supp.
487 (S.D.N.Y. 1978), for the proposition that "[t]he general rule in contract
cases is that if a party gives a reason for his conduct prior to litigation,
he is estopped from changing his ground and offering new explanations after
litigation has begun." Id. at 489. First the Court notes that in Holt Marine
this principle was not applied, and the defendant was not estopped from
raising the argument in question. Id. Moreover, this doctrine has been
infrequently applied since its announcement in 1877 and its reach is
uncertain. Primetime 24 Joint Venture v. DirecTV, Inc., No. 99 Civ. 3307,
2000 U.S. Dist. LEXIS 5022, at *31 (S.D.N.Y. April 6, 2000)(noting that the
strength of the doctrine precluding a party from changing position in
litigation is not certain under New York law); see also U.S. Fidelity & Guar.
Co. v. Treadwell Corp., 58 F. Supp. 2d 77, 93 n.15 (S.D.N.Y. 1999)(noting
that the reach of the doctrine that prohibits a party in a contract suit from
taking one position and then changing its position after litigation has begun
is uncertain). Finally, even if cognizable, this principle only applies if a
party can show that it relied on the initial position or that it could have
cured any deficiencies in its performance had it known the new reason.
Primetime, 2000 U.S. Dist. LEXIS 5022, at *32 (explaining that a party is
only estopped from asserting additional grounds for having terminated or
repudiated a contract "if a party either relied on the reasons for non-
performance originally given, or could have cured its performance had the
true grounds for repudiation been asserted earlier"). Here, the Bondholders
have failed to explain how they have been harmed by Aristocrat's initial
position.

29

Finally, the Court rejects the Bondholders' contention that Aristocrat was justified in declining to deliver shares until the Exchange Rate was corrected by the Court, and therefore there was no breach before August 12, 2005. (Int. Defs.' Mot. 9; DBAGL Mot. 13.)  The Bondholders provide no evidence that they expected to receive the shares after the Court's August 12, 2005 decision.  Additionally, this argument is inconsistent with the Bondholders' motion for summary judgment on liability, where the Bondholders argued, and this Court agreed, that Aristocrat's failure to deliver shares after the Bondholders converted constitutes a breach of the Indenture. Aristocrat Leisure, 2006 U.S. Dist. LEXIS 34709, at *22.

### 2.   May 31, 2006

The Bondholders' contention that May 31, 2006 is the appropriate breach date is similarly unpersuasive.  According to the Bondholders, because Aristocrat never issued a valid redemption after the Court rejected its December 2004 attempt to redeem the bonds, Aristocrat's breach became a continuing breach. (Int. Defs.' Mot. 11.)  Under the theory of continuing breach, the Bondholders propose that the proper date of breach is the last day the bonds could have been converted under the Indenture, plus thirty days to allow Aristocrat to cure its breach. (Int. Defs.' Mot. 11.)  However, since that day falls after the Maturity Date under the Indenture, and after the

Trustee's declaration of an Event of Default, the Bondholders
contend that May 31, 2006 is the appropriate date of breach.
(Int. Defs.' Mot. 12.)

The Court rejects these arguments. First, the Court agrees
with Aristocrat that "there is no need for the Court to impute
conversion dates, because the actual conversion dates are
undisputed." (Aristocrat Opp'n 8.) The fact that the Indenture
allowed the Bondholders to convert up until May 16, 2006 is
irrelevant for this Court's analysis since it is undisputed that
all of the Bondholders completed the conversion process prior to
that date. (See Int. Defs.' Counter 56.1 ¶¶ 55-66; DBAGL Counter
56.1 ¶¶ 61, 65.) Moreover, as the Court explains above, the
fact that the Trustees declared an Event of Default on May 31,
2006 is not determinative of the date of breach.

Finally, the Bondholders ask this Court to apply equitable
considerations, and to "look to the date that Bondholders would
likely have exercised their conversion rights, but for
Aristocrat's wrongdoing." (Int. Defs' Mot. 12.) However, this
analysis has been flatly rejected by the Second Circuit. In
Oscar Gruss, the district court determined that the date to fix
the value of warrants at issue in a breach of contract dispute
was the date that plaintiff was most likely to have exercised
the warrants. 337 F.3d at 191. The Second Circuit reversed the
district court's determination, holding that the appropriate

31

date for measuring damages is from the date defendant failed to deliver the warrants. Id. at 197-98. This Court will not ignore Second Circuit precedent and measure damages from the date when the Bondholders might have converted the bonds, when the summary judgment record provides the date that each Bondholder actually completed the conversion process. Cf. Van Gemert v. The Boeing Co., 553 F.2d 812, 814 (2d Cir. 1977) (holding that the stock underlying convertible bonds should be valued on the cut-off date for plaintiff to convert those bonds where defendant did not give plaintiff an opportunity to exercise the conversion rights.). The Bondholders' request for setting the breach date at May 31, 2006 is denied.

## IV. Available Damages For The Bondholders

Having determined that the date of breach is the Conversion Date for each bondholder, the Court addresses the types of damages available to the Bondholders, as calculated from the date of breach. First, the Court reiterates that specific performance is not an appropriate remedy in this case. The Bondholders can and will be made whole through a combination of general and consequential damages, which will cover the Bondholders for additional costs they incurred in closing out the short positions. Nonetheless, the Bondholders were required to mitigate their damages, which might limit the availability of consequential damages for some Bondholders. The Court finds

32

there is a genuine issue of material fact as to the
reasonableness of the Bondholders' decisions to hold open their
short positions after Aristocrat's breach, and therefore the
Court cannot rule at the summary judgment stage of this
litigation whether each Bondholder's admittedly different course
of conduct was reasonable as a matter of law.

A. Specific Performance

The Bondholders renew their request for specific
performance in their summary judgment motions. (Int. Defs' Mot.
29-34; DBAGL Mot. 22-23.)  Without ruling on the appropriateness
of renewing this argument after the Court previously considered
and rejected the Bondholders' request for specific performance,
see Aristocrat Leisure, 2006 U.S. Dist. LEXIS at *28-*48, the
Court reiterates its previous ruling that the extraordinary
remedy of specific performance is not warranted to remedy
Aristocrat's breach.  There is no dispute that Aristocrat shares
are available in the open market, and the values of those shares
on a given date are undisputed. See Lucente, 310 F.3d at 262
(denying specific performance in a case involving publicly
traded stocks since "[t]here is simply no reason why, assuming a
jury finds [defendant] liable for breach of contract, money
damages would not adequately compensate [plaintiff] for
[defendant's] breach." (citing Simon v. Electrospace Corp., 28
N.Y.2d 136, 320 N.Y.S.2d 225, 232-33, 269 N.E.2d 21 (N.Y. 1971)

33

(noting that specific performance is not appropriate where the claim involves publicly traded stock))). Accordingly, despite offering many rationales in support of specific performance, the Bondholders have not persuaded this Court to modify its prior ruling.

B. General Damages

Since the Court denies the Bondholders' request to order Aristocrat to issue shares as remedy for its breach, the Court must determine the monetary damages that will put the Bondholders in the same economic position as if Aristocrat performed. See Boyce, 464 F.3d at 384-85; Oscar Gruss, 337 F.3d at 196; Lucente, 310 F.3d at 262. To that end, all parties and this Court agree that the Bondholders are entitled to receive the value of the shares they would have received on the date of breach, (see Aristocrat Mot. 1; Int. Defs.' Mot. 13; DBAGL Mot. 6), which the Court determines to be the Conversion Date. However, despite their voluminous submissions in support of their motions for summary judgment, the parties provide little discussion on how the Court should value the shares the Bondholders are owed. (See Declaration of Patrick A. Sheldon In Support of the Intervening Defendants' Motion for Summary Judgment on the Issue of Damages, sworn to on February 12, 2007, ¶¶ 2-5 (providing share prices for Aristocrat stock for all possible breach dates); Ross Report ¶¶ 7-11 (concluding that the

34

Bondholders' damages should be the difference between the value
of the bonds if convertible and the value of the bonds if not
convertible as of December 20, 2004.).)

This Court holds, as a matter of law, that the value of the
shares is the trading price of the shares on the Conversion
Date. See, e.g., Simon, 28 N.Y.2d at 145-46, 320 N.Y.S.2d at 233
(explaining that since plaintiff was never the owner of the
shares in question, plaintiff's damages were the number of
shares plaintiff was entitled to under the contract, valued at
their trading price on the date of breach). Measuring damages
in this way is consistent with the principle that general
damages are "'market' damages because, when the promised
performance is the delivery of goods, such damages are measured
by the difference between the contract price and the market
value of the goods at the time of breach." Schoenfeld, 218 F.3d
at 175-76. Here, pursuant to the Indenture, the Bondholders
were entitled to Aristocrat shares after the Bondholders
completed the conversion process. The market value for these
"goods" is the prices of the shares on the date the Bondholders
were to receive the shares. As such, awarding the Bondholders
the market price for the shares each would have received if
Aristocrat honored their conversions places the Bondholders in
the same position as if they would actually have received the
shares after converting their bonds.

## C. Coupon Payments

In addition to general damages, the Bondholders seek consequential or incidental damages allegedly incurred as a result of Aristocrat's breach. The Court will first address the issues surrounding the Bondholders' entitlement to interest coupon payments up to the date of breach. Aristocrat agrees that the Bondholders are entitled to coupon payments that were due prior to the date of breach. (Aristocrat Opp'n 34.) The parties, dispute, however, whether such amounts should be included in any judgment against Aristocrat, since Aristocrat paid the coupon payments to the Trustee, and those payments were subsequently deposited with the Court. (Id.) The Bondholders contend, however, that because the Trustee asserts a lien on the funds that were deposited with the Court, the coupon payments should be included in the Court's judgment, and Aristocrat could be reimbursed for any of the funds deposited with the Court that were not used to satisfy the Trustee's lien. (See Int. Defs.' Reply 7.) The Bondholders also contend that they are entitled to interest on those coupon payments in the amount of 7.5 percent per year. (Int. Defs.' Mot. 26; DBAGL Mot. 22.)

To resolve this issue, the Court looks to the terms of the Indenture. Section 4.03 of the Indenture requires Aristocrat to pay the Trustee any overdue coupon or principal payments, plus interest on those overdue payments, at the rate of 7.5 percent

36

per year. (See Indenture § 4.03.)  In other words, pursuant to
the Indenture, Aristocrat was obligated to submit payments to
the Trustee in the amount of the coupon payments owed to the
Bondholders, plus, if the coupon payments were overdue, interest
at a rate of 7.5 percent per year from the date the coupon
payments came due to the date the payments were remitted.  The
Indenture also dictates that the Trustee gets first priority in
the distribution of any funds that the Trustee collected for
overdue coupon or principal payments. (See Indenture § 4.06
(explaining that any funds that the Trustee collects under
Article 4 of the Indenture should first be distributed to
compensate the Trustee); Indenture § 5.06 (explaining that the
Trustee can assert a senior claim and lien upon all property or
funds held or collected by the Trustee).)

Based on the clear language of the Indenture, Aristocrat
satisfied its obligation with respect to interest coupon
payments by making those payments to the Trustee, who deposited
the payments with the Court.[20]  The fact that the Trustee now
asserts a senior claim on the funds deposited with the Court for
the expenses it incurred was specifically contemplated by the
terms of the Indenture and in no way entitles the Bondholders to

---

[20] While not entirely clear from the record, it appears to the Court that
Aristocrat timely made the coupon payments to the Trustee, and therefore no
interest, at the contractual rate of 7.5 percent, accrued before the payments
were made. (See Aristocrat 56.1 ¶ 74 (citing Court Orders dated May 25, 2005,
November 25, 2005, and May 25, 2006, which provide for the Trustee's deposit
of the funds with the Court).)

37

a damage award that includes the interest coupon payments.  This
Court will not grant the Bondholders rights that the Indenture
does not grant. See Metro. Life Ins. Co. v. RJR Nabisco, Inc.,
906 F.2d 884, 889 (2d Cir. 1990) (explaining that, like in all
breach of contract cases, when a court is determining the
parties' rights under an unambiguous Indenture, the Court cannot
alter the terms of the agreement or allow them to be violated or
disregarded); Broad v. Rockwell Int'l Corp., 642 F.2d 929, 947
(5th Cir. 1981) (interpreting an indenture pursuant to New York
law and stating that "[a] court may not rewrite a term of [the
Indenture] by 'intrepretion' when that term is clear and
unambiguous on its face," even "to accord with [the Court's]
instinct for the dispensation of equity under the facts of a
case").  Therefore, this Court agrees with Aristocrat that the
Bondholders are not entitled to a damage award for the coupon
interest payments.

### D. In Lieu Of Dividend Payments As Consequential Damages

The Bondholders seek two types of consequential damages
related to hedging of their convertible bonds.  The Court will
first address the Bondholders' contention that their damage
award should include compensation for payments made in lieu of
dividends to the lenders of the Aristocrat shares, which the
Bondholders sold short. (Int. Defs.' Mot. 25; DBAGL Mot. 17.)
The Court finds that the general damages award fully compensates

the Bondholders for any costs associated with in lieu of dividend payments.

The value of the shares on the date of breach takes into account any dividends that would have been paid after the date of breach. See Sharma, 916 F.2d at 826 (explaining that "[m]easuring contract damages by the value of the item at the time of the breach is eminently sensible and actually takes expected lost future profits into account."). Aristocrat's shares, like all securities, trade on the market at certain prices because purchasers expect to earn profits such as dividends. See id. ("The value of assets for which there is a market is the discounted value of the stream of future income that the assets are expected to produce.").

Here, while the Bondholders do not seek actual dividend payments, the Second Circuit's analysis in Sharma is equally applicable to the Bondholders' request for in lieu of dividend payments because in lieu of dividend payments are equal in amount to dividends paid by the stock issuer. (See Int. Defs.' 56.1 ¶ 13.) The Bondholders made in lieu of dividend payments to the lenders in an amount equal to dividends Aristocrat paid on its shares. Thus, an award of the value of Aristocrat shares on the date of breach compensates the Bondholders for the value of Aristocrat dividends, which in turn compensates the Bondholders for any payments made in lieu of dividends to the

39

lender.    To hold otherwise would allow the Bondholders to
recover the value of the dividend payments twice:    once as the
value of Aristocrat's shares on the date of breach, which
includes expected future dividend payments, and a second time in
the form of in lieu of dividend payments.    This Court will not
allow such double recovery.

The concept of double recovery is further illustrated by
the undisputed fact that a convertible bondholder who holds
short positions would typically unwind those positions using the
stock received on conversion. (Int. Defs.' 56.1 ¶ 30.)
Thereafter, that bondholder would no longer own those share, and
thus would not earn any dividends on those shares.    The
Bondholders are essentially asking this Court to compensate them
for in lieu of dividend payments, while allowing them to keep
the value of the dividends that they would never have earned.
Accordingly, the Court concludes that the Bondholders are not
entitled to compensation for in lieu of dividend payments.

## E. Damages For Costs Associated With Closing Short Positions

The Court now turns to the much-contested issue of what
damages, if any, this Court should award the Bondholders for
costs the Bondholders incurred in closing their short positions.
The Court is mindful of the stringent requirements imposed on a
plaintiff seeking an award of consequential damages in a breach

40

of contract dispute, but after considering the parties'
arguments, the Court holds as a matter of law that the
Bondholders can recover consequential damages[21] in the form of
the extra costs incurred when the Bondholders bought shares in
the open market to close the short positions left open by
Aristocrat's refusal to honor the conversion notices.
Therefore, if it cost a Bondholder more to buy the share in the
open market than the value of the share on the date of breach,
that additional cost should be included in that Bondholder's
damage award.  Any recovery of consequential damages, however,
will be reduced if the trier of fact determines that a
Bondholder's course of action with respect to maintaining its
short position became unreasonable at some time after
Aristocrat's breach.

---

[21] The Court notes that these costs must be classified as consequential,
rather than direct damages.  The Court finds guidance in the Second Circuit's
decision in Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc, where the
Second Circuit analyzed whether a claim for lost profits should be considered
general damages or consequential damages. 487 F.3d 89, 109-10 (2d Cir. 2007).
The Second Circuit explained that "[l]ost profits are consequential damages
when, as a result of the breach, the non-breaching party suffers loss of
profits on collateral business arrangements."  Id. at 109; see also
Czarnikow-Rionda Co. v. Fed. Sugar Refining Co., 255 N.Y. 33, 173 N.E. 913
(N.Y. 1930) (analyzing whether plaintiff was entitled to consequential
damages for losses purportedly incurred when plaintiff could not satisfy its
obligations to its customers because of defendant's breach).  By contrast,
the Second Circuit explained that "when the non-breaching party seeks only to
recover money that the breaching party agreed to pay under the contract, the
damages sought are general damages." Tractebel, 487 F.3d at 109.  Here, the
Bondholders incurred costs because of their collateral arrangements to short
sell the shares underlying their convertible bonds.  While the Court finds
that those damages are foreseeable and directly caused by Aristocrat's
breach, they are collateral to the direct breach of the Indenture.  As such,
they are properly considered consequential damages.

41

## 1. Consequential Damages Are Available As a Matter of Law

In order for a breaching party to be held liable for damages beyond general damages, the Court must determine whether those damages were in the contemplation of the parties at the time or prior to contracting. Kenford, 73 N.Y.2d at 319, 537 N.E. 2d at 178; see Spang Indus., Inc. v. Aetna Cas. & Sur. Co., 512 F.2d 365, 368 (2d Cir. 1975) ("If the damages suffered do not usually flow from the breach, then it must be established that the special circumstances giving rise to them should reasonably have been anticipated at the time the contract was made."). The Court looks to "the reasonable contemplation of the parties, the nature, purpose and particular circumstances of the contract known by the parties . . . . as well as what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made." Kenford, 73 N.Y.2d at 319, 537 N.E.2d at 179 (internal citations and quotations omitted).

Aristocrat argues, and provides extensive evidence in support of its position, that it hoped to place the bonds with long-term holders and not with hedge funds or other traders. (See Bush Decl. ¶¶ 6-7; Bush Dep. 118-25, 138, 229, Nov. 30, 2006; Isaacs Dep. 12, 109-10, Dec. 15, 2006; Jenkins Dep. 280-

42

81, 311-12, 343-44, Oct. 19, 2006; Jeyaraj Dep. 38-41, 85-88, Nov. 12, 2006; Randall Dep. 46-49, Nov. 13, 2006.)  Viewing this evidence in the light most favorable to Aristocrat, the Court finds that the evidence demonstrates Aristocrat's preference for long-term investors who would hold the convertible bonds rather than hedging their positions, but the evidence does not demonstrate that hedge funds or other funds that might engage in short selling were precluded from buying and selling the convertible bonds, both as original investors or in the secondary market.

It is undisputed, and in fact Aristocrat concedes, that Aristocrat understood that "certain purchasers" of convertible bonds engage in short selling as a means of hedging their position. (Aristocrat's Counter 56.1 ¶ 12.)  Despite this knowledge, Aristocrat knowingly issued convertible bonds without including any restrictions in the Indenture as to the Bondholders' ability to sell the underlying shares, or restrictions as to sales of the convertible bonds in the secondary market. (See Jeyaraj Dep. 39:21-40:6, Nov. 12, 2006 (acknowledging that Aristocrat could not keep potential bondholders from selling the bonds); Jenkins Dep. 343:6-344:1, Oct. 19, 2006 (acknowledging the need to have some liquidity in the secondary market.).)  It follows that at the time Aristocrat entered the Indenture, it understood that at least some of the

43

Bondholders, as initial or as secondary purchasers of the convertible bonds, would sell short, and a failure to deliver shares upon conversion would leave those Bondholders with an open short position. When Aristocrat entered the Indenture it understood that if Aristocrat failed to deliver shares upon conversion it would be obligated to compensate the Bondholders for the value of the shares on the date of breach. Likewise, given the "nature, purpose, and particular circumstances of the contract," Kenford, 73 N.Y.2d at 319, 537 N.E.2d at 179, Aristocrat must have understood that by entering the Indenture it assumed liability for the costs of closing out short positions for failing to deliver shares. See Spang Indus., 512 F.2d at 369 (explaining that because parties to a contract focus on the contract's performance and not its breach, the breaching party is held liable for the damages "which both parties to the contract would have contemplated as flowing from its breach, if at the time they entered into it they had bestowed proper attention upon the subject." (internal citations omitted)).[22]

---

[22] The Court is not persuaded that Czarnikow-Rionda, 255 N.Y. 33, 173 N.E. 913, requires a different result. (Aristocrat Mot. 20 (citing Czarnikow-Rionda for the proposition that it is not foreseeable that the buyer of marketable goods would not cover in the market in the event of non-delivery by the seller).) Unlike in Czarnikow-Rionda where the issue was whether the non-breaching party was entitled to damages incurred on a subsequent contract when the non-breaching party failed to cover, here the question is whether the Bondholders are entitled to damages for the additional costs incurred in covering their short positions. Aristocrat's contention that the Bondholders unreasonably held open their short positions after Aristocrat's breach is relevant to the scope of damages the Bondholders can collect, which will be resolved at trial.

44

Even assuming Aristocrat instructed the underwriter[23] not to
issue the convertible bonds to any entity that might sell short,
those entities that did purchase the convertible bonds
"reasonably [would] suppose that [Aristocrat] assumed" liability
for damages associated with closing short positions if
Aristocrat failed to deliver the shares. See Kenford, 73 N.Y.2d
at 319, 537 N.E.2d at 179. Purchasers of convertible bonds
would reasonably assume that the issuer of convertible bonds
knew, understood, and accepted that many purchasers would engage
in the common practice of short selling the underlying shares.
Purchasers of convertible bonds would also reasonably assume
that the issuer of convertible bonds knew, understood, and
accepted that if it did not deliver shares upon conversion at
least some bondholders would be left with an open short
position. Therefore, a Bondholder who purchased the Aristocrat
convertible bonds pursuant to the Indenture would reasonably
suppose that by entering the Indenture without limiting the
right to hedge or to sell in the secondary market, Aristocrat

---

[23] The underwriter is not a party to this action, nor a party to the
Indenture. This Court will not impute knowledge to the Bondholders based
upon Aristocrat's allegations that the underwriter knew Aristocrat's
preference for not selling bonds to hedge funds or to funds that would short
sell. The question of consequential damages looks solely to the knowledge
and intent of parties to the contract at the time of contracting.

assumed liability for the cost to cover an open short if it breached its contractual obligation to convert bonds to shares.[24]

The Court notes that the issue of consequential damages often arises in cases where a plaintiff is claiming lost profits due to a defendant's breach of contract. See, e.g., Travellers Int'l, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1577-80 (2d Cir. 1994); Trademark Research Corp. v. Maxwell Online, Inc., 995 F.2d 326, 332-34 (2d Cir. 1993); Lava Trading Inc., v. Harford Fire Ins. Co., 365 F. Supp. 2d 434, 445-48 (S.D.N.Y. 2005). While the standard used to determine if a plaintiff is entitled to lost profits is equally applicable to a plaintiff seeking consequential damages other than lost profits, as is the case here, this Court agrees with the Bondholders that "it is easier to conclude that the parties contemplated assumption of the risk of actual loss flowing from breach than it is to

---

[24] Aristocrat offers the conclusory statement of Frank Bush, an Aristocrat executive between April 1999 and July 2004 (see Bush. Decl. ¶ 1), that "Aristocrat did not agree to assume responsibility for, and did not understand itself to be agreeing to assume responsibility for, hedging transactions that might be entered into by purchasers of the convertible bonds in the event that Aristocrat breached the Indenture by refusing to deliver shares." (Id. ¶ 7.) This declaration, without citing any admissible evidence, fails to create a question of material fact, and it will not defeat summary judgment. See Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 ("[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." (citing Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969))); United Magazine Co. v. Murdoch Magazines Distrib., Inc., 393 F. Supp. 2d 199, 211 (S.D.N.Y. 2005)("As the Supreme Court has held, a self-serving affidavit that merely reiterates conclusory allegations in affidavit form is insufficient to preclude summary judgment." (citing Lujan v. Nat'l Wildlife Found., 497 U.S. 871, 888-90 (1990))). Mr. Bush's statement cannot overcome the fact that the evidence merely shows Aristocrat's preference for long-term holders, not that Aristocrat limited its potential liability if hedging transactions occurred.

46

conclude that they contemplated the assumption of the risk of
the absence of hoped-for gain flowing from breach." (Int. Defs.'
Opp'n 10.)   Further, a plaintiff seeking lost profits is faced
with the difficult burden of demonstrating with some certainty
that it actually would have earned the profits it now claims.
See Travellers, 41 F.3d at 1579 ("Any calculation of damages
based on lost profits always entails a degree of uncertainty
caused by the need to rely on assumptions and estimates.");
Trademark, 995 F.2d at 333 (holding that plaintiff's claims for
lost profits lacked the requisite certainty as the damages were
based upon speculation, extrapolation of years of profits from
several months of actual profits, and plaintiff's hope that its
market share would increase).   By contrast, in the instant case,
the Court is not faced with statistical data based upon
assumptions and extrapolations, but exact figures as to costs
actually incurred by the Bondholders who bought shares in the
open market in light of Aristocrat's breach of contract.

     The Court is, however, concerned with the speculative
nature of consequential damages for those Bondholders that did
not yet close out their short positions.   It is unclear how the
Court could award Bondholders an unascertained amount of funds
to cover the costs that may or may not be incurred whenever the
remaining Bondholders with short positions close out those
positions.   Because the Court believes that the issue of the

47

reasonableness of the Bondholders' decisions with respect to

holding open short positions must be presented to a jury, the

Court will defer its ruling on the appropriateness of damages

for those Bondholders with open positions until after the trier

of fact resolves the reasonableness of such Bondholders' open

short positions.

Finally, the Court must address Aristocrat's argument that

the Bondholders' decisions to hold open their short positions

were intervening acts that broke the chain of causation.

(Aristocrat Mot. 16-17.)[25]   It is well-established that a

plaintiff is only entitled to consequential damages if those

damages are "reasonably certain and directly traceable to the

breach, not remote or the result of other intervening causes."

---

[25] In support of this argument, Aristocrat relies on TD Warehouse Investor
Servs. v. Integrated Fund Servs., Inc., No. 01 Civ. 8986, 2005 U.S. Dist.
LEXIS 5 (S.D.N.Y. Jan. 3, 2005), aff'd by Nat'l Investor Servs. Corp. v.
Integrated Fund Servs., Inc., 145 F. App'x 696 (2d Cir. 2005).   At the
outset, the Court notes that the issues posed in TD Warehouse were resolved
after a bench trial, and after the district court held additional evidentiary
hearings to make credibility assessments of the factual arguments raised, and
not at the summary judgment phase of the litigation. See 2005 U.S. Dist.
LEXIS 5, at *1-2.   In addition, the factual circumstances in TD Warehouse are
distinguishable from those at issue in the case at bar.   The breach of
contract in TD Warehouse arose when an accounting firm failed to accurately
record $3.8 million in revenue. Id. at *3.   Thereafter, plaintiffs waived
approximately $1.5 million in fees, believing that it appeared that their
fund was underperforming, when in fact, defendant had not accurately recorded
the fund's performance. Id.   The district court concluded that plaintiffs'
failure to recoup or attempt to recoup the unnecessarily waived fees after
learning of the accounting error constituted an intervening act that
prevented plaintiffs from recovering the waived fees. Id. at *20-21.   By
contrast, in this case, Aristocrat's refusal to deliver shares to the
converting Bondholders damaged the Bondholders by leaving them with open
short positions.   Aristocrat concedes that the Bondholders would incur costs
in obtaining securities in the open market. (Aristocrat 56.1 ¶ 77.)   Thus,
despite characterizing its argument as one of causation, the essence of
Aristocrat's argument is that the Bondholders allowed these damages to
increase, which is a question of mitigation.

48

Travellers, 41 F.3d at 1577 (citing Kenford Co. v. County of
Erie, 67 N.Y.2d 257, 493 N.E.2d 234, 235 (N.Y. 1986) (per
curiam)). Here, this Court finds that the costs the Bondholders
incurred in covering their short positions are directly
traceable to Aristocrat's failure to deliver shares. It is
undisputed that the Bondholders hedged their positions and held
short positions before Aristocrat breached the Indenture.
(Aristocrat 56.1 ¶ 76.) Therefore, by failing to deliver the
shares, Aristocrat left those Bondholders with open short
positions, which could only be closed if the Bondholders bought
shares in the market. Accordingly, the costs incurred in buying
the shares to close out the short positions are directly
attributable to Aristocrat's decision not to deliver the shares
to the Bondholders upon conversion. Nonetheless, the Court
agrees that the Bondholders' decision to hold open their short
positions is relevant to, and possibly dispositive of, the
damages the Bondholders should be awarded for unwinding the
short positions. This question, however, is not one of
causation, since Aristocrat's breach obviously caused the
Bondholders to buy shares in the market. Rather, the question
is whether the Bondholders waited too long to purchase those
shares, thereby increasing, or at a minimum not mitigating,
their damages.

## 2. Mitigation of Damages

As described above, the Bondholders are entitled to general and consequential damages as a matter of law. The Bondholders will not, however, recover damages that were avoidable.[26]  "New York's courts adhere to the universally accepted principle that a harmed plaintiff must mitigate damages." Air Et Chaleur, S.A. v. Janeway, 757 F.2d 489, 494 (2d Cir. 1985); see Wechsler v. Hunt Health Sys., Ltd., 330 F. Supp. 2d 383, 427 (S.D.N.Y. 2004) (Leisure, J.) ("Under New York law, an injured party cannot recover damages for a loss that it could have avoided by reasonable efforts."); Morgan Stanley High Yield Sec., Inc. v. Seven Circle Gaming Corp., 269 F. Supp. 2d 206, 222 (S.D.N.Y. 2003) ("'It has long been the rule in New York that where there has been a breach of contract, the party who suffers damage by reason of the breach has a duty to minimize the damages and any award of damages should be reduced by any unnecessary increase in damages due to the failure of the plaintiff to avoid them.'" (internal citations)).  It is the breaching party's burden to prove that a plaintiff could have lessened its damages. Air Et Chaleur, 757 F.2d at 494.  More specifically, the breaching

---

[26] The Court rejects the Bondholders' position that the theory of mitigation is not applicable to this matter (Int. Defs.' Mot. 23.)  The Bondholders argue that if they purchased the shares in the market to cover their short positions, and thereafter the share prices decreased, the Bondholders would have increased rather than decreased their damages.  Rather than demonstrating that the theory of mitigation does not apply to this dispute, the Court finds that this argument is relevant to whether the Bondholders' damages should be reduced by the mitigation doctrine, which is to be resolved by the trier of fact.

party must show that the plaintiff <u>unreasonably</u> failed to

minimize damages. <u>Fed. Ins. Co. v. Sabine Towing & Transp. Co.,</u>

<u>Inc.</u>, 784 F.2d 347, 350 (2d Cir. 1986). "However, if the course

of action chosen by the plaintiff was reasonable, the plaintiff

can recover despite the existence of another reasonable course

of action that would have avoided further damage." <u>Id.</u>

(explaining that the issue is not whether plaintiff chose the

path most likely to prevent future damage, but whether

plaintiff's decision was reasonable under the circumstances).[27]

Despite these well-established principles, their

application to the instant action is quite complex in light of

the fact that each Bondholder adhered to a different course of

action with respect to its short positions. (<u>See generally</u>

Aristocrat 56.1 ¶¶ 79-242; Jones Report.)  Moreover, the

question as to what was a reasonable course of action for a

Bondholder faced with Aristocrat's breach, is further

complicated by the extensive testimony that the Bondholders

---

[27] Aristocrat argues that because the Bondholders cannot satisfy the
reasonableness standard, the Bondholders try to shift the burden by asserting
that Aristocrat must prove that their decision to pursue specific performance
was "palpably erroneous." (Aristocrat Opp'n 30.)  While Aristocrat is correct
that the "palpably erroneous" standard applies when a defendant seeks to
prove that a plaintiff failed to mitigate damages by adhering to a course of
action that was initially proper but became unreasonable (<u>see id.</u> (citing
<u>Fed. Ins.</u>, 783 F.2d at 350 and <u>Ellerman Lines Ltd. v. The S.S. President</u>
<u>Harding</u>, 288 F.2d 288, 290 (2d Cir. 1961))), any indication that the
Bondholders are improperly shifting the burden to Aristocrat is without
merit.  Regardless of whether Aristocrat argues that the Bondholders'
decision to seek specific performance was always unreasonable, or later
became unreasonable, it is always Aristocrat's burden to prove that the
Bondholders failed to mitigate damages.

51

believed that Aristocrat's refusal to issue shares was unprecedented in the convertible bond market. (See, e.g., Carter Dep. 46-47, Oct. 24, 2006; Corry Dep. 161-62, Oct 24, 2006; Green Dep. 76-77, Dec. 1, 2006; Lally Dep. 158, Oct. 25, 2006; Preston Dep. 62-63, Oct, 28, 2006; see also Jones Report at 10.) As such, there is no clear, established market practice applicable to this particular set of circumstances that would allow the Court to determine the question of reasonableness as a matter of law.[28]

Aristocrat asks this Court to find that by failing to purchase shares to cover their short positions, all of the Bondholders' actions with respect to holding open their short positions, regardless of their specific course of action, were unreasonable as a matter of law. (Aristocrat Mot. 21.) Specifically, Aristocrat asserts that the Bondholders' decisions to hold open their short positions after Aristocrat's December

---

[28] The Court considered the evidence submitted regarding a "buy-in," where a purchaser of a stock would buy that stock in the market, through a third party, if the seller did not deliver and the purchaser had sold that share to another purchaser. (See Calvy Dep. 177, Oct. 17, 2006; Fuchs Dep. 92, Nov. 22, 2006; Iosilevich Dep. 67-68, Nov. 3, 2006; Corry Dep. 231, Oct. 24, 2006; Preston Dep. 134-36, Oct. 28, 2006.)  While this evidence might be useful to a trier of fact in determining whether the Bondholders' decisions to not purchase the shares were reasonable, there is no evidence that the "buy-in" process was ever used in connection with convertible bonds. (See Iosilevich Dep. 67, Nov. 3, 2006; Jones Dep. 129-30, Jan. 15, 2007.)  Therefore, the proffered evidence does not demonstrate to this Court that using a "buy-in" was the only reasonable course of action under the circumstances.

52

20, 2004 statement[29] that Aristocrat did not intend to convert
the bonds was based exclusively on the Bondholders' faulty
position that they were was entitled to specific performance.
(Aristocrat Mot. 17-18, 20.)  Conversely, the Bondholders ask
this Court to find that all of their different investment
strategies were reasonable as a matter of law.  In particular,
the Bondholders' contend that (i) keeping open the short
positions maintained the Bondholders' market-neutral positions,
whereas closing the positions would have increased their market
risks, (ii) Aristocrat's argument relies on the false
supposition that the Bondholders knew the future trend of
Aristocrat's stock price, and (iii) the Bondholders' decisions
were based upon their reasonable assessments of market
conditions and market risks.[30] (See Int. Defs.' Mot. 23-25; DBAGL
Mot. 19-21.)  The Court holds that these competing
interpretations of reasonable action must be left for the trier
of fact, and therefore the Court denies summary judgment on the
mitigation issue.

---

[29]  Since the Court rejects December 20, 2004 as the date of breach, the Court
similarly holds that the duty to mitigate damages did not attach on that
date.  Rather, the Bondholders were required to take reasonable steps to
minimize their damages after the Conversion Date.
[30] The Bondholders' proffered expert report supports this Court's
determination that this issue cannot be disposed of on summary judgment.
Throughout his report, Dr. Jones concludes that a Bondholder's actions were
reasonable if that Bondholder had certain beliefs as to the outcome of this
litigation, or assessments of risk. (See, e.g., Jones Report at 10-13.)  This
Court cannot determine as a matter of law that the Bondholders' positions
were reasonable based upon assumptions as to those Bondholders' subjective
beliefs.

Even though the Court cannot dispose of the mitigation issue as a matter of law, there are several legal principles raised in the parties' motion papers that deserve discussion. First, the Court finds that Aristocrat misconstrues the mitigation of damages analysis when it contends that the Bondholders' course of action was unreasonable because "the Bondholders have conceded in depositions, [that] they would have been made whole if they had closed out their short positions and pursued damages in the amount of the cost of cover." (Aristocrat Opp'n 29.)   In the testimony upon which Aristocrat relies, the deponents are asked to assume that the Bondholders knew they were never getting shares and that they would get monetary damages for the breach, (see, e.g., Green Dep. 265-67, Dec. 1, 2006; Iosilevich Dep. 173, Nov. 3, 2006; Solomon Dep. 77-81, 84-85, Dec. 2, 2006), facts which were not known when the Bondholders actually made their decisions.   The case law makes clear that the appropriate inquiry is whether the Bondholders' decisions were reasonable in light of circumstances when they made their decisions. See Carlisle Ventures, Inc. v. Banco Espanol de Credito, S.A., 176 F.3d 601, 609 (2d Cir. 1999) ("The fact that in retrospect a reasonable alternative course of action is shown to have been feasible is not proof of the fact that the course actually pursued by the plaintiff was unreasonable." (internal citations and quotations omitted));

Fisher v. First Stamford Bank & Trust Co., 751 F.2d 519, 524 (2d
Cir. 1984) ("Hindsight may not serve as a basis to decrease
damages plaintiff is otherwise entitled to recover."); Matushita
Elec. Corp. of Am. v. Gottlieb, No. 90 Civ. 3010, 1991 U.S.
Dist. LEXIS 10511, at *27 (S.D.N.Y. Aug. 1, 1991) ("Proof of
mitigation of damages requires only a showing that plaintiff
took reasonable steps to cut its losses, not that plaintiff did
what the defaulting defendants would have had it do, or what in
hindsight seems most effective to reduce the defaulting
defendants' damages."). As such, Aristocrat's proposed
backward-looking analysis does not satisfy its burden on the
mitigation issue.

Further, the Court deems it necessary to address what
expenses a plaintiff can be expected to incur in mitigating its
damages. As just described, the crux of any mitigation analysis
is the reasonableness of a plaintiff's actions. The question,
therefore, is not whether a proposed course of action is an
extra burden on a plaintiff, (see DBAGL Mot. 20), but whether
that burden is unreasonable. See, e.g., Korea Life Ins. Co.,
Ltd. v. Morgan Guar. Trust Co. of N.Y., No. 99 Civ. 12175, 2004
U.S. Dist. LEXIS 16436, at *25-26 (S.D.N.Y. Aug. 20, 2004)
(holding that plaintiff did not fail to mitigate damages where
the transactions defendant suggests would not have been
financially reasonable and a plaintiff does not have an

obligation to go beyond reasonable steps to mitigate damages);
Carrols Equities Corp. v. Villanave, 57 A.D.2d 1044, 1045, 395
N.Y.S.2d 800, 803 (4th Dep't 1977) (duty to mitigate does not
include an obligation to undertake extraordinary and costly
measures).

The parties also dispute how the Bondholders' decision to
pursue specific performance impacts the mitigation issue.  This
Court is not persuaded that seeking specific performance is
inherently unreasonable.  Neither the parties nor this Court
have found any case law that suggests that a chosen litigation
strategy is unreasonable because that argument fails.  Even
though the Court rejected and now reiterates its denial of
specific performance, the Court does not believe that this
decision is dispositive of whether the Bondholders reasonably
mitigated their damages.  Rather, in resolving the mitigation
issue, the trier of fact should consider all of the evidence
related to the Bondholders' strategies with respect to their
short positions after Aristocrat's breach, including how a
Bondholder determined the hedge ratio it was to maintain, why a
Bondholder changed its hedge ratio after the breach, what role a
Bondholder's investors had in its hedging strategy, and what
impact a Bondholder's accounting practices had on its hedging
strategy.

Having considered the relevant case law on the issue of
mitigating damages, and having reviewed the extensive record
submitted in connection with these motions for summary judgment,
the Court is compelled to leave the various factual disputes as
to the reasonableness of the Bondholders' actions to a trier of
fact. See, e.g., Morgan Stanley High Yield Sec., 269 F. Supp. 2d
at 222-23 (denying summary judgment on the issue of mitigation
where defendant argued that after its breach plaintiffs could
have mitigated by selling the Notes and Warrants at issue, while
plaintiffs argued that selling the Notes and Warrants would have
been impracticable in light of the nature of the high-yield debt
market and prevailing market conditions); Van Syckle v. C.L.
King & Assocs., Inc., 822 F. Supp. 98, 103 (N.D.N.Y. 1993)
(denying summary judgment where there were questions of fact as
to whether plaintiffs acted reasonably under the circumstances
when they failed to cancel the stock trades at issue and failed
to sell the stocks that plaintiff alleged were improperly
purchased).[31]

---

[31] Contrary to Aristocrat's argument, this Court is not persuaded that
Drummond v. Morgan Stanley & Co. Inc., 95 Civ. 2011, 1996 U.S. Dist. LEXIS
16137 (Oct. 30, 1996), is illustrative of the analysis required in the case
at bar. (See Aristocrat Mot. 21. (citing id. at *5 ("A plaintiff who chooses
not to mitigate damages but who instead declines other offers to purchase the
securities in effect makes a new investment decision as to which he or she
must suffer the consequences.").)  Unlike in Drummond, where the plaintiff
rejected several bids to purchase the bonds at issue after the defendant
breached the contract, Drummond, 1996 U.S. Dist. LEXIS 16137, at *5-6, here
the relevant investment decision to hedge the convertible bonds were made
before Aristocrat's breach.

## F. Prejudgment Interest

The final issue that this Court must address in resolving
these motions for summary judgment on damages is the issue of
what prejudgment interest the Bondholders should be awarded to
make them whole for their injuries. Under New York law,
"prejudgment interest is normally recoverable as a matter of
right in an action at law for breach of contract." Graham v.
James, 144 F.3d 229, 239 (2d Cir. 1998) (internal citations
omitted). This Court already held that the statutory interest
rate of nine percent, pursuant to sections 5001 and 5004 of the
New York Civil Practice Law and Rules, applies to damages
stemming from Aristocrat's breach. Aristocrat Leisure, 2006 U.S.
Dist. LEXIS at *51-52. As such, the Bondholders are entitled to
statutory interest of nine percent on the value of the shares on
the Conversion Date, and for any consequential damages
ultimately awarded for the costs associated with covering their
short positions.

The parties dispute what interest, if any, should be
awarded for principal payments. The Court has previously
analyzed section 4.03 of the Indenture and determined that the
interest rate of 7.5 percent per annum is applicable for
defaults on payments of interest or principal under the
Indenture. Id. at *50. This Court holds that the Bondholders
are entitled to prejudgment interest for the principal amounts

at the 7.5 percent interest rate from May 31, 2006 through the date each Bondholder signed a Receipt and Release Agreement.

Pursuant to N.Y. C.P.L.R. § 3219, the accrual of prejudgment interest is halted if a defendant deposits with the clerk of court a sufficient sum of money to settle the disputed claim.[32]  Here, Aristocrat does not contend that it deposited such funds, but rather that it made a no prejudice offer to the Bondholders to pay them the principal before it came due on May 31, 2006. (Aristocrat 56.1 ¶ 243.)  Viewing the evidence in the light most favorable to Aristocrat, Aristocrat's offer (see Allen Decl. Ex. 68) was not an unconditional tender within the context of prejudgment interest analysis, since, at a minimum, Aristocrat expected the Bondholders to relinquish any further right to claim principal payments or interest thereon. See Malson Ltd. v. Liberty Mut. Fire Ins., No. 84 Civ. 1717, 1986 U.S. Dist. LEXIS 28663, at *2-3 (S.D.N.Y. Mar. 3, 1986) (explaining that a tender not deposited with a court must be free from all conditions and "[a]n amount conditioned on settlement of a dispute does not satisfy this requirement"); Tanger v. Ferrer, 49 A.D.3d 286, 286, 853 N.Y.S.2d 316, 317 (1st

---

[32] N.Y. CPLR § 3219 provides in relevant part: "At any time not later than ten days before trial, any party against whom a cause of action based upon contract, expressed or implied, as asserted, and against whom a separate judgment may be taken, may, without court order, deposit with the clerk of the court for safekeeping, an amount deemed by him to be sufficient to satisfy the claim asserted against him, and serve upon the claimant a written tender of payment to satisfy such claim. . . . If the tender is not accepted and the claimant fails to obtain a more favorable judgment, he shall not recover interest or costs from the time of the offer."

Dep't 2008) (holding that defendants failed to effectively
employ a CPLR 3219 tender where defendants included a
"reservation of rights" in the tender notice); Cohen v.
Transcontinental Ins. Co., 262 A.D.2d 189, 190-91, 693 N.Y.S.2d
529, 531 (1st Dep't 1999) (holding that requiring plaintiff to
sign a satisfaction of judgment and offering a check marked
"full & final settlement all claims" were conditioned tenders
that did not stop the accrual of interest).  As such, each
Bondholder is entitled to prejudgment interest, calculated at
7.5 percent per annum, from May 31, 2006 until the date it
executed the Receipt and Release Agreement.

## **CONCLUSION**

For the foregoing reasons, Aristocrat's motion for summary judgment is GRANTED IN PART and DENIED IN PART.  Similarly, the Intervening Defendants' and DBAGL's motions for summary judgment are GRANTED IN PART and DENIED IN PART.  Because there are genuine issues of material fact as to the reasonableness of the Bondholders' decisions to hold open their short positions after Aristocrat's breach, the Court cannot dispose of the issue of mitigation of damages, nor determine the scope of available consequential damages.  These issues must be determined by the trier of fact.  The parties are ordered to appear before this Court for a pre-trial conference in courtroom 18B on May 26, 2009, at 11:00 a.m.

**SO ORDERED.**
**New York, New York**

April $\underline{27}^{th}$, 2009

Peter K. Leisure

U.S.D.J.

61

Copies of this Opinion and Order have been e-mailed to:

Mark C. Hansen, Esq.
Kellogg, Huber, Hansen, Todd, Evans, & Figel, PLLC.
1615 M Street, N.W., Suite 400
Washington, D.C.   20036

Charles S. Gilman, Esq.
Cahill Gordon & Reindel LLP
80 Pine Street
New York, New York 10005

Evan A. Davis, Esq.
Cleary Gottlieb Steen & Hamilton L.L.P
One Liberty Plaza
New York, New York 10006

James I. McClammy, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017