UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



ARISTOCRAT LEISURE LIMITED,

          Plaintiff,

 - against -

DEUTSCHE BANK TRUST COMPANY
AMERICAS, as Trustee,

          Defendant,

KBC FINANCIAL PRODUCTS UK LTD,
KBC INVESTMENTS HONG KONG LTD,
KBC ALPHA MASTER FUND SPC KBC
CONVERTIBLE ARBITRAGE FUND,KBC
ALPHA MASTER FUND SPC KBC
CONVERTIBLE OPPORTUNITIES
FUND, KBC ALPHA MASTER FUND
SPC KBC MULTI-STRATEGY
ARBITRAGE FUND, KBC
CONVERTIBLES MAC 28
LIMITED, MELODY IAM LIMITED,
AMARANTH LLC,
ALEXANDRA GLOBAL MASTER FUND,
LTD., UFJ INTERNATIONAL PLC,
DEEPHAVEN INTERNATIONAL
CONVERTIBLE TRADING, LTD.,
CALAMOS ADVISORS LLC ON BEHALF
OF CALAMOS GROWTH AND INCOME
FUND, CALAMOS GLOBAL GROWTH
AND INCOME FUND AND CERTAIN
OTHER INSTITUTIONAL CLIENTS,
CQS CONVERTIBLE AND
QUANTITATIVE STRATEGIES
MASTER FUND LTD., D.E. SHAW
INVESTMENT GROUP, LLC, D.E.
SHAW VALENCE INTERNATIONAL,
INC, QVT FUND LP, LEHMAN
BROTHERS INTERNATIONAL
(EUROPE), DEUTSCHE BANK AG,
LONDON BRANCH,

        Intervening Defendants.

**OPINION AND ORDER**

04 Civ. 10014  (PKL)

**APPEARANCES**

KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, PLLC
Mark C. Hansen, Esq.
Michael K. Kellogg, Esq.
Rebecca A. Beynon, Esq.
1615 M Street, N.W., Suite 400
Washington, D.C.  20036

Attorneys for Plaintiff


CAHILL GORDON & REINDEL LLP
Charles A. Gilman, Esq.
80 Pine Street
New York, NY 10005
Attorney for Defendant Deutsche Bank Trust Company Americas


CLEARY GOTTLIEB STEEN & HAMILTON LLP
Evan A. Davis, Esq.
One Liberty Plaza
New York, New York 10006

Attorney for Intervening Defendants, other than Deutsche Bank
AG, London Branch


DAVIS POLK & WARDWELL LLP
James I. McClammy, Esq.
450 Lexington Avenue
New York, New York 10017

Attorneys for Intervening Defendant, Deutsche Bank AG, London
Branch

**Table of Contents**

BACKGROUND

DISCUSSION

I. Aristocrat's Rule 50(b) Motion for Judgment as a Matter of Law
and Alternative Rule 59 Motion for a New Trial

   A. Motion for Judgment as a Matter of Law

      1. Legal Standard Under Rule 50(b)

      2. Sufficiency of the Evidence

   B. Motion for a New Trial

      1. Legal Standard Under Rule 59

      2. Advice of Counsel

         a. Applicable Law

         b. Aristocrat's Arguments

         c. Bondholders' Arguments

         d. Analysis

      3. Jury Instructions

         a. Aristocrat's Argument

         b. Analysis

      4. Special Verdict Form

II. Bondholders' Motion to Enter Partial Judgment Under Rule
54(b)

   A. Final Judgment Is Appropriate

      1. Legal Standard Under Rule 54(b)

      2. Analysis

   B. Judgment Calculations

      1. Bondholders' Proposed Judgments Shall Be Offset By Gains
On Short Positions

    a. $16,834,376 Offset to Judgments of QVT, Lehman, and DBAGL

    b. $1,093,358 Offset to Judgments of Deephaven, KBC FP, and four KBC AIM funds—ARB, MAC 28, Multi, and OPPS

2. Pre-Judgment Interest

    a. Pre-Judgment Interest Rate of 7.5% Applies to Principal Payments From May 31, 2006, Through the Date that Each Bondholder Signed a Receipt and Release Agreement

    b. Pre-Judgment Interest Rate of 9% Applies to General Damages As of Each Bondholder's Conversion Date

3. Coupon Payments on Deposit With the Court

4. Post-Judgment Interest

5. Judgments for Non-Parties

CONCLUSION

**LEISURE, District Judge:**

Plaintiff, Aristocrat Leisure Ltd. ("Aristocrat") moves post-trial for an order granting judgment as a matter of law pursuant to Federal Rule of Civil Procedure ("Rule") 50(b) or, alternatively, for a new trial pursuant to Rule 59. Aristocrat contends that, pursuant to Rule 50(b), no reasonable jury could arrive at a verdict in favor of the intervening defendant Bondholders based on the evidence presented at trial. Alternatively, Aristocrat argues that the Court should order a new trial pursuant to Rule 59 because Bondholders improperly put at issue their counsel's legal advice without the Court finding waiver of privilege and because the jury instructions and special verdict form were erroneous and prejudicial.

Bondholders move post-trial for an order directing the Clerk of Court to enter partial judgment pursuant to Rule 54(b) on Bondholders' counterclaims for counter-declaratory relief with respect to the meaning of the Indenture and for breach of contract. Aristocrat opposes Bondholders' motion for entry of partial judgment on the grounds that the Court should enter final, rather than partial, judgment and that Bondholders' proposed judgments conflict with the law and overstate damages by approximately $60 million.

The defendant Trustee moves post-trial asking the Court to declare Aristocrat in breach of its obligations under the

5

Indenture to deliver shares to five non-party bondholders and to issue final judgments in favor of each non-party bondholder on the same terms as other similarly situated Bondholders.

For the reasons set forth below, Aristocrat's motion for judgment as a matter of law pursuant to Rule 50(b) is DENIED. Aristocrat's alternative motion for a new trial pursuant to Rule 59 also is DENIED. Bondholders' motion for entry of partial judgment pursuant to Rule 54(b) is DENIED. Bondholders' claims for violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 and for breach of the implied covenant of good faith and fair dealing are DISMISSED WITHOUT PREJUDICE. The Trustee's motion to enter final judgment for five Non-Party Bondholders is DENIED, pending the exchange of limited discovery described herein.  The Court directs the parties to submit joint revised proposed final judgments consistent with this Opinion and Order.  Upon receipt of the parties' joint revised proposed final judgments, the Court shall enter final judgment.

The Court makes the following determinations with respect to the calculation of the Bondholders' judgments:  (1) Aristocrat is entitled to an offset for gains realized by DBAGL, Lehman, and QVT upon closing their short positions; (2) Aristocrat is entitled to an offset for interim trading gains realized by Deephaven, KBC FP, and four of the five KBC AIM funds (ARB, MAC 28, Multi, and OPPS); (3) a pre-judgment

interest rate of 7.5% per year applies to the principal payments Aristocrat made to Bondholders under the Receipt and Release Agreements for the period from May 31, 2006 through the date each Bondholder signed a Receipt and Release Agreement; (4) for all Bondholders, whether fully hedged, partially hedged, or unhedged, a pre-judgment interest rate of 9% on general damages shall accrue from each Bondholder's conversion date; (5) Aristocrat is not entitled to an offset for bond interest coupon payments that Aristocrat paid to the Trustee, who paid them into the Court; and (6) post-judgment interest shall be set by the Court pursuant to 28 U.S.C. § 1961(a) upon entry of final judgment.

## BACKGROUND

The Court assumes familiarity with the facts and allegations as stated in the Court's many prior decisions in this action.[1]  Plaintiff Aristocrat, a global gaming machine

---

[1] See Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams., 262 F.R.D. 348 (S.D.N.Y. 2009) (Leisure, J.); Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams., No. 04 Civ. 10014, 2009 WL 3321047 (S.D.N.Y. Oct. 8, 2009) (Leisure, J.); Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams., No. 04 Civ. 10014, 2009 WL 3111766 (S.D.N.Y. Sept. 28, 2009) (Leisure, J.); Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams., 262 F.R.D. 293 (S.D.N.Y. 2009) (Leisure, J.);  Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams., 618 F. Supp. 2d 280 (S.D.N.Y. 2009) (Leisure, J.); Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams., No. 04 Civ. 10014, 2007 U.S. Dist. LEXIS 9521 (S.D.N.Y. Feb. 5, 2007) (Leisure, J.); Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams., No. 04 Civ. 10014, 2007 U.S. Dist. LEXIS 9517 (S.D.N.Y. Feb. 5, 2007) (Leisure, J.); Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams., No. 04 Civ. 10014, 2006 U.S. Dist. LEXIS 80055 (S.D.N.Y. Nov. 2, 2006) (Leisure, J.); Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams., No. 04 Civ. 10014, 2006 U.S. Dist. LEXIS 34709 (S.D.N.Y.

supplier, is incorporated in Australia, with headquarters in

Sydney.  (Compl. ¶ 4.)  Defendant Deutsche Bank Trust Company

Americas ("Trustee"), incorporated in New York with a principal

place of business in New York City, defends this action on

behalf of all convertible bondholders and is an affiliate of one

of the lead underwriters and managers of the bond offer at

issue.  (Id. ¶ 5; see also Aristocrat Leisure Ltd. v. Deutsche

Bank Trust Co. Ams., No. 04 Civ. 10014, 2006 U.S. Dist. LEXIS

34709, at *3 (S.D.N.Y. May 30, 2006) (Leisure, J.).)  The

intervening defendant bondholders ("Bondholders"),[2] who own a

substantial majority of the bonds at issue in this case, are

---

May 30, 2006) (Leisure, J.); Aristocrat Leisure Ltd. v. Deutsche Bank Trust
Co. Ams., 426 F. Supp. 2d 125 (S.D.N.Y.2005) (Leisure, J.); Aristocrat
Leisure Ltd. v. Deutsche Bank Trust Co. Ams., No. 04 Civ. 10014, 2005 U.S.
Dist. LEXIS 16788 (S.D.N.Y. Aug. 12, 2005) (Leisure, J.); Aristocrat Leisure
Ltd. v. Deutsche Bank Trust Co. Ams., No. 04 Civ. 10014, 2005 U.S. Dist.
LEXIS 5378 (S.D.N.Y. Mar. 30, 2005) (Leisure, J.).

[2] Unless noted otherwise, the term "Bondholders" is used in this Opinion and
Order to refer to all purchasers of Aristocrat's convertible bonds.  The term
"Indenture" refers to the May 31, 2001 indenture agreement, pursuant to which
the convertible bonds were issued.
     The intervening defendant Bondholders are Alexandra Global Master Fund,
Ltd. ("Alexandra"), Amaranth LLC ("Amaranth"), Calamos Advisors LLC
("Calamos"), CQS Convertible and Quantitative Strategies Master Fund("CQS"),
D.E. Shaw Investment Group, LLC and D.E. Shaw Valence International, Inc.
(collectively, "D.E. Shaw"), Deephaven International Convertible Trading,
Ltd. ("Deephaven"), KBC Financial Products UK Ltd. ("KBC FP"), KBC
Investments Hong Kong Limited ("KBC HK"), five KBC Alternative Investment
Management Limited ("KBC AIM") funds—KBC Alpha Master Fund spc KBC
Convertible Arbitrage Fund ("ARB"), KBC Convertibles MAC 28 Limited ("MAC
28"), Melody IAM Limited ("Melody"), KBC Alpha Master Fund spc KBC Multi-
Strategy Arbitrage Fund ("Multi"), and KBC Alpha Master Fund spc KBC
Convertible Opportunities Fund ("OPPS")—Lehman Brothers International
(Europe) ("Lehman"), UFJ International Limited ("UFJ"), QVT Fund LP ("QVT"),
and Deutsche Bank AG London Branch ("DBAGL").
     The "Non-Party Bondholders" are Angus Barker, Flushing Enterprises, P.
Van Woerden and M. Van Woerdan-Visser, Sloan Financial Corp., and UBS AG.
Although they are not parties to this action, the Trustee has submitted
proposed final judgments on their behalf.

various corporations organized in the Delaware, Illinois, New York, England, and the Caribbean. See Aristocrat Leisure, 2006 U.S. Dist. LEXIS 34709, at *3; First Am. Answer & Countercl. of Intervening Defs. ("Bondholders' Answer & Countercl.") 2-3.)

This case arises out of Aristocrat's issuance of US$130,000,000 of 5% convertible bonds, due May 2006, to qualified institutional buyers. Aristocrat filed this suit as a declaratory action on December 20, 2004, alleging that but for a scrivener's error, Aristocrat would have been able to redeem the bonds on November 22, 2004, its notice and call would have been effective on December 20, 2004, and Aristocrat would have terminated the Bondholders' right to convert. On March 30, 2005, the Court permitted thirteen[3] Bondholders to intervene as defendants under Rule 24(a), holding that the Trustee could not represent their interests adequately with respect to their counterclaims for counter-declaratory relief and breach of contract because of a risk of "collusion" and "adversity of interest." Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams., No. 04 Civ. 10014, 2005 U.S. Dist. LEXIS 5378, at *12 (S.D.N.Y. Mar. 30, 2005) (Leisure, J.). The next day,

---

[3] Several additional Bondholders have intervened in this action by stipulation or by Order of the Court. See Aristocrat Leisure, 262 F.R.D. at 354 (granting KBC Investments Hong Kong Ltd.'s motion to intervene); Stip. & Order 10/19/06, dkt no. 140 (stipulating to intervention of Deutsche Bank AG, London Branch); Stip. & Order 10/3/06, dkt. no. 136 (stipulating to intervention of Bondholders KBC Convertibles MAC 28 Limited and KBC Melody IAM Limited); Stip. & Order 8/25/06, dkt. no. 125 (stipulating to intervention of Lehman Brothers International (Europe)).

Bondholders filed a First Amended Answer and Counterclaim, answering Aristocrat's complaint and asserting counterclaims for: (1) counter-declaratory judgment, (2) damages for violation of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934, (3) breach of the implied covenant of good faith and fair dealing, (4) declaratory judgment that Aristocrat is liable for any decline in stock price following an event of default, and (5) damages for breach of contract. (Bondholders' Answer & Countercl. ¶¶ 31-46.)

By Opinion and Order dated August 12, 2005, this Court found that Aristocrat's December 20, 2004, communication did not constitute an effective call for redemption, and the Bondholders' conversion rights were not terminated. See Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams., No. 04 Civ. 10014, 2005 U.S. Dist. LEXIS 16788, at *20-22 (S.D.N.Y. Aug. 12, 2005) (Leisure, J.). Subsequently, by Opinion and Order dated May 30, 2006, this Court found that Aristocrat is in breach of the Indenture with respect to each Bondholder who submitted evidence to the Court but denied Bondholders' request for specific performance, holding that monetary damages were sufficient. See Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams., No. 04 Civ. 10014, 2006 U.S. Dist. LEXIS 34709, at *22-23, *47 (S.D.N.Y. May 30, 2006) (Leisure, J.).

On April 27, 2009, the Court resolved the parties' motions
for summary judgment on damages for Aristocrat's breach, holding
that Bondholders are entitled to general damages for
Aristocrat's breach as of the date that each Bondholder
completed the conversion process as defined in the Indenture.
Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams., 618 F.
Supp. 2d 280, 293-94, 299 (S.D.N.Y. 2009).  The Court also
determined that Bondholders who hedged their positions in the
convertible bonds were entitled to consequential damages as a
matter of law in the amount of the difference between the value
of the shares on the date of breach and the value of the shares
when they were purchased in the open market.  Id. at 302-06.
The Court was unable to determine as a matter of law the
reasonableness of Bondholders' decisions to hold open their
short positions after Aristocrat's breach, and left this sole
issue to be determined by a trier of fact.  Id. at 309.
Accordingly, a jury trial commenced on October 5, 2009, where
the sole disputed issue of fact to be resolved was whether
Aristocrat proved its affirmative defense that Bondholders
unreasonably failed to mitigate their consequential damages by
keeping open their short positions in Aristocrat stock after
Aristocrat's breach of the Indenture.

Prior to trial, the Court resolved the parties' in limine
motions, including Aristocrat's motion to prevent the

Bondholders from introducing evidence suggesting that they received advice of counsel in connection with their decisions to hold open short positions.  See Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams., No. 04 Civ. 10014, 2009 WL 3111766, at *13-16 (S.D.N.Y. Sept. 28, 2009) (Leisure, J.). Since Bondholders "represented that they will not argue that they relied on privileged advice rendered by counsel in opposing Aristocrat's claim that their actions were unreasonable," the Court held that Bondholders would not waive privilege by "introducing evidence suggesting that they received advice of counsel in connection with their decisions to hold open short positions." Id. at *16.  But the Court cautioned Bondholders "not to sidestep [its] ruling by imparting to the jury the actual content of the legal advice provided by counsel, or by arguing that an individual Bondholder's actions were reasonable because they relied on an opinion of counsel." Id.  The Court explained that "[a]rguments such as these indeed would put the subject matter of the communication with counsel at issue and would result in a waiver of the privilege." Id.

At trial, Aristocrat argued that by holding open short positions in Aristocrat stock, Bondholders[4] unreasonably failed to mitigate their consequential damages and that, had Bondholders closed these short positions shortly after Aristocrat's breach, Bondholders would not have incurred consequential damages.  Aristocrat also argued that rather than mitigate losses, Bondholders made a bet on the value of Aristocrat's stock going down.  On October 20, 2009, after the close of the evidence, Aristocrat and Bondholders each moved for judgment as a matter of law pursuant to Rule 50(a) and the Court denied both motions.  (Trial Tr. 1630:2-1634:13.)  On October 22, 2009, the jury reached a verdict that Aristocrat did not meet its burden of proving its affirmative defense that the Bondholders seeking consequential damages at trial unreasonably failed to mitigate their consequential damages following Aristocrat's breach of the Indenture.  (See Special Verdict Form, dkt. no. 324, question 1.)

Aristocrat now moves post-trial for an Order granting judgment as a matter of law pursuant to Rule 50(b) or, alternatively, for a new trial pursuant to Rule 59.  Aristocrat

---

[4] Not all Bondholders who held short positions in Aristocrat stock sought consequential damages at trial.  The Bondholders who sought, and were awarded, consequential damages at trial are:  Alexandra, Deephaven, KBC FP, KBC HK, the five KBC AIM funds (ARB, MAC 28, Melody, Multi, and OPPS), and UFJ.  The Bondholders who held a short position in Aristocrat stock but did not seek consequential damages at trial are:  Amaranth, CQS, DBAGL, D.E. Shaw, Lehman, and QVT.  The sole Bondholder who did not hedge is Calamos.  Unless noted otherwise, for ease of reference, the Court uses the general term "Bondholders" throughout this Opinion and Order.

contends that, pursuant to Rule 50(b), no reasonable jury could arrive at a verdict in favor of the Bondholders based on the evidence presented at trial.  Alternatively, Aristocrat argues that the Court should order a new trial pursuant to Rule 59 because Bondholders improperly put at issue their counsel's legal advice without the Court finding waiver of privilege and because the jury instructions and special verdict form were erroneous and prejudicial.

Bondholders move post-trial for an order directing the Clerk of Court to enter partial judgment pursuant to Rule 54(b) on Bondholders' counterclaims for counter-declaratory relief with respect to the meaning of the Indenture and for breach of contract.  Aristocrat opposes Bondholders' motion for entry of partial judgment on the grounds that the Court should enter final, rather than partial, judgment and that Bondholders' proposed judgments conflict with the law and overstate damages by approximately $60 million.

The Trustee moves post-trial asking the Court to declare Aristocrat in breach of its obligations under the Indenture to deliver shares to five non-party bondholders and to issue final judgments in favor of each non-party bondholder on the same terms as other similarly situated Bondholders.

The Court first addresses Aristocrat's motion for judgment as a matter of law under Rule 50(b) and Aristocrat's alternative

14

motion for a new trial pursuant to Rule 59.  Next, the Court
addresses Bondholders' motion to enter partial judgment under
Rule 54(b).  Finally, the Court addresses the Trustee's motion
for declaratory judgment and entry of final judgment with
respect to five non-party bondholders.

## DISCUSSION

## I. Aristocrat's Rule 50(b) Motion for Judgment as a Matter of Law and Alternative Rule 59 Motion for a New Trial

### A. Motion for Judgment as a Matter of Law

Aristocrat moves for judgment as a matter of law pursuant
to Rule 50(b) on the grounds that no reasonable jury could have
arrived at a verdict in favor of Bondholders based on the
evidence presented at trial.  The Court first addresses the
legal standard under Rule 50(b) and then analyzes the
sufficiency of the evidence presented at trial.

#### 1. Legal Standard Under Rule 50(b)

Rule 50(b) provides that "[i]f the court does not grant a
motion for judgment as a matter of law" after a party has been
heard fully at trial, that party "may file a renewed motion for
judgment as a matter of law and may include an alternative or
joint request for a new trial under Rule 59."  Fed. R. Civ. P.
50(b).  The Court may properly grant a motion for judgment as a
matter of law under Rule 50(b) "only if there is 'such a

15

complete absence of evidence supporting the verdict that the
jury's findings could only have been the result of sheer surmise
and conjecture, or such an overwhelming amount of evidence in
favor of the movant that reasonable and fair minded [persons]
could not arrive at a verdict against [the moving party].'"
Stratton v. Dep't for the Aging for the City of N.Y., 132 F.3d
869, 878 (2d Cir. 1997) (quoting LeBlanc-Sternberg v. Fletcher,
67 F.3d 412, 429 (2d Cir. 1995) (Kearse, J.)); see also Weissman
v. Dawn Joy Fashions, Inc., 214 F.3d 224, 233 (2d Cir. 2000);
Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276,
289 (2d Cir. 1998) (Kearse, J.).  In deciding a Rule 50(b)
motion, "a district court is required to 'consider the evidence
in the light most favorable to the party against whom the motion
was made and to give that party the benefit of all reasonable
inferences that the jury might have drawn in his favor from the
evidence.'"  LeBlanc-Sternberg, 67 F.3d at 429 (quoting Smith v.
Lightning Bolt Prods., Inc., 861 F.2d 363, 367 (2d Cir. 1988)).
"Judgment as a matter of law may not properly be granted under
Rule 50 unless the evidence, viewed in the light most favorable
to the opposing party, is insufficient to permit a reasonable
juror to find in her favor."  Galdieri-Ambrosini, 136 F.3d at
289.  "[T]he court must give deference to all credibility
determinations and reasonable inferences of the jury, and it may

16

not itself weigh the credibility of witnesses or consider the weight of the evidence." Id.

### 2. Sufficiency of the Evidence

Aristocrat argues that it is entitled to judgment as a matter of law because the jury's verdict was not supported by the evidence. The Court's review of the record indicates that there is substantial evidence in support of the verdict.

Aristocrat contends that it is inherently unreasonable for the Bondholders to have held their short positions open with the expectation of receiving shares of Aristocrat stock from this Court while at the same time expressly disclaiming reliance on advice of counsel. (See Aristocrat's Mot. for J. as a Matter of Law or, Alternatively, for a New Trial ("Aristocrat's Mem.") 1.) Aristocrat further argues that the remaining reasons for holding open the Bondholders' short positions "lack any objective basis in the record and do not, as a matter of law, justify the Bondholders' failure to mitigate their consequential damages." (Id.) The Court disagrees with Aristocrat and holds that the evidence, viewed in a "light most favorable" to Bondholders, is sufficient "to permit a reasonable juror to find in [Bondholders'] favor." Galdieri, 136 F.3d at 289.

At trial, Bondholders offered extensive testimony about their respective actions following Aristocrat's breach of the

17

Indenture.  Bondholders provided a number of reasons for keeping open their short positions, which may be grouped in the following categories:  (1) they had been promised shares and it made no sense both to ask the Court for shares and buy them in the market; (2) they thought that Aristocrat might deliver the shares if the Court interpreted the Indenture in Bondholders' favor; (3) closing the short positions without waiting for shares to be delivered would cost millions of dollars and incurring this expense would expose Bondholders to Aristocrat's credit risk; and (4) closing short positions following Aristocrat's breach would cause a "short squeeze" in the marketplace and increase the amount of money Bondholders needed to spend to purchase Aristocrat's shares.  (See Intervening Defs.' & Countercl. Pls.' Mem. of Law in Opp'n to Aristocrat's Mot. for J. as a Matter of Law or, Alternatively, for a New Trial ("Bondholders' Opp'n") 19.)  This evidence, viewed in a light most favorable to Bondholders, is sufficient to permit a reasonable jury to conclude that Bondholders' actions in maintaining their short positions did not constitute an unreasonable failure to mitigate consequential damages.

First, Bondholders testified at trial that they did not close their short positions because they had been promised shares and it made no sense both to ask the Court for shares and buy them in the market.  Aristocrat contends that Bondholders'

18

belief that the Court might award specific performance was
unreasonable as a matter of law because Bondholders did not
assert reliance on legal advice at trial.  (See Aristocrat's
Mem. 4-6.)  Prior to trial, this Court determined that seeking
specific performance was not inherently unreasonable.  See
Aristocrat Leisure, 618 F. Supp. 2d at 309 ("This Court is not
persuaded that seeking specific performance is inherently
unreasonable.  Neither the parties nor this Court have found any
case law that suggests that a chosen litigation strategy is
unreasonable because that argument fails.").  In arguing that
Bondholders' belief that the Court might award specific
performance is unreasonable where these Bondholders do not
assert reliance on legal advice, Aristocrat cites Goldman v.
Commissioner of Internal Revenue, 39 F.3d 402 (2d Cir. 1994),
and its progeny.  (See Aristocrat's Mem. 5-6 (discussing
Addington v. Comm'r of Internal Revenue, 205 F.3d 54 (2d Cir.
2000) (Sotomayor, J.); David v. Comm'r of Internal Revenue, 43
F.3d 788 (2d Cir. 1995); Goldman v. Comm'r of Internal Revenue,
39 F.3d 402 (2d Cir. 1994)).)  The question in these cases (and
two cases that Aristocrat cites from other jurisdictions) is
whether a party can rely on an affirmative defense, to which it
has the burden of proof, of reliance on professional advice
where the advice was not rendered by qualified experts.  See
Addington, 205 F.3d at 57-59 (rejecting taxpayers' appeal of

negligence penalties because taxpayers' tax advisor, upon whom
taxpayers relied, was not familiar with the plastics industry,
rendering taxpayers' "reliance on [him] . . . objectively
unreasonable"); David, 43 F.3d at 789 (rejecting taxpayers'
appeal of negligence penalties because "[n]one of the . . .
accountants [upon whom taxpayers relied] was a knowledgeable
participant in the oil and gas business"); Goldman, 39 F.3d at
408 (denying taxpayers' appeal of a negligence penalty and
holding that, "[w]hile reliance on professional advice can, in
certain circumstances, provide a defense to a negligence
penalty," a taxpayer's "[r]eliance on expert advice is not
reasonable where the 'expert' relied on knows nothing about the
business in which the taxpayer invested"); Freytag v. Comm'r of
Internal Revenue, 904 F.2d 1011, 1017 (5th Cir. 1990) (affirming
tax court's determination that taxpayers failed to discharge
their burden to prove absence of negligence in taking certain
deductions where taxpayers "relied upon the advice of their
'finders,' who apparently had no expertise whatsoever in the
financial aspects of the portfolios involved"); Tallent v.
Liberty Mut. Ins. Co., No. Civ. A. 1997-1777H, 2005 WL 1239284,
at *12-13, 19 (Mass. Super. Ct. Apr. 22, 2005) (holding that
defendant unreasonably failed to settle a claim in violation of
a Massachusetts statute governing unfair or deceptive business
practices in the insurance industry where defendant's reliance

20

on advice of counsel defense "was unreasonable" because the
advice came from attorneys who lacked experience and objectivity
to advise defendant properly).  Aristocrat insists that any
distinction between these cases and the instant case "is
meaningless" because "[t]he controlling principle in these cases
is that, as a matter of law, a person cannot reasonably believe
that it is prudent to undertake a course of action—the success
of which turns on resolution of a legal issue about which he
lacks legal expertise–without relying on legal advice."
(Aristocrat's Reply Mem. of Law in Supp. of Its Mot. for J. As a
Matter of Law Or, Alternatively, For a New Trial ("Aristocrat's
Reply") 3.)  The Court rejects Aristocrat's interpretation of
the "controlling principle" of these cases.  These cases do not
stand for the proposition that "a person cannot reasonably
believe that it is prudent to undertake a course of action—the
success of which turns on resolution of a legal issue about
which he lacks legal expertise—without relying on legal advice."
(Id.)  Rather, they stand for the proposition that it is
unreasonable to rely on expert advice where the purported expert
lacks knowledge about the subject matter underlying the advice.
See Addington, 205 F.3d at 58 ("In general, it is unreasonable
to rely on an advisor who lacks knowledge about the industry in
which the taxpayer is investing."); David, 43 F.3d at 789-90
("In Goldman, we held that . . . taxpayers' reliance on expert

advice is not reasonable where the 'expert' lacks knowledge of
the business in which the taxpayers invested." (citing Goldman,
39 F.3d at 407-08 (holding that tax expert lacked expertise in
the oil and gas industry))).  The Court holds that because this
action does not involve the question of whether Bondholders'
counsel was qualified to render advice on specific performance,
Goldman and its progeny has no bearing on this case.  Therefore,
Bondholders' belief that the Court might award specific
performance was not unreasonable as a matter of law merely
because Bondholders did not assert reliance on legal advice at
trial.

Second, Bondholders believed that Aristocrat might change
its mind and deliver conversion shares if the Court interpreted
the Indenture in Bondholders' favor.  (Trial Tr. 538:7-18,
645:6-20, 697:15-698:3).  A number of Bondholders as well as
Bondholders' expert, Professor Charles Jones, testified that it
was in Aristocrat's best interest to change its mind and deliver
shares to preserve Aristocrat's reputation and ability to raise
funds in the capital markets.  (See Bondholders' Opp'n 20; Trial
Tr. 539:5-11, 854:13-17, 921:1-11, 1292:9-23, 1334:1-9.)
Accordingly, a reasonable factfinder could find that Aristocrat
genuinely was seeking a clarification of its rights under the
Indenture and, if its understanding of the Indenture were
incorrect, would deliver shares to Bondholders.  (See

Bondholders' Opp'n 21.)  Aristocrat relies heavily on Drummond
v. Morgan Stanley & Co., Inc., No. 95 Civ. 2011, 1996 WL 631723
(S.D.N.Y. Oct. 31, 1996) (Chin, J.), in support of its argument
that "no reasonable person could have thought [Aristocrat] would
simply change its mind and deliver shares."  (Aristocrat's Mem.
7 (citing Drummond, 1996 WL 631723, at *3 ("[W]hen Morgan
Stanley did not respond promptly, plaintiff should have realized
that Morgan Stanley was not going to change its mind.")).)  In
Drummond, Morgan Stanley breached its obligation to purchase a
$50 million collateralized mortgage obligation ("CMO") from
plaintiff.  See Drummond v. Morgan Stanley & Co., Inc., No. 95
Civ. 2011, 1997 WL 266982, at *1 (S.D.N.Y. May 20, 1997) (Chin,
J.) (reciting the Court's findings of fact and conclusions of
law).  On February 23, 1994, plaintiff sold a $50 million face
value CMO to Morgan Stanley for an agreed-upon price of
$50,375,000.  Id.  The next day, Morgan Stanley claimed that it
made a mistake in calculating the value of the CMO in
formulating its bid, but would be willing to purchase the CMO
for $49,687,500.  Id.  Plaintiff rejected Morgan Stanley's
reduced bid, id., and declined offers from other bidders,
eventually selling the CMO six months later for approximately
$46.1 million.  Drummond, 1996 WL 631723, at *2.  Prior to a
bench trial, the Court granted Morgan Stanley's motion for
summary judgment on the issue of mitigation of damages, holding

that plaintiff failed to mitigate his general damages as a
matter of law by waiting six months to sell his CMO after Morgan
Stanley cancelled the contract.  Id. at *1-2.  The plaintiff in
Drummond had argued that a factual dispute existed with respect
to what period of time would have been reasonable for him to
wait before selling his CMO because a factfinder could conclude
that six months was reasonable based on plaintiff's belief that
Morgan Stanley would honor its contract and rescind the
cancellation, given the company's reputation for excellence and
integrity.  Id. at *2.  The Court rejected this argument,
holding that, "[e]ven assuming that plaintiff did believe that
Morgan Stanley would rescind the cancellation, this would not be
sufficient to raise a material issue of fact for trial, for a
reasonable factfinder could only conclude that six months was
not a reasonable period of time for plaintiff to wait" because
"plaintiff should have realized that Morgan Stanley was not
going to change its mind."  Id. at *3.

     Drummond is not dispositive of the question here—whether it
was reasonable for Bondholders to think that Aristocrat would
change its mind and deliver shares.  The Court previously held
that—under the facts of this case—mitigation of consequential
damages cannot be decided as a matter of law.  See Aristocrat
Leisure, 618 F. Supp. 2d at 308 ("The Court holds that [the
parties'] competing interpretations of reasonable action must be

left for the trier of fact, and therefore the Court denies
summary judgment on the mitigation issue.")  The Court addressed
Drummond in its April 27, 2009 decision, stating that, "[u]nlike
in Drummond, where the plaintiff rejected several bids to
purchase the bonds at issue after the defendant breached the
contract, here the relevant investment decision[s] to hedge the
convertible bonds were made before Aristocrat's breach."  Id. at
309 n.31.  Aristocrat acknowledges this distinction but insists
that the Bondholders "made clear at trial[ that] the relevant
investment decisions were [Bondholders'] decisions not to cover-
a choice they repeatedly made after [Aristocrat's] breach."
(Aristocrat's Reply 2 (citing Trial Tr. 1425:18-21 (Peter Rice),
1469:16-21 (Vadim Iosilevich)).)  While certain Bondholders
testified at trial that they "made a choice to continue [a]
short," Trial Tr. 1469:16-17, this "choice" is not analogous to
the investment decisions faced by the plaintiff in Drummond, who
received offers to purchase his CMO from several bidders,
including the breaching party.  See Drummond, 1997 WL 266982, at
*1.  Also unlike Drummond, in which the victim of the breach
initiated the action seeking damages for breach of contract,
id., the instant case was initiated by Aristocrat for a
declaration from the Court regarding Aristocrat's ability to
call the bonds under the Indenture.  (See Compl. ¶ 3.)  It was
reasonable, therefore, for a factfinder to conclude that, upon

the Court's adjudication, Aristocrat would conform its conduct to the Court's ruling.

Third, a fair-minded person also may find that Bondholders were reasonable in wanting to keep open their short positions to avoid exposure to Aristocrat's credit risk. (Bondholders' Opp'n 21.)  Aristocrat's argument that it did not pose a credit risk is contradicted by the record.  Aristocrat's junk-level credit rating throughout the relevant time period could lead a reasonable factfinder to believe that awaiting payment from Aristocrat presented a credit risk to Bondholders.  (Trial Tr. 1214:5-1216:21, 1289:17-1290:4, 1304:16-1306:11, 1367:9-21.) Aristocrat's own expert, David J. Ross, acknowledged during the trial that the rating agency, Standard & Poor's, defines a company with Aristocrat's credit rating as being one that "faces major ongoing uncertainties for exposure to adverse business, financial or economic conditions, which could lead to the obligors' inadequate capacity to meet its financial commitment in the obligation."  (Trial Tr. 1216:13-19.)

Fourth, the record provides evidence from Professor Jones that had Bondholders purchased shares in the market to close their short positions shortly after Aristocrat breached the Indenture, as Aristocrat suggests they should have done to mitigate consequential damages, share prices would have increased substantially, causing a short squeeze in the market.

(Trial Tr. 1288:6-1289:3, 1292:24-1296:12, 1298:11-1301:14.)

Although Aristocrat's expert testified that Aristocrat share prices would not have risen dramatically had Bondholders closed their short positions in a commercially reasonable manner after Aristocrat's breach of the Indenture, (Trial Tr. 1059:3-1061:10, 1105:5-1108:2, 1218:17-1223:24, 1225:25-1229:19), the jury was entitled to not credit this testimony and, instead, credit the testimony of Bondholders' expert, who testified that Aristocrat share prices would have risen "by 10 or 15 percent" had Bondholders closed their short positions consistent with Aristocrat's suggestion (Trial Tr. 1295:12-1296:12, 1298:16-19). See Cayuga Indian Nation of N.Y. v. Pataki, 83 F. Supp. 2d 318, 328 (N.D.N.Y. 2000) (stating that after a district court admits expert testimony under Daubert, "it is 'for the jury to decide which, if either, expert witnesses' testimony it [chooses] to accept.'" (quoting Trumps v. Toastmaster, Inc., 969 F. Supp. 247, 253 n.7 (S.D.N.Y. 1997)); Trial Tr. 1817:19-21, 1818:11-14 (instructing the jury that, "[y]ou may give the expert opinion testimony whatever weight, if any, you find it deserves in light of all the evidence in this case," and that "[y]ou may reject the testimony of any expert opinion witness in whole or in part if you conclude the reasons given in support of an opinion are unsound or if you for other reasons do not believe the witness").

In light of the record, the Court finds that the jury's verdict was supported by substantial evidence and Aristocrat's motion for judgment as a matter of law must be denied.

B. Motion for a New Trial

In the alternative, Aristocrat moves for a new trial pursuant to Rule 59 on two grounds.  First, Aristocrat contends that it is entitled to a new trial because Bondholders improperly placed their legal advice at issue, thereby waiving attorney-client privilege.  Second, Aristocrat claims that it is entitled to a new trial because the jury instructions and the special verdict form were erroneous and prejudicial.  The Court addresses each argument in turn, after providing the applicable legal standard.

1. Legal Standard Under Rule 59

"In contrast to a motion for judgment as a matter of law, a motion for a new trial pursuant to [Rule] 59 may be granted . . . although there is evidence to support the jury's verdict, so long as the district court determines that, in its independent judgment, 'the jury has reached a seriously erroneous result or [its] verdict is a miscarriage of justice.'"  Nimely v. City of N.Y., 414 F.3d 381, 392 (2d Cir. 2005) (quoting Munafo v. Metro. Transp. Auth., 381 F.3d 99, 105 (2d Cir. 2004)).  In deciding a motion for a new trial, "the district court [is] free to examine

the evidence through its own eyes." Meloff v. N.Y. Life Ins.
Co., 240 F.3d 138, 147 (2d Cir. 2001).  "While the Court need
not necessarily weigh the evidence in the light most favorable
to the non-moving party, disagreement with the verdict alone is
insufficient to justify ordering a new trial." Muller v.
Costello, 997 F. Supp. 299, 302 (N.D.N.Y. 1998).

### 2.   Advice of Counsel

Aristocrat claims that Bondholders waived attorney-client
privilege in two respects.  First, Aristocrat claims that
certain Bondholders' testimony placed at issue their beliefs
concerning a legal question on which they received legal advice.
(See Aristocrat's Mem. 12-16)  Second, Aristocrat claims that
statements made by Bondholders' counsel placed the content of
legal advice at issue. (Id. 17-19.)  The Court provided the jury
with a limiting instruction that addressed the issue of reliance
on legal advice.  (See Trial Tr. 876:14-877:6, 1798:17-1799:4,
1821:4-17.)  Aristocrat claims that Bondholders' waiver of
attorney-client privilege was not cured by the Court's limiting
instruction, and that Aristocrat is entitled to a new trial to
have a fair opportunity "to test the Bondholders' claimed belief
that the Court would award them shares."  (Id. 20.)

### a.   Applicable Law

An implied waiver of attorney-client privilege may occur "'when a client testifies concerning portions of the attorney-client communication, . . . when a client places the attorney-client relationship directly at issue, . . . and when a client asserts reliance on an attorney's advice as an element of a claim or defense.'" In re County of Erie, 546 F.3d 222, 229 (2d Cir. 2008) (quoting Sedco Int'l, S.A. v. Cory, 683 F.2d 1201, 1206 (8th Cir. 1982)). Determining whether a party has waived attorney-client privilege involves questions of fairness, and must be addressed "'on a case-by-case basis, and depends primarily on the specific context in which the privilege is asserted.'" Erie, 546 F.3d at 229 (quoting In re Grand Jury Proceedings, 219 F.3d 175, 183 (2d Cir. 2000)); see also United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991) ("[P]rivilege may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications.").

As discussed in this Court's September 28, 2009 decision, the Second Circuit's decision in In re County of Erie is particularly relevant to the parties' dispute. See Aristocrat, 2009 WL 3111766, at *15-16. In Erie, the Second Circuit criticized the test for at issue waiver first articulated in Hearn v. Rhay, 68 F.R.D. 574 (E.D. Wash. 1975), as cutting "too broadly" and held that, contrary to what may have been

articulated by Hearn, "[a] mere indication of a claim or defense certainly is insufficient to place legal advice at issue." Erie, 546 F.3d at 229. Rather, for an at issue waiver to occur, "a party must rely on privileged advice from his counsel to make his claim or defense." Id. (emphasis in original); see also Green v. Beer, No. 06 Civ. 4156, 2010 WL 2653650, at *6 (S.D.N.Y. July 2, 2010) (finding no at issue waiver where the legal advice in dispute "is no doubt relevant" to the parties' claims, but where the parties "are not relying on that advice to demonstrate the reasonableness of their decision"); United States v. Ghailani, -- F. Supp. 2d --, 2010 WL 1633012, at *2 (S.D.N.Y. Apr. 26, 2010) (Kaplan, J.) (referring to the requirement that a party rely on the privileged communication as a claim or defense as "the critical point" in deciding whether an at issue waiver has occurred); Nycomed U.S. Inc. v. Glenmark Generics Ltd., No. 08 Civ. 5023, 2009 WL 3334365, at *1 (E.D.N.Y. Oct. 14, 2009) ("As per Second Circuit jurisprudence, the key to a judicial finding of an implied waiver 'is some showing by the party arguing for a waiver that the opposing party relies on the privileged communication as a claim or defense or as an element of a claim or defense.'" (quoting Erie, 546 F.3d at 228)). The Second Circuit declined, however, to specify in Erie the degree to which a party must rely on

31

privileged advice before waiver of attorney-client privilege is found.  See Erie, 546 F.3d at 229.

### b.   Aristocrat's Arguments

Aristocrat contends that Bondholders impliedly waived attorney-client privilege by introducing evidence concerning "their subjective beliefs on [the] innately legal question" of whether Bondholders would receive shares.  (Aristocrat's Reply 5.)  Aristocrat therefore argues that "[t]he trial of this matter was fundamentally unfair," and a new trial must be ordered, "because [Aristocrat] was denied any opportunity to test either the basis for the Bondholders' claimed belief or whether they actually followed the advice they were given."  (Id.)

Aristocrat contends that Bondholders—both through statements made by fact witnesses and arguments made by counsel— waived attorney-client privilege at trial.  Aristocrat points to the testimony of Bondholders' first witness, Matthew Nunn, Deephaven's corporate representative, as evidence that a waiver occurred, as Nunn's testimony "plainly signaled to the jury that [Bondholders] had received legal advice supporting their litigation position."  (Aristocrat's Mem. 15.)  On examination by counsel for Aristocrat, Nunn was asked if "after [the] initial determination by you [that Aristocrat had a strong

case], you changed your mind many times about how this [case] would come out in the courts, didn't you?"  (Trial Tr. 423:2-7.) Nunn answered in the affirmative and stated that "[t]here was a period of discovery for me, by which lots of, you know, quite a few days, where I, you know, got to understand an awful lot of things that, you know, legal type things that I didn't previously understand.  We took legal advice, I spoke to in-house lawyers, and that process led me to change my mind, that's correct."  (Trial Tr. 423:10-15.)

Immediately after this testimony, the Court held a sidebar conference where counsel for Bondholders acknowledged that Nunn "stepped over the line" in responding to Bondholders' questioning.  (Trial Tr. 424:19.)  The Court suggested that a jury instruction may be appropriate to address Nunn's testimony, but that to instruct the jury on this issue in the middle of Nunn's testimony would "blow [the issue] out of proportion." (Trial Tr. 424:24-425:2.)  Nunn then was cautioned by counsel for Aristocrat and counsel for Bondholders out of the hearing of the jury, and the Court explained to the jury that the witness was being cautioned by counsel because "there are certain things that should not be said during the trial because they could be prejudicial to one side or the other."  (Trial Tr. 426:12-23.)

During subsequent examination by Bondholders, Nunn was asked to describe "the collective judgment [that was] ultimately

reached" concerning whether Deephaven, Nunn's employer, had a right to convert the bonds. (Trial Tr. 457:15.)  Nunn testified that "[t]he collective judgment was that we had a very good case . . . we felt that we still had a right to convert." (Trial Tr. 457:16-19.)  Nunn concluded that "we felt that we were entitled to shares, and we felt that we would get shares." (Trial Tr. 458:17-18.)  Aristocrat claims that this testimony, and the testimony of other Bondholders that "echoed Mr. Nunn's testimony," constituted a waiver of the attorney-client privilege by placing the basis for Nunn's beliefs at issue. (Aristocrat's Mem. 16 n.34.)

Aristocrat also contends that Bondholders' counsel made statements during the course of trial that waived attorney-client privilege. (See Aristocrat's Mem. 17-19.)  The disputed statements include references made by Bondholders' counsel pertaining to counsel's belief that Bondholders would receive shares as specific performance, (Trial Tr. 475:6-16 ("[O]nce we go through th[e] door [of the reasonableness of the legal positions of both sides], I would have a lot to say about why I thought we were right")); statements made by Bondholders' counsel that referred to Bondholders' arguments in the first person, (Trial Tr. 302:10-15 ("[W]e said because of the unusual situation, . . . because it would be unfair to make us go into the market and buy all these shares . . . we felt that we should

34

. . . get specific performance.  We should get the shares,
because that's what we were promised.  That's the argument we
made.")); and statements that either gave the impression that
the Court confirmed that Bondholders had received sound legal
advice or reinforced the implication that Bondholders' belief
that they would receive shares rested on legal advice, (Trial
Tr. 317:12-15 ("And the evidence, I submit, will show you
[Bondholders] all thought Aristocrat was wrong.  They were
entitled to shares.  They hired a lawyer to present their case,
and you can guess who that lawyer was."), 1744:25-1745:18 ("I'm
going to talk about what Judge Leisure said the law was. . . .
He said, [specific performance is] a question that rests with
the sound discretion of the Court. . . .  He can't point to a
case to say how it's going to come out")).

    Taken as a whole, Aristocrat asserts that Bondholders
waived attorney-client privilege and that this waiver was
neither curable nor harmless.  (See Aristocrat's Mem. 12-19.)
Aristocrat argues that "the picture painted by the Bondholders
at trial that they firmly believed they would get shares is
likely a gross distortion of the legal advice they received,"
and that it is entitled to a "fair opportunity to take discovery
of the legal advice the Bondholders received" and use it during
a new trial "to test the Bondholders' claimed belief that the
Court would award them shares."  (Id. 19-20.)

c.    Bondholders' Arguments

In opposition to Aristocrat's argument that Bondholders waived attorney-client privilege, Bondholders argue that "'reliance on privileged advice in the assertion of the claim or defense' is the 'essential element of a claim of waiver'" and that "Bondholders never asserted that their pursuit of specific performance was reasonable because they relied on legal advice." (Bondholders' Opp'n 10-12 (quoting Erie, 546 F.3d at 229).) Bondholders also contend that Aristocrat's argument of implied waiver is in conflict with an agreement reached between the parties whereby "the parties agreed that each party would be able to tell the jury that it consulted with lawyers, and that 'it thought it would win the litigation,' but would not be permitted to explain the 'whys and wherefores' for this belief." (Id. at 11; see also Aristocrat, 2009 WL 3111766, at *15 (finding that the agreement at issue "was intended to preclude either party from delving into the reasonableness of the other side's belief that they would win the underlying litigation, rather than to preclude either party from stating that they consulted with counsel in the course of forming their opinions about the likely outcome of this case").)

In addressing the claim that statements made by individual Bondholders during trial caused a waiver of attorney-client

privilege, Bondholders admit that Nunn's testimony may have

"stepped over the line." (Bondholders' Opp'n 13.)  However,

Bondholders claim that this error was addressed quickly and

effectively by the Court, in a manner that was not objected to

by Aristocrat. (See id.)  Bondholders argue that none of the

statements made by Bondholders' counsel implicated a waiver of

attorney-client privilege and even if Bondholders "put legal

advice at issue inadvertently, any potential prejudice to

Aristocrat was cured by the special instruction on this topic."

(Id. at 16.)  The special curative instruction was written with

input from Bondholders and Aristocrat, and was delivered by the

Court to the jury on three separate occasions. (See Trial Tr.

491:3-12, 799:20-800:7, 800:23-802:16, 859:8-862:25, 873:15-20,

874:12-875:4, 876:14-877:6, 1798:17-1799:4, 1821:4-17.)

              d.   Analysis

     The Court first addresses Aristocrat's argument that

Bondholders' testimony at trial, and statements made by

Bondholders' counsel, caused a waiver of attorney-client

privilege.  The Court then addresses the effect of the special

jury instruction on any potential prejudice.

     Aristocrat has not shown that Bondholders, or Bondholders'

counsel, waived attorney-client privilege at trial.  Testimony

by Bondholders that they consulted with attorneys in the course

                          37

of this case, does not, in and of itself, place the content of
those communications at issue.  Rather, as explained both supra
and in this Court's in limine ruling on this issue, the
Bondholders must rely on privileged advice for waiver to be
found.  See Aristocrat, 2009 WL 3111766, at *16.  The Court
agrees with Aristocrat that whether a party has waived attorney-
client privilege involves questions of fundamental fairness; but
notions of equitable fairness cannot be used as a substitute for
the lack of the essential element of reliance on privileged
communications.  (See Aristocrat's Mem. 12; see also Ghailani,
2010 WL 1633012, at *2 ("[P]rivilege is waived where a party
affirmatively puts its attorney's advice (or other privileged
communication) at issue.  But the critical point is that a party
claiming an implied or at issue waiver must make 'some showing .
. . that the opposing party relies on the privileged
communication as a claim or defense or as an element of a claim
or defense.'"  (quoting Erie, 546 F.3d at 228)).)  The testimony
of Bondholders, with the exception of a portion of Nunn's
testimony that is addressed below, does not implicate reliance
on advice of counsel.

     Similarly, Aristocrat has not demonstrated that any
statements made by counsel for Bondholders caused a waiver of
the attorney-client privilege.  Much of Aristocrat's argument on
this issue is focused on statements by Bondholders' counsel that

Bondholders believed they were justified in seeking shares of
Aristocrat stock.  (See Trial Tr. 317:12-15, 457:15-20, 1728:3-
5; Aristocrat's Mem. 17-18.)  Statements such as these are well
within the scope of the December 11, 2006, agreement between the
parties.  See Aristocrat, 2009 WL 3111766, at *14-15 (stating
that the agreement between the parties provides that Bondholders
would be able to state at trial that "some of the bondholders
hedged their position based on their estimate of the outcome of
the litigation").  Even if these statements were not within the
scope of the December 11, 2006, agreement between the parties,
the described belief that Bondholders were entitled to shares
was not linked directly to legal advice.  Rather, as discussed
in section I.A.2. supra, Bondholders testified to numerous
reasons—free from any claim of reliance on legal advice--why they
believed Aristocrat was likely to offer shares.  (See
Bondholders' Opp'n 19 (summarizing that (1) Bondholders thought
Aristocrat might deliver shares if the Court interpreted the
Indenture in Bondholders' favor, (2) closing the short positions
without waiting for shares to be delivered would cost millions
of dollars, (3) incurring this expense would expose Bondholders
to Aristocrat's credit risk, (4) receiving shares was important
to the realization of return under Bondholders' convertible
arbitrage strategy, and (5) closing short positions following
Aristocrat's breach would cause a "short squeeze" in the

marketplace and increase the amount of money Bondholders needed
to spend to purchase Aristocrat's shares).)

    Aristocrat's remaining arguments concerning statements made
by Bondholders' counsel are unavailing.  First, both Aristocrat
and Bondholders read from portions of this Court's prior
opinions in this case to support their respective positions
concerning the reasonableness of Bondholders' actions.  (See
Trial Tr. 474:12-18, 1744:19-1745:18.)  In reading portions of
this Court's opinions, Bondholders' counsel did not reference
privileged legal advice.  Second, Aristocrat is correct that in
certain circumstances it can be problematic for an attorney to
refer to his or her client's arguments in the first person.
See, e.g., Autowest, Inc. v. Peugeot, Inc., 434 F.2d 556, 568
(2d Cir. 1970).  Aristocrat, however, provides no support for
the argument that the use of the first person tense creates the
type of broad waiver of privilege sought here.  Finally,
Bondholders' counsel's statement that, were "the issue of the
reasonableness of the legal positions of both sides" to be
addressed, he "would have a lot to say about why [he] thought
[Bondholders] were right," was directed at arguments made by
counsel in legal briefs, and was not, when read in context, a
clear statement of counsel's own personal beliefs.  (See Trial
Tr. 475:2-18.)  Furthermore, at trial, Aristocrat agreed that
Bondholders' counsel's statements were inadvertent, (Trial Tr.

488:10-18), and, after both sides were heard on the issue, the

Court concluded that a curative jury instruction should be given

to address the issue.  (Trial Tr. 491:1-13.)  Given the nature

and limited scope of Bondholders' counsel's inadvertent

comments, and the curative instruction that followed, the Court

declines to find that a waiver of attorney-client privilege

occurred.

Aristocrat's most persuasive argument is that Nunn waived

the attorney-client privilege when, in response to questions

concerning the strength of Aristocrat's legal arguments, he

agreed that he "changed [his] mind many times about how this

[case] would come out in the courts" and that he "took legal

advice, . . . spoke to in-house lawyers, and that process led

[him] to change [his] mind."  (Trial Tr. 423:5-15.)  While the

Court agrees that Nunn's testimony may have "stepped over the

line" (see Bondholders' Mem. 13), the Court also agrees with

Bondholders that the special jury instruction provided to the

jury on three separate occasions cured any potential prejudice

to Aristocrat.

On three occasions during the trial, the Court read to the

jury a limiting instruction that Bondholders were not asserting

that they relied on legal advice that they would receive

Aristocrat shares, and that legal advice was not an issue in

this case.[5]  There was no indication that the jurors either
failed to comprehend the special instruction or were swayed by
the stricken testimony.  Therefore, consistent with sound
precedent, the Court holds that the limiting instruction cured
any prejudice Aristocrat suffered either by Nunn's testimony or
by Bondholders' counsel's inadvertent remarks.  See Tesser v.
Bd. Of Educ. Of City Sch. Dist. Of City of New York, 370 F.3d
314, 319 (2d Cir. 2004) (declining to grant new trial where
alleged error was addressed by a clear jury instruction and
where there was "no basis on which to conclude that 'it is
likely that in some material respect the fact finder's judgment
was swayed by the [alleged] error'" (quoting Costantino v. David
M. Herzog, M.D., P.C., 203 F.3d 164, 174 (2d Cir. 2000));
Trademark Research Corp. v. Maxwell Online, Inc., 995 F.2d 326,
340 (2d Cir. 1993); (stating, in the context of a curative jury
instruction, that "it must be assumed that the jury followed
instructions"); Okraynets v. Metro. Transp. Auth., 555 F. Supp.
2d 420, 426-27 (S.D.N.Y. 2008) (stating, in the context of a

---

[5] The jury instruction was: "This is a limiting instruction on the law.  The
bondholders are not asserting that they relied on legal advice that they
would receive Aristocrat shares.  They are not claiming that their actions
were reasonable because they relied on any legal advice they may have
received.  You're instructed to disregard any testimony or argument
suggesting that the bondholders relied on legal advice that they would
receive shares or that the bondholders acted reasonably because of any legal
advice.  Because there's no issue of reliance on legal advice, there's
likewise no issue as to the content or soundness of legal advice, and you
should not speculate as to these matters.  You are also instructed to
disregard any comment, question, or testimony relating to the soundness of
legal advice."  (Trial Tr. 876:14-877:2, 1798:17-1799:4, 1821:4-17.)

curative jury instruction, that "it must be presumed that juries are able to understand the court's instructions, and that juries follow these instructions").[6]

For the foregoing reasons, the Court holds that Aristocrat's motion for a new trial based on the claim that Bondholders waived the attorney-client privilege is denied.


### 3. Jury Instructions

Jury instructions are intended "to give the jury a clear and concise statement of the law applicable to the facts of the case." Girden v. Sandals Int'l, 262 F.3d 195, 203 (2d Cir. 2001). "An erroneous [jury] instruction requires a new trial unless the error is harmless." LNC Invs., Inc. v. First Fidelity Bank, N.A. N.J., 173 F.3d 454, 460 (2d Cir. 1999) (Sotomayor, J.) (citation and internal quotation marks omitted). "'A jury instruction is erroneous if it misleads the jury as to the correct legal standard, or does not adequately inform the jury on the law.'" Cameron v. City of N.Y., 598 F.3d 50, 68 (2d Cir. 2010) (quoting LNC Invs., 173 F.3d at 460); see also

---

[6] Aristocrat argues, in a footnote, that the Court's curative instruction was ineffective because an instruction from a court cannot "purge from the juror's minds what they have already heard." (Aristocrat's Mem. 15 n. 33.) The precedent Aristocrat relies on for this proposition acknowledges that curative instructions ordinarily will be followed, but that in particularly egregious circumstances a statement may be so prejudicial as to render a curative instruction useless. See, e.g., United States v. Reyes, 18 F.3d 65, 71-72 (2d Cir. 1994) (curative instruction found to be ineffective when the improper testimony "directly implicated the defendant in the crime"). The instant case does not involve disputed testimony that is so prejudicial as to overcome the presumption that a jury will follow a curative instruction.

Holzapfel v. Town of Newburgh, 145 F.3d 516, 521 (2d Cir. 1998)
("An error exists if the jury was misled about the correct legal
standard or was otherwise inadequately informed regarding the
controlling law, and where such error is other than harmless, a
new trial is required."). "An error is harmless only if the
court is convinced that the error did not influence the jury's
verdict." Patalano v. Am. President Lines, 250 F. App'x 425,
427 (2d Cir. 2007) (citing LNC Invs., 173 F.3d at 462). Because
"a trial court has considerable discretion in the formulation
and style of jury instructions, . . . a new trial is only
warranted if, taken as a whole, the jury instructions gave a
misleading impression or inadequate understanding of the law."
Patalano, 250 F. App'x at 427-28 (2d Cir. 2007); see also Parker
v. Sony Pictures Entm't, Inc., 260 F.3d 100, 106-07 (2d Cir.
2001); Owen v. Thermatool Corp., 155 F.3d 137, 139 (2d Cir.
1998); Plagianos v. Am. Airlines, Inc., 912 F.2d 57, 59 (2d Cir.
1990).

### a. Aristocrat's Argument

First, Aristocrat contends that the Court's jury charge,
"taken as a whole, provided the jury with an inadequate
understanding of the applicable law" because "[t]he Court
repeatedly mischaracterized the applicable legal standard, . . .
incorrectly advising the jurors that the relevant question was

44

not whether the Bondholders <u>affirmatively took reasonable steps</u>

<u>to mitigate</u>, but 'whether the bondholders <u>unreasonably failed</u> to

mitigate their consequential damages after Aristocrat's

breach.'" (Aristocrat's Mem. 20 (emphasis in original) (quoting

Trial Tr. 1819:7-9).) Aristocrat claims that

> by repeatedly describing the issue for
> decision as whether the Bondholders
> "unreasonably failed to mitigate their
> consequential damages"--rather than whether
> the Bondholders made reasonable efforts to
> mitigate their damages—the Court failed
> properly to convey the long-established
> mandate of New York law that imposes on an
> injured party an <u>affirmative duty</u> to take
> reasonable steps to mitigate its damages.

(<u>Id.</u> 22-23.)

Second, Aristocrat argues that "the Court failed to

instruct the jury on several central tenets of the New York law

of mitigation," including that:

> (1) the Bondholders were required to make substitute
> arrangements to obtain shares to cover their short
> positions within a reasonable amount of time and, to
> the extent they failed to make such arrangements, any
> consequential damages award should be reduced
> accordingly;

> (2) in assessing the Bondholders' conduct, the jury
> should bear in mind that reasonable conduct for a
> hedge fund in the absence of litigation is not
> necessarily the same as what is reasonable for a hedge
> fund seeking to recover consequential damages in
> litigation;

> (3) if the Bondholders had a reasonable opportunity to
> eliminate the exposure to the risk that the cost of
> covering their short positions would increase, then
> [Aristocrat] cannot be held liable for any increased

cost the Bondholders could have avoided by covering; and

(4) the Bondholders were not allowed to decline a reasonable opportunity to cover their short positions or speculate on the stock market price of [Aristocrat] shares at [Aristocrat's] expense.

(Id. 21 (citing Aristocrat's Revised Proposed Jury Instructions, dkt. no. 311, at 33-34).)

Third, Aristocrat contends that "the Court improperly and disproportionately emphasized to the jury that the Bondholders' conduct should not be assessed 'based on a backward-looking analysis,' and that the Bondholders did not have an obligation to undertake 'extraordinary and costly measures to mitigate consequential damages.'" (Aristocrat's Mem. 22 (quoting Trial Tr. 1824:19-20, 1825:11-12).) Aristocrat states that "[w]hile instructions relating to hindsight and extraordinary measures would not have been per se erroneous," they were erroneous here where the Court allegedly "disproportionately emphasized their importance to the jury and failed to provide other instructions on critical elements of New York law." (Id. 24.)

Fourth, Aristocrat argues that, notwithstanding Aristocrat's request, the Court "failed to provide the jury with a proper understanding of its prior rulings, . . . including that the Bondholders would be fully compensated, through an award of general damages, for the value of the performance promised by [Aristocrat] under the Indenture." (Id. 22.)

46

Aristocrat also takes issue with the Court declining "to provide the jury with any guidance whatsoever regarding . . . whether the Bondholders could reasonably have believed that this Court would order specific performance and direct [Aristocrat] to deliver shares." (Id.)  Aristocrat describes the Court's "refusal to provide any instruction concerning the law of specific performance" as "clearly erroneous" because without this instruction, the jury purportedly "had no basis whatsoever for assessing the critical issue in this case—whether the Bondholders' asserted basis for holding open their short positions was objectively reasonable." (Id. 24.)

     b. Analysis

The Court holds that its instructions to the jury "adequately inform[ed] the jury of the law," and, "taken as a whole," did not give "a misleading impression or inadequate understanding of the law." Owen, 155 F.3d at 139 (citation and internal quotation marks omitted).

First, the Court rejects Aristocrat's argument that the Court mischaracterized the applicable legal standard.  The complete instruction that the Court provided included the very instruction that Aristocrat sought:

> The only issue left for you to decide is whether the bondholders unreasonably failed to mitigate their consequential

damages after Aristocrat's breach, <u>which</u>
<u>means whether the bondholders failed to act</u>
<u>reasonably to reduce, lessen or minimize the</u>
<u>consequential damages following Aristocrat's</u>
<u>breach of contract.</u>
     <u>The bondholders have a duty under the</u>
<u>law to mitigate their consequential damages.</u>
Aristocrat has the burden to prove that the
bondholders unreasonably failed to mitigate
their consequential damages.

. . .

     <u>Any party who claims consequential</u>
<u>damages as a result of another's breach of</u>
<u>contract has a duty under the law to use</u>
<u>reasonable diligence under the circumstances</u>
<u>to mitigate or reduce, lessen or minimize</u>
<u>those damages.</u> <u>The law imposes on injured</u>
<u>parties a duty to take advantage of</u>
<u>reasonable opportunities</u> that a party may
have to prevent the aggravation of its
consequential damages so as to reduce,
lessen or minimize those losses or damages.

(Trial Tr. 1819:7-16, 1822:22-1823:4 (emphasis added).)   This

instruction is consistent with the Model Federal Jury

Instructions, Second Circuit precedent, Southern District of New

York courts, and New York caselaw, including cases that

Aristocrat itself cites, and properly conveys to the jury

Bondholders' duty under New York law to mitigate damages as well

as Aristocrat's duty to establish that Bondholders did not

uphold that duty.  <u>See</u> 4 Leonard B. Sand, et al., <u>Modern Federal</u>

<u>Jury Instructions-Civil</u> Instr. 77-7 (2009) ("[A]ny person who

claims damages as a result of an alleged wrongful act of another

has <u>a duty under the law to use reasonable diligence under the</u>

<u>circumstances</u> to 'mitigate,' or minimize, those damages. . . .

48

If the plaintiff unreasonably failed to take advantage of an
opportunity to lessen his damages, you should deny recovery for
those damages which he would have avoided had he taken advantage
of the opportunity." (emphasis added)); see also Fed. Ins. Co.
v. Sabine Towing & Transp. Co., Inc., 783 F.2d 347, 350 (2d Cir.
1986) ("The burden of showing that a plaintiff unreasonably
failed to minimize damages rests with the wrongdoer."); Air Et
Chaleur, S.A. v. Janeway, 757 F.2d 489, 494 (2d Cir. 1985)
("[T]he district court was . . . correct in holding that
defendant bore the burden of introducing evidence to prove that
plaintiffs could have lessened their damages."); Robin Bay
Assocs., LLC v. Merrill Lynch & Co., No. 07 Civ. 376, 2008 WL
2275902, at *8 (S.D.N.Y. June 3, 2008) ("The 'defense of failure
to mitigate requires the defendant to establish not only that
the plaintiff unreasonably failed to mitigate, but that
reasonable efforts would have reduced the damages.'" (emphasis
added) (quoting Coastal Power Int'l, Ltd. v. Transcon. Capital
Corp., 10 F. Supp. 2d 345, 370 (S.D.N.Y. 1998) (Kaplan, J.));
Wilmot v. State, 32 N.Y.2d 164, 168-69, 297 N.E.2d 90 (1973)
("No recovery may be had for losses which the person injured
might have prevented by reasonable efforts and expenditures"
(citation and internal quotation marks omitted)); Cornell v.
T.V. Dev. Corp., 17 N.Y.2d 69, 74, 215 N.E.2d 349 (1966)
(stating, in employment context, that "[w]hile the plaintiff is

required to mitigate damages upon breach, the burden of proving a lack of diligent effort to mitigate damages is upon the defendant"); Losei Realty Corp. v. City of N.Y., 254 N.Y. 41, 48, 171 N.E. 899 (1930) ("'The burden of proving that the damages which have been sustained . . . could have been prevented, unquestionably rests upon the party guilty of the breach of contract.'" (quoting Hamilton v. McPherson, 28 N.Y. 72, 77 (1863)); Eskenazi v. Mackoul, -- N.Y.S.2d --, 72 A.D.3d 1012, 1014 (App. Div. 2010) ("A party seeking to avail itself of the affirmative defense of failure to mitigate damages must establish that the injured party failed to make diligent efforts to mitigate its damages, and the extent to which such efforts would have diminished those damages."); LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 899 N.Y.S.2d 15, 17, 72 A.D.3d 409 (App. Div. 2010) (holding that it was error for the trial court to shift the burden on mitigation "from defendants to plaintiff to show that it reasonably mitigated its damages" because "defendants [have] the burden of establishing not only that plaintiff failed to make diligent efforts to mitigate, but also the extent to which such efforts would have diminished plaintiff's damages").  The Court's instruction on mitigation of damages, therefore, provided the correct legal standard and adequately informed the jury on the law.  See Cameron, 598 F.3d at 68; LNC Invs., 173 F.3d at 460.

Second, the Court properly declined certain of Aristocrat's proposed instructions on mitigation because they misconstrue the applicable legal standard for mitigation of damages. Aristocrat's first proposed instruction—"Bondholders were required to make substitute arrangements to obtain shares to cover their short positions within a reasonable amount of time" (Aristocrat's Revised Proposed Jury Instructions, dkt. no. 311, at 33)—erroneously requires Bondholders to undertake a particular action rather than actions that were reasonable under the circumstances at the time.  See Matsushita Elec. Corp. of Am. v. Gottlieb, No. 90 Civ. 3010, 1991 WL 152615, at *9 (S.D.N.Y. Aug. 1, 1991) ("Proof of mitigation of damages requires only a showing that plaintiff took reasonable steps to cut its losses, not that plaintiff did what the defaulting defendants would have had it do, or what in hindsight seems most effective to reduce the defaulting defendants' damages."). Aristocrat's second proposed instruction regarding the behavior of hedge funds—"that reasonable conduct for a hedge fund in the absence of litigation is not necessarily the same as what is reasonable for a hedge fund seeking to recover consequential damages in litigation" (Aristocrat's Revised Proposed Jury Instructions, dkt. no. 311, at 34)—is vague and unhelpful to the jury because it fails to convey any cognizable legal standard regarding what is reasonable conduct for a hedge fund, either in

51

the midst of, or outside of, litigation.  Aristocrat's third
proposed instruction—"if the Bondholders had a reasonable
opportunity to eliminate the exposure to the risk that the cost
of covering their short positions would increase, then
[Aristocrat] cannot be held liable for any increased cost the
Bondholders could have avoided by covering" (id.)—erroneously
replaces the duty to mitigate with a duty to "eliminate"
consequential damages.  See Air Et Chaleur , 757 F.2d at 494
("[D]efendant bore the burden of introducing evidence to prove
that plaintiffs could have lessened their damages." (emphasis
added)); Robin Bay, 2008 WL 2275902, at *8 ("'[D]efendant [must]
establish not only that the plaintiff unreasonably failed to
mitigate, but that reasonable efforts would have reduced the
damages.'" (emphasis added) (quoting Coastal Power, 10 F. Supp.
2d at 370)); Eskenazi, 72 A.D.3d at 1014 ("A party seeking to
avail itself of the affirmative defense of failure to mitigate
damages must establish that the injured party failed to make
diligent efforts to mitigate its damages, and the extent to
which such efforts would have diminished those damages."
(emphasis added)).  Aristocrat's final proposed instruction—
"Bondholders were not allowed to decline a reasonable
opportunity to cover their short positions or speculate on the
stock market price of [Aristocrat] shares at [Aristocrat's]
expense" (Aristocrat's Revised Proposed Jury Instructions, dkt.

no. 311, at 34)—likewise is contrary to the law, which does not
require an injured party to choose the path most likely to
prevent future damage, but rather to behave in a way that is
reasonable under the circumstances.  See Carlisle Ventures, Inc.
v. Banco Espanol de Credito, S.A., 176 F.3d 601, 609 (2d Cir.
1999) ("The fact that in retrospect a reasonable alternative
course of action is shown to have been feasible is not proof of
the fact that the course actually pursued by the plaintiff was
unreasonable." (internal citations and quotations marks
omitted)); Fed. Ins. Co., 783 F.2d at 350 ("[I]f the course of
action chosen by the plaintiff was reasonable, the plaintiff can
recover despite the existence of another reasonable course of
action that would have avoided further damage."); Fisher v.
First Stamford Bank & Trust Co., 751 F.2d 519, 524 (2d Cir.
1984) ("Hindsight may not serve as a basis to decrease damages
plaintiff is otherwise entitled to recover."); Matsushita, 1991
WL 152615, at *9 ("Proof of mitigation of damages requires only
a showing that plaintiff took reasonable steps to cut its
losses, not that plaintiff did what the defaulting defendants
would have had it do, or what in hindsight seems most effective
to reduce the defaulting defendants' damages.").  Thus, the
Court properly rejected Aristocrat's proposed instructions as
contrary to the law.

Third, Aristocrat has no basis to argue that the Court emphasized disproportionately that the jury should not evaluate Bondholders' conduct based on hindsight and that Bondholders did not have an obligation to take extraordinary and costly measures to mitigate their consequential damages. (Aristocrat's Mem. 21-24.)  The Court's instruction on the law of mitigation was clear, concise, and correct.  See Girden, 262 F.3d at 203 (stating that the purpose of jury instructions is to "give the jury a clear and concise statement of the law applicable to the facts of the case"); Trial Tr. 1824:18-1825:12 (providing instruction).[7]  The text of the instruction was taken almost verbatim from controlling precedent.  See Carlisle, 176 F.3d at 609 ("The fact that in retrospect a reasonable alternative

---

[7] The full text of the hindsight instruction is as follows:

> In making your assessment, keep in mind the finding of an unreasonable failure to mitigate cannot be based on a backward-looking analysis.  The appropriate inquiry is whether the bondholders' decisions were reasonable in light of the circumstance when they made their decisions.  The test is an objective one:  What a reasonable person would have done to mitigate consequential damages in the circumstances at the time.
> The fact that in retrospect a reasonable alternative course of action is shown to have been feasible is not proof of the fact that the course actually pursued by the bondholders was unreasonable.  In other words, hindsight might not serve as a basis to decrease . . . damages a bondholder's otherwise entitled to recover.  Proof of mitigation of damages requires only a showing that the bondholder took reasonable steps to cut its losses, not that the bondholder did what in hindsight seems more effective to reduce the damages that occurred.  A bondholder does not have an obligation to undertake extraordinary and costly measures to mitigate consequential damages.

(Trial Tr. 1824:18-1825:12.)

course of action is shown to have been feasible is not proof of the fact that the course actually pursued by the plaintiff was unreasonable." (internal citations and quotations marks omitted)); Fisher, 751 F.2d at 524 (2d Cir. 1984) ("Hindsight may not serve as a basis to decrease damages plaintiff is otherwise entitled to recover."); Matsushita, 1991 WL 152615, at *9 ("Proof of mitigation of damages requires only a showing that plaintiff took reasonable steps to cut its losses, not that plaintiff did what the defaulting defendants would have had it do, or what in hindsight seems most effective to reduce the defaulting defendants' damages."). That Aristocrat finds the law unhelpful to its position is not tantamount to "improper[] and disproportionate[] emphasi[s]" by the Court. (Aristocrat's Mem. 22.)

Fourth, the record contradicts Aristocrat's argument that the Court failed to inform the jury of its previous ruling that Bondholders were entitled to general damages equal to the value of Aristocrat's promised performance. The Court instructed the jury that: "This Court already has held that Aristocrat breached the contract, . . . and the bondholders are entitled to two types of money damages: General damages and consequential damages. General damages are the value of the performance promised by Aristocrat under the contract." (Trial Tr. 1818:16–21.) The Court also rejects Aristocrat's contention that the

Court's "refusal to provide any instruction concerning the law of specific performance was . . . clearly erroneous." (Aristocrat's Mem. 24; see also Aristocrat's Revised Proposed Jury Instructions, dkt. no. 311, at 35.)   The Court previously held that Bondholders' strategy of seeking specific performance was not unreasonable per se.   See Aristocrat Leisure, 618 F. Supp. 2d at 309 ("This Court is not persuaded that seeking specific performance is inherently unreasonable.").   The Court also held that though it "rejected and now reiterates its denial of specific performance, the Court does not believe that th[e] decision [to seek specific performance] is dispositive of whether the Bondholders reasonably mitigated their damages." Id.   Instructing the jury on the law of specific performance, therefore, would contradict the Court's prior rulings by asking the jury to evaluate a legal conclusion already drawn by the Court and would ignore the Court's holding that, "in resolving the mitigation issue, the trier of fact should consider all of the evidence related to the Bondholders' strategies with respect to their short positions after Aristocrat's breach," rather than just Bondholders' request for specific performance.   Id. (emphasis added).   The Court, therefore, properly rejected Aristocrat's attempt to relitigate an issue already decided by the Court.

4. Special Verdict Form

"'The formulation of special verdict questions rests in the discretion of the trial judge . . . [unless] a judgment [is] entered upon answers to questions which mislead and confuse the jury or which inaccurately frame the issues to be resolved by the jury.'" Parker, 260 F.3d at 106 (quoting Cann v. Ford Motor Co., 658 F.2d 54, 58 (2d Cir. 1981)).

Aristocrat contends that the special verdict form submitted to the jury was "misleading . . . and improperly slanted toward a verdict for the Bondholders." (Aristocrat's Mem. 24.)  First, Aristocrat argues that the special verdict form "failed to require the jury to evaluate the reasonableness of the conduct of the Bondholders on a case-by-case basis." (Id.)  Second, Aristocrat argues that "the form was temporally vague, in that it did not properly guide the jury as to the time period during which it should evaluate each Bondholder's conduct." (Id. 24-25.)

Both Aristocrat and Bondholders submitted proposed special verdict forms.  In crafting the special verdict form that ultimately went to the jury, the Court used as guidance each side's proposed form.  The jury was provided the special verdict form only after the Court's extensive instructions.  Question 1 of the special verdict form requires the jury to decide whether Aristocrat "[met] its burden of proving by a preponderance of

the evidence that any of the [Bondholders] seeking consequential
damages at trial unreasonably failed to mitigate their
consequential damages following Aristocrat's breach of the
Indenture[.]"  (Special Verdict Form, dkt. no. 324, at 2
(emphasis in original).)  If the jury answers "Yes," it is
instructed to "move on to Question 2."  (Id.)  If the jury
answers "No," it is instructed that it has "completed the
special verdict form and [that] the foreperson should sign and
date" the final page.  (Id.)

    Question 2 of the special verdict form instructs that, if
the jury "answered yes to Question 1," it should "identify the
Bondholder(s) that unreasonably failed to mitigate its (their)
consequential damages by writing 'Yes' or 'No' in the column
labeled 'Unreasonably Failed to Mitigate Consequential
Damages?'" on a chart in question 2.  (Id.)  The chart has four
columns:  The first lists by name each Bondholder seeking
consequential damages at trial; the second lists, with respect
to each Bondholder identified in the first column, the "Breach
Date (date when conversion was completed)"; the third asks the
jury to indicate whether each listed Bondholder "Unreasonably
failed to Mitigate Consequential Damages" by writing "Yes or
No"; and the fourth asks the jury to provide the "Date at Which
Actions Became Unreasonable" in the format "Month-Day-Year or
N/A."  (Id.)

The text of the special verdict form contradicts
Aristocrat's argument that the form does not require the jury to
evaluate the conduct of the Bondholders on a case-by-case basis.
(See id. question 2 (asking the jury to identify the Bondholders
that unreasonably failed to mitigate damages on a chart listing
each Bondholder by name).)  Prior to deliberation, the Court
also instructed the jury that "[y]ou will determine the facts
concerning each bondholder[]."  (Trial Tr. 1823:24-25 (emphasis
added).)  The special verdict form is not temporally vague, as
Aristocrat contends.  The form specifically asks the jury to
evaluate Bondholders' conduct "following Aristocrat's breach of
the Indenture," (Special Verdict Form, dkt. no. 324, question
1), and even lists the breach date for each Bondholder (id.
question 2).  Moreover, column four of the chart in question 2
explicitly asks the jury to identify the "Date at Which Actions
Became Unreasonable" in the format "Month-Day-Year or N/A."
(Id.)  The Court properly exercised its discretion in choosing
the wording of the special verdict form, Parker, 260 F.3d at
106, and there was no indication that the jury was confused by
the instructions or the special verdict form.  See United States
v. Stewart, 433 F.3d 273, 310 (2d Cir. 2006) ("We presume that
juries follow their instructions . . . .").  Because the special
verdict form was sufficient, Aristocrat's argument does not
support granting a new trial.

For the foregoing reasons, Aristocrat's Rule 50(b) motion for judgment as a matter of law is denied and Aristocrat's alternative Rule 59 motion for a new trial is denied.

## II.  Bondholders' Motion to Enter Partial Judgment Under Rule 54(b)

Bondholders, other than DBAGL,[8] move this Court to enter partial judgment pursuant to Rule 54(b) and submit proposed partial judgments for each Bondholder reflecting general and consequential damages that Bondholders contend are consistent with the jury verdict, the Court's prior rulings, and the applicable law.  Aristocrat contends that the Court should issue final, as opposed to partial, judgments on all claims. Aristocrat also objects to Bondholders' proposed judgments on the grounds that they overstate damages, interest, and are not adjusted for bond interest coupon payments that Aristocrat previously paid to the Trustee, who subsequently deposited them with the Court.  The Trustee also moves for declaratory judgment and for entry of final judgment with respect to five non-party bondholders.  Aristocrat opposes the Trustee's motion on the grounds that the Trustee has not provided Aristocrat with

---

[8] Bondholder DBAGL, which is represented by counsel different than the rest of the Bondholders, moves separately for the Court to enter final judgment in favor of DBAGL pursuant to its proposed final judgments.  (See DBAGL's Mem. of Law in Supp. of Its Proposed Final J. & in Response to Aristocrat's Partial Opp'n ("DBAGL Mem.") 1; Decl. of James I. McClammy in Supp. of DBAGL's Proposed Final J. & in Response to Aristocrat's Partial Opp'n ("McClammy Decl.") Exs. B & C.)  Otherwise, DBAGL joins the rest of the Bondholders' arguments for calculating damages and interest.

certain discovery needed to ascertain damages for these non-parties.  The Court addresses each issue below.

### A. Final Judgment Is Appropriate

Bondholders move for entry of partial judgment under Rule 54(b) on their counterclaims for counter-declaratory relief with respect to the meaning of the Indenture and for breach of contract ("Indenture Counterclaims").  (See Intervening Defs.' & Countercl. Pls.' Mem. of Law in Supp. of Their Mot. for Entry of J. Pursuant to Rule 54(b) ("Bondholders' 54(b) Mem.") 1.) Bondholders claim that partial final judgment is appropriate because while their Indenture Counterclaims are adjudicated fully and ripe for judgment, their counterclaims for violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 (the "Securities Fraud Counterclaim") and for breach of the implied covenant of good faith and fair dealing (the "Good Faith Counterclaim"), which have been stayed since March 2005, should remain pending with this Court while the rest of the case is on appeal.  (Id.)  Aristocrat objects to Bondholders' motion for partial judgment and, instead, requests that the Court dismiss the Securities Fraud and Good Faith Counterclaims and enter final judgment on all claims.  For the reasons discussed below, Bondholders' motion for partial judgment is denied and final judgment on all claims, including the Securities Fraud and

Good Faith Counterclaims, shall be entered after the parties
submit revised proposed final judgments consistent with this
Opinion and Order.

### 1. Legal Standard Under Rule 54(b)

Rule 54(b) permits the Court to "direct entry of a final
judgment as to one or more, but fewer than all, claims . . .
only if the court expressly determines that there is no just
reason for delay." Fed. R. Civ. P. 54(b). Certification of a
final partial judgment under Rule 54(b) is appropriate where:
(1) there are multiple claims or parties; (2) at least one claim
or the rights and liabilities of at least one party has been
finally decided within the meaning of 28 U.S.C. § 1291; and (3)
there is an express determination by the district court that
there is no just reason for delay and that the clerk should
enter judgment. See In re Aircrash at Belle Harbor, N.Y. on
Nov. 12, 2001, 490 F.3d 99, 108-09 (2d Cir. 2007); Ginett v.
Computer Task Group, Inc., 962 F.2d 1085, 1091 (2d Cir. 1992);
Take-Two Interactive Software, Inc. v. Brant, No. 06 Civ. 5279,
2010 U.S. Dist. LEXIS 22367, at *5-6 (S.D.N.Y. Mar. 5, 2010).
While "[f]actors (1) and (2) address the issue of whether rule
54(b) applies at all to the circumstances of the case," factor
(3) "is left to the sound judicial discretion of the district
court and is to be exercised in the interest of sound judicial

administration."  Ginett, 962 F.2d at 1091-92 (citations and
internal quotation marks omitted); see also In re Aircrash, 490
F.3d at 109.

       "'In determining whether to grant partial judgment, a court
should consider the relationship between the adjudicated and
unadjudicated claims.'"  United States v. B.C.F. Oil Ref. Inc.,
No. 05 Civ. 562, 2007 WL 81933, at *3 (E.D.N.Y. Jan. 9, 2007)
(quoting Siderpali, S.P.A. v. Judal Indus., Inc., 833 F. Supp.
1023, 1034 (S.D.N.Y. 1993)).  "[I]f the resolved claims are
separable or extricable, . . . then the district court may
certify the issue at its discretion."  B.C.F. Oil, 2007 WL
81933, at *3; see also Correspondent Svcs. Corp. v. J.V.W. Inv.
Ltd., 232 F.R.D. 173, 175 (S.D.N.Y. 2005).  But "[e]ven when the
claims are separable, a district court should use the power
granted by 54(b) 'sparingly' in light of the policy against
piecemeal appeals."  B.C.F. Oil, 2007 WL 81933, at *3 (quoting
O'Bert v. Vargo, 331 F.3d 29, 41 (2d Cir. 2003) (Kearse, J.));
see also Ginett, 962 F.2d at 1093.


       2. Analysis
       The first element of the Rule 54(b) test is satisfied
because this action involves multiple claims.  (See generally
Compl.; Bondholders' Answer & Countercl.)  While the second
element of the Rule 54(b) test technically is satisfied, all

claims in this action—rather than simply "at least one claim"—
are adjudicated, readying this case for final, rather than
partial, judgment. In re Aircrash, 490 F.3d at 109. As
pleaded, Bondholders' Securities Fraud Counterclaim is
contingent upon an interpretation of the Indenture in
Aristocrat's favor. (See Bondholders' Answer & Countercl. ¶ 32
("In the event that it is determined herein that the notice of
redemption was effective to terminate the conversion rights of
the Intervening Defendants prior to the valid and effective
exercise of their conversion rights, then Plaintiff's Offering
Memorandum misrepresents the terms of the Indenture."); id. ¶ 37
("If, contrary to the contention of the Intervening Defendants,
this Court agrees with Plaintiff's understanding of the terms of
the Indenture, then the Intervening Defendants will have been
damaged by Plaintiff's misleading statements and omissions.").)
Because the Court already interpreted the Indenture in
Bondholders' favor, rather than Aristocrat's favor, the
Securities Fraud Counterclaim must be dismissed without
prejudice as moot.  Bondholders' Good Faith Counterclaim also
must be dismissed because it is encompassed in Bondholders'
already-adjudicated Indenture Counterclaims.  See DVCi Techs.,
Inc. v. Timesquaremedia.com, Inc., No. 00 Civ. 0207, 2000 WL
33159189, at *3 (S.D.N.Y. Nov. 29, 2000) (holding that
plaintiff's second claim for relief "premised on the breach of

64

the implied covenant of good faith and fair dealing . . .
duplicates plaintiff's breach of contract claim"); Bondholders'
Answer & Countercl. ¶¶ 38, 42-46.  Where a party receives relief
"under one theory of recovery and is restored to the same
economic position he would have occupied if the contract had
been honored, there is no reason to accept alternative theories
of recovery." DVCi Techs., 2000 WL 33159189, at *3; see also
Adams v. Lindblad Travel, Inc., 730 F.2d 89, 94 (2d Cir. 1984).
Here, as in DVCi Technologies, Bondholders' Good Faith
Counterclaim must be dismissed because "awarding [Bondholders]
damages for breach of contract . . . in effect restores
[Bondholders] to the same economic position [they] would have
been in had the contract not been breached." DCVi Techs., 2000
WL 33159189, at *3.  Bondholders acknowledge that to preserve
their Securities Fraud and Good Faith Counterclaims should this
Court's interpretation of the Indenture be reversed on appeal,
they may file a protective cross-appeal challenging the
dismissal of these claims.  (See Intervening Defs. and
Countercl. Pls.' Reply Mem. of Law in Supp. of Their Mot. for
Entry of J. Pursuant to Rule 54(b) ("Bondholders' 54(b) Reply")
3.)  Therefore, the Court rejects Bondholders' request to retain
the Securities Fraud and Good Faith Counterclaims while the rest
of the action is on appeal to the Second Circuit.

Bondholders' argument that the Securities Fraud
Counterclaim "cannot be abandoned . . . because the subject
matter jurisdiction of this Court depends on the Securities
Fraud Claim" is misguided.  (Bondholders' 54(b) Mem. 3.)  First,
as discussed above, the Securities Fraud Counterclaim, as
pleaded, no longer presents a live case or controversy and,
therefore, should be dismissed.  See Irish Lesbian and Gay Org.
v. Giuliani, 143 F.3d 638, 648 (2d Cir. 1998) (stating that "a
federal court should refuse to hear a case that no longer
presents a live case or controversy").  Second, this Court's
original jurisdiction is premised on alienage diversity
jurisdiction, rather than federal question jurisdiction, so that
Bondholders' federal Securities Fraud Counterclaim is not
determinative of this Court's supplemental jurisdiction over
Bondholders' state claims.  See Grupo Dataflux v. Atlas Global
Group, L.P., 541 U.S. 567, 570, 124 S. Ct. 1920, 158 L. Ed. 2d
866 (2004) ("[T]he jurisdiction of the court depends upon the
state of things at the time of the action brought." (citation
and internal quotation marks omitted)); see also Leonard J.
Strandberg & Assocs. v. Misan Constr. Corp., No. 08 Civ. 2939,
2010 WL 1565485, at *3 (E.D.N.Y. Apr. 19, 2010) ("This 'time-of-
flling' rule 'measures all challenges to subject-matter
jurisdiction premised upon diversity of citizenship against the
state of facts that existed at the time of filing [the

complaint,] whether the challenge be brought shortly after
filing, after the trial, or even for the first time on appeal.'"
(quoting Grupo, 541 U.S. at 570-71)).  Because this action
initially was brought by an Australian citizen against a New
York citizen for an amount exceeding $75,000, the Court's
original subject matter jurisdiction was premised on 28 U.S.C. §
1332(a)(2).  (See Compl. ¶ 6.)  Following the intervention of
thirteen Bondholders—citizens of Delaware, Illinois, New York,
England, and the Caribbean—as defendants under Rule 24(a), the
Court took supplemental jurisdiction over Bondholders' state
counterclaims, which—like Aristocrat's main claim—involved
interpreting the terms of the Indenture and Aristocrat's
performance thereunder, thereby "form[ing] part of the same case
or controversy."  28 U.S.C. § 1367(a); see also Bondholders'
Answer & Countercl. 2-3 & ¶ 6.  Because Bondholders intervened
as defendants, their state counterclaims are outside of the
supplemental jurisdiction stripping provision of section
1367(b).  See 28 U.S.C. § 1367(b) ("In any civil action of which
the district courts have original jurisdiction founded solely on
section 1332 of this title, the district courts shall not have
supplemental jurisdiction under subsection (a) over claims by
plaintiffs against persons made parties under Rule 14, 19, 20,
or 24 of the Federal Rules of Civil Procedure . . . when
exercising supplemental jurisdiction over such claims would be

inconsistent with the jurisdictional requirements of section
1332."). The pertinent question, therefore, is whether section
1367(b) precludes plaintiff Aristocrat from asserting its
original declaratory judgment claims against Bondholders, who
are "parties under Rule . . . 24." Id.; see also 16 James Wm.
Moore et al., Moore's Federal Practice § 106.46 (3d ed. 2010)
("Under Section 1367, one may intervene as a defendant and then
assert a counterclaim against a nondiverse plaintiff or a
crossclaim against a nondiverse party. However, the plaintiff
may not respond with a claim against a nondiverse intervenor
because it is a claim made by a plaintiff against a person made
a party under Rule 24, a result expressly prohibited by Section
1367(b)."). The Court holds in the negative because Aristocrat
does not assert any new claims against Bondholders; rather,
Bondholders merely are defending against Aristocrat's original
claim, which not only is permissible, but required, for the
exercise of supplemental jurisdiction here. See Moore et al.,
supra, § 106.46 ("[A] party may not intervene as a defendant
solely for the purpose of asserting a claim against a nondiverse
plaintiff. The intervenor must be potentially liable to the
plaintiff on the primary claim in order to be treated as a
defendant to whom supplemental jurisdiction may apply under
Section 1367(b)."). Therefore, the Court has supplemental
jurisdiction over Bondholders' state counterclaims asserted

against Aristocrat regardless of the presence of Bondholders'
federal Securities Fraud Counterclaim.

For the foregoing reasons, Bondholders' Securities Fraud and
Good Faith Counterclaims, held in abeyance since March 2005, are
dismissed without prejudice.  Bondholders' motion for partial
judgment under Rule 54(b) is denied and final judgment shall be
entered on all claims after the parties submit joint revised
proposed final judgments consistent with this Opinion and Order.

### B. Judgment Calculations

Bondholders, including DBAGL, submit proposed judgments for
each Bondholder in this case, while the Trustee submits proposed
judgments for five non-party Bondholders.  (See Decl. of
Theodore S. Geiger In Supp. of Bondholders' Rule 54(b) Mot.
("Geiger Decl.") Exs. 1-16; Decl. of Theodore S. Geiger In Supp.
of Bondholders' Reply Mem. of Law in Further Supp. of Their Mot.
for Entry of J. Pursuant to Rule 54(b) ("Geiger Reply Decl.")
Ex. 1; McClammy Decl. Exs. B & C; Ltr. from Laura Fraher to the
Court, 11/13/09, at 1 & Exs. 1-2; Decl. of Laura Fraher in Supp.
of Trustee's Mot. for Ct. to Consider Whether to Issue J. in
Favor of Add'l Non-Party Bondholders ("Fraher Decl.") Exs. 2-4.)
Unless indicated otherwise, DBAGL and the Trustee join
Bondholders' arguments regarding judgment calculations.  All
parties agree that for general damages, the applicable exchange

rate to be used to convert Australian dollars into U.S. dollars
is the exchange rate on the day after each Bondholder submitted
conversion notices (the "conversion date"), previously
determined to be the breach date.[9]   (See Bondholders' 54(b) Mem.
3.)   For consequential damages, the parties agree that the
exchange rate to be used to convert Australian dollars into U.S.
dollars is the exchange rate on the date of the purchase of
shares to cover a short position (the "cover date").   (Id.)   The
parties disagree, however, on whether:   (1) Bondholders'
judgments should be offset by gains derived from closing short
positions and from interim trading on short positions; (2) the
pre-judgment interest rate should be calculated from the
conversion date or cover date; (3) coupon payments Aristocrat
paid into the Court should be used to offset Bondholders'
judgments; (4) the post-judgment interest rate should be
governed by New York or federal law; and (5) the Court should
enter judgment in favor of five non-party bondholders.   The
Court addresses each disputed issue in turn.

1. Bondholders' Proposed Judgments Shall Be Offset By Gains
   On Short Positions

---

[9] The conversion date is the day after a Bondholder completes the conversion
process as detailed in section 13.02 of the Indenture.   See Aristocrat
Leisure, 618 F. Supp. 2d at 293 n.13.   The conversion date, therefore, varies
for each Bondholder.   Id.

An "injured party should not recover more from the breach than he would have gained had the contract been fully performed." Freund v. Wash. Square Press, Inc., 34 N.Y.2d 379, 382, 314 N.E.2d 419 (1974); see also Rudman v. Cowles Commc'ns, Inc., 30 N.Y.2d 1, 14, 280 N.E.2d 867 (1972) (stating that in assessing breach of contract damages, earnings of terminated employee in new business should be credited toward unpaid salary recoverable from former employee). Federal courts in this Circuit and New York state courts consistently have held that damages otherwise recoverable for breach of contract must be reduced by any cost savings realized by an injured party as a result of another party's breach. See, e.g., Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 495 (2d Cir. 1995) ("[W]hen computing damages for a defendant's wrongful conduct, 'if any benefit or opportunity for benefit appears to have accrued to the plaintiff because of the breach, a balance must be struck between benefit and loss, and the defendant is only chargeable with the net loss.'" (quoting S&K Sales Co. v. Nike, Inc., 816 F.2d 843, 852 (2d Cir. 1987))); Adams, 730 F.2d at 92-93 ("[Plaintiff's] lost . . . profits equal the revenues he would have received from the 34 additional passengers . . . minus the additional costs he would have incurred in handling those passengers."); Broome v. Biondi, 17 F. Supp. 2d 211, 228 (S.D.N.Y. 1997) ("Even if [plaintiff] could claim damages

associated with the sale of her apartment, these expenses have to be offset by any profit she made through that sale."); Alesayi Beverage Corp. v. Canada Dry Corp., 947 F. Supp. 658, 671 (S.D.N.Y. 1996) ("[A]ny revenues due to the non-breaching party must be offset by any amount that the non-breaching party saved as a result of the breach."); Am. List Corp. v. U.S. News & World Report, Inc., 75 N.Y.2d 38, 44, 549 N.E.2d 1161 (1989) ("[P]laintiff has sufficiently demonstrated that the moneys it seeks-the present value of the balance owed by defendant under the contract less the costs reasonably saved by plaintiff as a result of the breach-are general damages flowing as a natural and probable consequence of the breach."); McMaster v. State, 15 N.E. 417, 423 (N.Y. 1888) (affirming reduction of damages award for value of "care, labor, trouble, risk, and responsibility" that plaintiff was spared because of breach); R&I Elecs., Inc. v. Neuman, 411 N.Y.S.2d 401, 404, 66 A.D.2d 836 (App. Div. 1978) ("In some cases the breach of a contract may prevent a loss as well as cause one, and, insofar as it prevents loss, the amount saved should be credited to the wrongdoer."). This principle is consistent with the fundamental view that "damages are meant to put a plaintiff in the same economic position he would otherwise be in but for a defendant's breach of contract." Boyce v. Soundview Tech. Group, Inc., 464 F.3d 376, 392 (2d Cir. 2006) see also Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 196

(2d Cir. 2003) (McLaughlin, J.); <u>Lucente v. Int'l Bus. Machs.</u>
<u>Corp.</u>, 310 F.3d 243, 262 (2d Cir. 2002) (McLaughlin, J.).

### a. $16,834,376 Offset to Judgments of QVT, Lehman, and DBAGL

Aristocrat contends that three of the Bondholders—QVT,
Lehman, and DBAGL—improperly ask the Court to award them general
damages without an offset of $16,834,376 in gains that they
earned when closing their short positions in Aristocrat stock—
"gains they would not have realized absent the breach."  (See
Aristocrat's Consol. Mem. of Law In Partial Opp'n to Mots. Of
Intervening Defs., Deutsche Bank AG, London Branch, and Deutsche
Bank Trust Co. Ams. For Entry of J. ("Aristocrat's 54(b) Opp'n")
6; see also Damages Decl. of David J. Ross ("Ross Decl.") ¶¶ 15-
16 & Ex. F.)  Aristocrat contends that this nearly $17 million
gain should be offset against QVT's, Lehman's, and DBAGL's full
measure of general damages.

Bondholders proffer two arguments for why Aristocrat is not
entitled to a nearly $17 million offset.  First, Bondholders
contend that Aristocrat is attempting to re-litigate issues
already resolved by the Court in its summary judgment decision
on damages from April 27, 2009.  (See Bondholders' 54(b) Reply
5-8; DBAGL's Mem. of Law in Supp. of Its Proposed Final J. & in
Response to Aristocrat's Partial Opp'n ("DBAGL Mem.") 2-3.)

Bondholders claim that, prior to the instant motion, Aristocrat never argued that an award of "general damages should be offset for any 'profit' that would ultimately be realized if and when the judgments in this action are finally paid where short positions were closed at prices below the share price on the date of breach." (Bondholders' 54(b) Reply 6.) Bondholders further claim that Aristocrat has waived its offset argument because Aristocrat was aware that Bondholder witnesses who had closed their short positions "uniformly" said, as early as their 2006 depositions, "that they did not intend to return or credit the difference" to Aristocrat for any financial profit made when closing their short positions. (Id.) Aristocrat counters that since Bondholders have the burden to establish the amount of actual damages and "have never before asserted that their damages awards should be computed without regard to these profits," Aristocrat "cannot have waived a defense to an issue on which the Bondholders have the burden of proof and which they have never previously raised." (Aristocrat's Sur-Reply Mem. of Law in Partial Opp'n to Mots. of Intervening Defs., DBAGL, & Trustee for Entry of J. ("Aristocrat's 54(b) Sur-Reply") 7.)

Second, Bondholders contend that Aristocrat is not legally entitled to a nearly $17 million offset because an offset against general damages is justified under New York law only where the non-breaching party saved money or avoided expenses as

74

a result of its not having to perform under the contract following the breach.  (Bondholders' 54(b) Reply 9; DBAGL's Mem. 3.)  Bondholders argue that here, where they, as the non-breaching parties, have performed fully their contractual obligations, there is no expense to be saved or loss avoided as a result of Aristocrat's breach.  (See Bondholders' 54(b) Reply 9.)

The Court first holds that Aristocrat has not waived its argument that damages should be offset by the amount that Bondholders earned from closing their short positions.  Prior to the instant motions, the offset issue was not raised by either side, and the Court agrees with Aristocrat that the issue could not have been raised in a meaningful way any earlier, since QVT, Lehman, and DBAGL did not disclose that they had realized approximately $17 million upon closing their short positions until September 2009, one month prior to the trial on consequential damages.[10]  (See Aristocrat's Rule 54(b) Opp'n 7

---

[10] DBAGL contends that Aristocrat was aware of the earnings DBAGL made on its short position well in advance of trial.  (See DBAGL Mem. 2 n.3)  Aristocrat does not dispute that it "was in possession of documents outlining all of DBAGL's trades in Aristocrat stock related to [DBAGL's $8,339,000 Asian Convertible Bonds Trading Desk ("DBAGL Asian")] at the time Aristocrat deposed a DBAGL representative on October 24, 2006."  (Id.)  However, Aristocrat did not possess trading information with respect to another DBAGL position, DBAGL OMNIS (for $3,301,000), until shortly before trial.  (See Aristocrat's 54(b) Sur-Reply 7 n.10; Trial Tr. 1033:14-1034:5.)  DBAGL does not dispute this fact.  Because there is only one DBAGL party in this action representing both the DBAGL OMNIS and DBAGL Asian positions, Aristocrat did not possess all of the relevant DBAGL trading information until shortly before trial.  Moreover, because there is only one DBAGL party representing both DBAGL positions, there should be only one DBAGL judgment in this case encompassing both positions.

n.8; Aristocrat's 54(b) Sur-Reply 7 n.10 & 8.)   Therefore,

Aristocrat has not waived its argument that it is entitled to an

offset equivalent to the gains that QVT, Lehman, and DBAGL

generated upon closing their short positions.

Second, the Court holds that Aristocrat is entitled to an

offset.  As discussed above, if a victim derives a benefit from

the breaching party's breach of contract, the breaching party

only is responsible for the victim's net loss.  See Indu Craft,

47 F.3d at 495; S&K Sales, 816 F.2d at 852; Stern, 539 F.2d at

1311-12.  The parties do not dispute that had Aristocrat

delivered shares upon conversion, those Bondholders with short

positions would have closed their short positions and would not

have engaged in post-breach trades.  See Trial Tr. 328:19-329:4

[DBAGL], 364:12-20 [UFJ], 416:14-417:19 [Deephaven], 588:14-

590:8 [KBC FP and KBC HK], 810:25-811:3 [QVT], 913:14-18, 916:9-

16 [Lehman], 949:23-950:4 [D.E. Shaw], 975:19-23 [CQS], 1451:18-

20, 1457:18-21 [Alexandra], 1573:19-22, 1580:9-12 [KBC AIM

funds]; Aristocrat's 54(b) Opp'n 14.  Accordingly, had

Aristocrat performed fully under the Indenture, Bondholders with

short positions would not have generated earnings on their short

positions following conversion.

The parties dispute who has the burden of proving the

amount of offset or setoff to damages.  Federal district courts

in the Second Circuit do not have a consistent view on whether

the breaching party or the victim of the breach bears the burden

of proof on offset.  Compare Mathias v. Jacobs, 238 F. Supp. 2d

556, 580-81 (S.D.N.Y. 2002) ("[Plaintiff] had the burden of

proof to establish the portion of damages he alleged was

represented by the full amount of the options, and to refute

[defendant's] claim for an apportionment and offset to reduce

[plaintiff's] asserted losses."); Minpeco, S.A. v.

Conticommodity Servs., Inc., 676 F. Supp. 486, 490 (S.D.N.Y.

1987) ("[T]he accepted rule is that the plaintiff, because it

bears the burden of proving its claim for damages, also bears

the burden of proof with regard to the offset."); Filmline

(Cross-Country) Prods., Inc. v. United Artists Corp., 662 F.

Supp. 798, 813 (S.D.N.Y. 1987) (Sprizzo, J.) (requiring

plaintiff to prove offsetting costs saved by reason of

defendant's wrongful conduct), with Auburn Chevrolet-Oldsmobile-

Cadillac, Inc. v. Branch, No. 06 Civ. 0362, 2009 WL 667430, at

*10 (N.D.N.Y. Mar. 10, 2009) ("The Court finds that Defendant

has not met his burden of showing that he is entitled to any

recoupment or set-off with regard to that [damages] amount.");

Ruhlmann v. Smith, 323 F. Supp. 2d 356, 368 (N.D.N.Y. 2004)

("Defendants do not dispute that, as the parties asserting that

set-off is appropriate, they bear the burden of proof."); Aniero

Concrete Co., Inc. v. N.Y. City Constr. Auth., 308 F. Supp. 2d

164, 190-91 n.17 (S.D.N.Y. 2003) (stating that because "the

defendant wishes to reduce the amount of [plaintiff's] claim by
asserting its right to a 'credit,' 'offset,' or 'setoff,'
defendant bears the burden of proving its entitlement by a
preponderance of the evidence"); U.S. for Use and Benefit of F &
G Mech. Corp. v. Manshul Constr. Corp., No. 94 Civ. 2436, 1998
WL 849327, at *28 (E.D.N.Y. Oct. 1, 1998) (holding "that
defendant has failed to satisfy its burden of proof on its
claims for set-off or recoupment"); Susi v. Belle Acton Stables,
Inc., 261 F. Supp. 219, 222 (S.D.N.Y. 1966) ("[T]he burden of
proving . . . a set-off, recoupment, or reduction of damages is
upon the defendants."). New York state courts, on the other
hand, consistently require the party that would benefit from the
offset—in this case, Aristocrat—to prove its entitlement to a
reduction of damages. See Am. Oil Co. v. Coughlin, 24 N.Y.S.2d
731, 732, 261 App. Div. 852 (App. Div. 1941) (holding that,
where defendants "pleaded a counterclaim or set-off," they "had
the burden of proof on [that] issue"); Feiger v. Iral Jewelry,
Ltd., 382 N.Y.S.2d 216, 221, 85 Misc. 2d 994 (Sup. Ct. 1975)
(stating that defendant has the burden of proof to establish
offset on commission payments owed to plaintiff, which defendant
did not meet, but noting that, even if plaintiff had the burden,
plaintiff still would prevail); Porter v. McMorran, 264 N.Y.S.2d
296, 299, 48 Misc. 2d 79 (Sup. Ct. 1965) (holding that "[t]he
burden of proof as to any amount sought to be offset was upon

the [defendant] . . . and failure to sustain this burden at
trial cannot thereafter precipitate a collateral attack upon the
judgment . . . [by way of] a counterclaim in a subsequent
proceeding"); Tiger Sec. Group, Inc. v. State, 851 N.Y.S.2d 74
(Table), 2007 WL 4105821, at *16 (Text) (Ct. Cl. Sept. 25, 2007)
("Defendant bears the burden of proof on any affirmative
defense, rights to set-off, or counterclaims asserted by it.");
Mastic Acres, Inc. v. State, 260 N.Y.S.2d 532, 535, 46 Misc. 2d
660 (Ct. Cl. 1965) ("The defendant has failed to meet its burden
of proof by way of offset . . . ."). The Court need not resolve
whose burden it is to prove entitlement to an offset because
even if Aristocrat bears the burden, Aristocrat has satisfied it
by demonstrating that, as a result of its breach of the
Indenture, QVT, Lehman, and DBAGL derived gains upon closing
their short positions at favorable prices. (See Ross Decl. ¶¶
15-16 & Ex. F.)

Aristocrat also refutes Bondholders' limited reading of the
offset principle, (see Bondholders' 54(b) Reply 9 (contending
that an offset is appropriate only "where the non-breaching
party saved money or avoided expenses as a result of its not
having to perform under the contract following the breach")), by
proffering authority supporting the bedrock principle that an
injured party should not recover more from the breach than he
would have gained had the contract been performed fully. (See

Aristocrat's 54(b) Opp'n 6-13; Aristocrat's 54(b) Sur-Reply 3-
6.)   Although Bondholders attempt to factually distinguish ten
cases that Aristocrat cites, (see Bondholders' 54(b) Reply 9-
11),[11] these cases, though factually dissimilar, do not limit, or
otherwise qualify, the legal principle that an injured party
"cannot choose to recover for his injuries yet retain his
windfall." Minpeco, 676 F. Supp. at 488.   Indeed, the factual
diversity of these cases demonstrates the broad reach of the
offset principle, which extends even to securities fraud victims
whose damages are offset by profits derived as a result of a
wrongdoer's actions.  See, e.g., Byrnes v. Faulkner, Dawkins &
Sullivan, 550 F.2d 1303, 1314 (2d Cir. 1977) (holding that
securities fraud losses must be offset by corresponding gains
since "the transaction cannot be fractionated"); Minpeco, 676 F.
Supp. at 490 (holding that whatever losses plaintiff trader
incurred on its short positions when price of silver increased

---

[11] Bondholders seek to distinguish Freund, 34 N.Y.2d at 382-83, as "not
concern[ing] an offset to general damages but[, rather,] a claim for the cost
of self-publishing a book following the breach of contract to publish."
(Bondholders' 54(b) Reply 11.)

   Bondholders seek to distinguish the following offset cases as limited to
circumstances where the non-breaching party did not have to perform a duty
after the breaching party breached the contract:  Indu Craft, 47 F.3d at 493-
95; Am. List Corp., 75 N.Y.2d at 44; McMaster, 108 N.Y. at 548-53; R&I
Elecs., 411 N.Y.S.2d at 404.  (Bondholders' 54(b) Reply 9-10.)

   Bondholders seek to distinguish these offset cases as limited to the
employee-wage context: Rudman, 30 N.Y.2d at 14; Cornell, 17 N.Y.2d at 74;
Hollwedel, 263 N.Y. at 101.  (Bondholders' 54(b) Reply 10.)

   Bondholders seek to distinguish offset cases involving claims of fraudulent
securities activity from the instant case, which involves a breach of
contract:  Apex Oil Co. v. DiMauro, 744 F. Supp. 53, 55 (S.D.N.Y. 1990)
(Wood, J.); Minpeco, 676 F. Supp. at 490.  (Bondholders' 54(b) Reply 11.)

as a result of defendant's fraudulent securities activities
"must be offset by the measure of the increase in value which
accrued to its own physical silver holdings"); see also Apex
Oil, 744 F. Supp. at 55 (stating that, as in Minpeco, "requiring
each counterclaimant to net out its gains and losses will
neither unjustly enrich [the wrongdoer], nor shelter it from any
appreciable liability, nor undermine the goal of deterrence . .
. [because t]here is no unjust enrichment where a claimant has
actually benefited from the alleged wrongdoing of another"
(emphasis in original)).

Additionally, neither of the cases that Bondholders cite in
affirmative support of their argument against an offset applies
here.  In Allied Semi-Conductors International, Ltd. v. Pulsar
Components International, Inc., the court held that the disputed
damages issue was resolved by the "clear statutory mandate" of
section 2-711(1)(a) of the New York Uniform Commercial Code
("N.Y. U.C.C."), which expressly allows a buyer who receives
non-conforming goods to recover "so much of the price as has
been paid" plus the cost of "cover."  907 F. Supp. 618, 630, 632
(E.D.N.Y. 1995) (quoting N.Y. U.C.C. § 2-711(1)(a)).  Because
the buyer "sustain[ed] no cover damages" from the seller's
breach of contract, the court awarded only "the purchase price
paid" and, as mandated by statute, disregarded the buyer's
profit on its cover transaction.  Id.  Because the N.Y. U.C.C.

does not apply to the instant case, Allied Semi-Conductors is unavailing.  In G.A. Thompson & Co., Inc. v. Wendell J. Miller Mortgage Co., Inc., the claimant's gains occurred "before the breach," unlike Bondholders' gains, which occurred because of the breach, thereby rendering G.A. Thompson inapplicable to the instant case.  457 F. Supp. 996, 998-99 (S.D.N.Y. 1978).

In a footnote in their reply brief, Bondholders contend that Aristocrat's proposed judgments erroneously include offsets for payments in lieu of dividends received by QVT, Lehman, and DBAGL.  (Bondholders' 54(b) Reply 12 n.3; see also Ross Decl. Ex. F.)  Bondholders claim that because the Court previously ruled that in lieu of dividend payments are not recoverable as damages, "they should not be taken into account for offset purposes either."  (Bondholders' 54(b) Reply 12 n.3.)  In its April 27, 2009 ruling, the Court precluded Bondholders from obtaining "in lieu of dividend payments" as part of their damages award because such payment would be tantamount to receiving "double recovery."  Aristocrat Leisure, 618 F. Supp. 2d at 301-02.  The Court did not address, let alone preclude, the offset at issue in the instant motion.  Moreover, Aristocrat deducts the in lieu of dividend payments made by DBAGL, Lehman, and QVT from DBAGL's, Lehman's, and QVT's total gains on closing their short positions, resulting in a smaller, rather than larger, offset against these Bondholders' general damages.  (See

Ross Decl. ¶ 16 & Ex. F at 2-5 (subtracting "In Lieu Dividend Payment" from the "Cumulative Gain" for DBAGL Asian, DBAGL OMNIS, Lehman, and QVT).)

For the foregoing reasons, the judgments of QVT, Lehman, and DBAGL shall be offset by the amount of earnings QVT, Lehman, and DBAGL derived upon closing their short positions.

### b. $1,093,358 Offset to Judgments of Deephaven, KBC FP, and four KBC AIM funds—ARB, MAC 28, Multi, and OPPS

Aristocrat contends that several Bondholders—Deephaven, KBC FP, and four of the five KBC AIM funds (ARB, MAC 28, Multi, and OPPS)—"have omitted from their calculation of consequential damages the interim trading gains they made on their short positions before the positions were finally closed," resulting in a net overstatement of consequential damages of $1,093,358 (after adjusting for interim trading losses of certain other Bondholders—UFJ, KBC HK, and one KBC AIM fund, Melody). (Aristocrat's 54(b) Opp'n 7, 13; Ross Decl. ¶ 14 & Ex. E.) Bondholders contend that "these trades generally either were made in error and quickly reversed or were the result of what was called at trial a 'dynamic hedging strategy' following the breach." (Bondholders' 54(b) Reply 13.)  Bondholders' position is that "[b]ecause these trades are not within an established category for reduction of damages, the proposed offset should

not be allowed." (Id.) Bondholders also claim that because
some of these trades served to increase rather than close short
positions, "the proposed offset is at odds with this Court's
prior ruling[] . . . that consequential damages are limited to
the extra costs the Bondholders incurred when they 'bought
shares in the open market to close the short positions left open
by Aristocrat's refusal to honor the conversion notices.'" (Id.
(quoting Aristocrat Leisure, 618 F. Supp. 2d at 302).)
Bondholders also contend that Aristocrat never argued during the
October 2009 trial that these adjustments were unreasonable.
(Id. 14.)

The Court agrees with Aristocrat that a $1,093,358 offset
against consequential damages for interim trading gains is
appropriate. For the reasons discussed above, Bondholders are
not entitled to retain earnings derived as a result of
Aristocrat's breach because such gains, when added to the
damages Bondholders are to receive as a result of Aristocrat's
breach, would put Bondholders in a better position than they
would have been absent Aristocrat's breach. Accordingly, the
gains that Deephaven, KBC FP, and four KBC AIM funds (ARB, MAC
28, Multi, and OPPS) earned on their short positions through
interim trading will be offset from their consequential damages.

For the foregoing reasons, Aristocrat is entitled to a
downward adjustment to general damages in the amount of

$16,834,376 for gains realized by DBAGL, Lehman, and QVT when they closed their short positions.  Aristocrat also is entitled to a downward adjustment to consequential damages in the amount of $1,093,358 for the interim trading gains that Deephaven, KBC FP, and four of the five KBC AIM funds (ARB, MAC 28, Multi, and OPPS) earned on interim trades on their short positions.

### 2. Pre-Judgment Interest

The parties disagree about the calculation of certain aspects of the applicable pre-judgment interest rate.  The Court begins by summarizing the pre-judgment interest rate calculation issues to which there is no dispute.  Then the Court analyzes the pre-judgment interest issues in dispute.

The parties agree that (1) with respect to general damages, unhedged Bondholders are entitled to recover pre-judgment interest on the value of their shares from the breach date, previously determined to be the conversion date, through May 30, 2006—after which the interest rate is in dispute—at the statutory rate of 9% simple interest per annum, pursuant to N.Y. C.P.L.R. §§ 5001(a) and 5004; and (2) with respect to consequential damages, Bondholders are entitled to recover pre-judgment interest from each Bondholder's cover date through the date of final judgment at the statutory pre-judgment interest rate of 9% simple interest per annum, pursuant to N.Y. C.P.L.R.

§§ 5001(a) and 5004.  See Aristocrat Leisure, 618 F. Supp. 2d at
310; Aristocrat Leisure, 2006 U.S. Dist. LEXIS 34709, at *52;
Geiger Decl. Exs. 1–16; Decl. of W. David Sarratt in Supp. of
Aristocrat's Consol. Mem. of Law in Partial Opp'n to the Mots.
of Int. Defs., DBAGL, & Trustee for Entry of J. ("Sarratt
Decl.") Exs. G–W; Ross Decl. ¶¶ 18-19; Aristocrat's 54(b) Sur-
Reply 9 n.13.

     Now the Court turns to the pre-judgment interest issues in
dispute:  (a) with respect to general damages, whether a pre-
judgment interest rate of 7.5% applies to the period from May
31, 2006, through the date each Bondholder signed a Receipt and
Release Agreement; (b) with respect to general damages for
hedged Bondholders, whether the statutory pre-judgment interest
rate of 9% should accrue from the date of each such Bondholder's
cover transaction (as Aristocrat contends) or from the
conversion date (as Bondholders contend).  Below, the Court
addresses each issue in turn.

          a. Pre-Judgment Interest Rate of 7.5% Applies to
             Principal Payments From May 31, 2006, Through the Date
             that Each Bondholder Signed a Receipt and Release
             Agreement

     Aristocrat contends that because Bondholders' proposed
judgments fail to account for the Court's ruling that an
interest rate of 7.5% per year, rather than 9% per year, applies

to the pre-judgment interest for the principal amounts of
Aristocrat shares from May 31, 2006, through the dates of the
Receipt and Release Agreements, Bondholders' proposed judgments
overstate pre-judgment interest by $409,000.[12]  (Aristocrat's
54(b) Opp'n 14 n.16 (citing Aristocrat Leisure, 618 F. Supp. 2d
at 310 (holding that, pursuant to section 4.03 of the Indenture,
"Bondholders are entitled to prejudgment interest for the
principal amounts at the 7.5 percent interest rate from May 31,
2006 through the date each Bondholder signed a Receipt and
Release Agreement." (emphasis added))); Ross Decl. ¶ 18 n.10.)
Bondholders respond that the 7.5% interest rate does not apply
to this time period because Aristocrat's payments under the
Receipt and Release Agreements were not "in fact a payment of
principal" but rather "a down payment of damages for the failure
to deliver shares in an amount equal to principal."
(Bondholders' 54(b) Reply 19.)

    The Court reiterates that with respect to pre-judgment
interest "for principal payments," section 4.03 of the Indenture
entitles Bondholders to prejudgment interest "at the 7.5 percent
interest rate from May 31, 2006, through the date each
Bondholder signed a Receipt and Release Agreement." Aristocrat
Leisure, 618 F. Supp. 2d at 310.  The issue here is whether the

---

[12] It is undisputed that pre-judgment interest on general damages does not
accrue following the date that each Bondholder signed a Receipt and Release
Agreement.  See Geiger Decl. Exs. 1—16; Ross Decl. ¶ 18.

payments Aristocrat made to Bondholders under the Receipt and
Release Agreements, which are equivalent to the principal
amounts, effectively constitute principal payments under the
Court's April 27, 2009 ruling.  The Court finds in the
affirmative, and contemplated as much in its April 27, 2009
decision.  See id. (referring to the payments Aristocrat made to
Bondholders under the Receipt and Release Agreements as
"principal payments").  The Court repeats, therefore, that the
pre-judgment interest rate of 7.5% applies to the payments
Aristocrat made to Bondholders under the Receipt and Release
Agreements for the period from May 31, 2006 through the date
each Bondholder signed[13] a Receipt and Release Agreement.

### b. Pre-Judgment Interest Rate of 9% Applies to General Damages As of Each Bondholder's Conversion Date

Aristocrat contends that for Bondholders who held short
positions ("hedged Bondholders"), pre-judgment interest on
general damages for short positions should be calculated from
the dates of the cover transactions.  (Aristocrat's 54(b) Opp'n
14.)  Bondholders, on the other hand, ask the Court to award
pre-judgment interest on general damages from the conversion

---

[13] As Aristocrat notes, calculating the pre-judgment interest rate from the
date each Bondholder signed a Receipt and Release Agreement, as opposed to
the date that Aristocrat made payment pursuant to the Receipt and Release
Agreement, is consistent with the Court's April 27, 2009 decision.  See
Aristocrat Leisure, 618 F. Supp. 2d at 310; Ross Decl. ¶ 18 n.10.  If the
signature date is not available for certain Bondholders, the parties may
calculate pre-judgment interest from the date on which Aristocrat made
payment.  (See Ross Decl. ¶ 18 n.10.)

date, regardless of whether a particular Bondholder was fully
hedged, partially hedged, or unhedged.  (Bondholders' 54(b)
Reply 14.)  Aristocrat argues that calculating pre-judgment
interest on general damages for hedged Bondholders from the
conversion date, as Bondholders request, would give Bondholders
"nearly $34 million in pre-judgment interest premised on the
supposed loss of use of money that they would not have had if
[Aristocrat] had fully performed under the contract."
(Aristocrat's 54(b) Opp'n 19.)

        Bondholders proffer several arguments for why pre-judgment
interest on general damages for short positions should accrue
from the conversion date.  First, Bondholders assert that
Aristocrat has waived its argument that pre-judgment interest
should run from the date of each Bondholder's cover transaction
because Aristocrat did not raise it during the parties' briefing
of the summary judgment motion on damages.  (See Bondholders'
54(b) Reply 15.)  Second, Bondholders contend that this Court
previously rejected Aristocrat's proposal that hedged
Bondholders should receive pre-judgment interest as of their
cover date when it held that "Bondholders are 'entitled to
statutory interest of nine percent' both 'on the value of the
shares on the Conversion Date, and for any consequential damages
ultimately awarded for the costs associated with covering
[Bondholders'] short positions.'"  (Id. 15-16 (quoting

Aristocrat Leisure, 618 F. Supp. 2d at 310).)  Third,

Bondholders argue that pre-judgment interest on hedged positions

should accrue from the conversion date because, from that date,

"Bondholders were deprived of their ability to 'use' property to

which they were rightfully entitled, and therefore are entitled

to pre-judgment interest on the value of that property."  (Id.

16 (citing Love v. State of N.Y., 78 N.Y.2d 540, 544, 583 N.E.2d

1296 (1991) ("[Prejudgment interest] is simply the cost of

having the use of another person's money for a specified

period."); BVE Prods., Inc. v. Saar Co., LLC, 835 N.Y.S.2d 555,

556, 40 A.D.3d 349 (App. Div. 2007) ("CPLR 5001(a) provides that

[prejudgment] interest 'shall' be recovered on monetary damages

awarded for breach of contract or any act or omission affecting

possession or enjoyment of property." (quoting N.Y. C.P.L.R. §

5001(a)))).)  Finally, Bondholders note that using the cover

date, as Aristocrat suggests, "would create without cause a

fundamental distinction between the relief available to

Bondholders who hedge and those who do not" and, thus, "is not a

fair measure."  (Bondholders' 54(b) Reply 17.)

    The Court holds that the pre-judgment interest rate on

general damages for all Bondholders, including hedged

Bondholders, shall be calculated from each Bondholder's

conversion date, as Bondholders suggest.  As a threshold matter,

the Court holds that Aristocrat has not waived its argument for

using the cover date as the pre-judgment interest accrual date for general damages for hedged Bondholders.  Section 5001(c) of the New York Civil Practice Law and Rules ("N.Y. C.P.L.R.") provides that "[t]he date from which interest is to be computed shall be specified in the verdict, report or decision," but "[i]f a jury is discharged without specifying the date"—as occurred here—then "the court upon motion shall fix the date." N.Y. C.P.L.R. § 5001(c); see also Aristocrat's 54(b) Sur-Reply 11-12.  Thus, it is not untimely for Aristocrat to dispute the applicable date from which pre-judgment interest should accrue on general damages for hedged Bondholders.

Though timely, Aristocrat's argument fails on the merits. On April 27, 2009, the Court determined that Bondholders are entitled to a statutory pre-judgment interest rate of 9% "on the value of the[ir] shares on the Conversion Date, and for any consequential damages ultimately awarded for the costs associated with covering their short positions."  Aristocrat Leisure, 618 F. Supp. 2d at 310 (emphasis added).  In deciding that Bondholders are entitled to a 9% pre-judgment interest rate on the value of their shares "on the Conversion Date," the Court did not distinguish between hedged and unhedged Bondholders. Id.  The Court sees no reason to draw such a distinction now.

Section 5001(a) of the N.Y. C.P.L.R. provides, in relevant part, that "[i]nterest shall be recovered upon a sum awarded

because of a breach of performance of a contract." N.Y.
C.P.L.R. § 5001(a). The statute further mandates that
"[i]nterest shall be computed from the earliest ascertainable
date the cause of action existed, except that interest upon
damages incurred thereafter shall be computed from the date
incurred." Id. § 5001(b); see also Ginett v. Computer Task
Group, Inc., 962 F.2d 1085, 1101 (2d Cir. 1992). Interest "is
intended to indemnify successful plaintiffs 'for the non-payment
of what is due to them' and is not meant to punish defendants
for delaying the final resolution of the litigation." Love, 78
N.Y.2d at 544 (quoting Trimboli v. Scarpaci Funeral Home, Inc.,
326 N.Y.S.2d 227, 230, 37 A.D.2d 386 (App. Div. 1971), aff'd 30
N.Y.2d 687, 283 N.E.2d 614 (1972)); see also Brushton-Moira
Cent. School Dist. v. Fred H. Thomas Assocs., P.C., 91 N.Y.2d
256, 262, 692 N.E.2d 551 (1998) ("The award of interest reflects
. . . the principle that damages are properly ascertained as of
the date of the breach and . . . that there may be a time lag
between the accrual of a plaintiff's cause of action and the
resulting damage sustained and actual payment by defendant.").
"[I]nterest is not a penalty. Rather, it is simply the cost of
having the use of another person's money for a specified
period." Love, 78 N.Y.2d at 544; see also Paddington Partners
v. Bouchard, 34 F.3d 1132, 1141 (2d Cir. 1994) ("The purpose of

interest awarded under Section 5001 is to compensate adequately the recipient, rather than to penalize the paying party.").

In a breach of contract action, pre-judgment interest ordinarily accrues from the date of the breach. See Brushton-Moira, 91 N.Y.2d at 263 (holding "that plaintiff's damages . . . should be based on the cost to repair or replace the defective panels as of [the breach date] and, pursuant to statutory mandate, prejudgment interest must also be calculated from that same date"); Love, 78 N.Y.2d at 544 (holding that, in the context of a bifurcated trial, pre-judgment interest should accrue from the date of liability, rather than the date of assessment of plaintiff's damages); Kaiser v. Fishman, 590 N.Y.S.2d 230, 234, 187 A.D.2d 623 (App. Div. 1992) ("In the instant case, the contract was breached on June 5, 1981, . . . and that is the date from which the trial court should have awarded interest on the cost-to-cure damages . . . ."). But "where damages are incurred at various times after the cause of action accrues, section 5001 grants courts wide discretion in determining a reasonable date from which to award pre-judgment interest." Conway v. Icahn & Co., Inc., 16 F.3d 504, 512 (2d Cir. 1994). "An award of interest is 'often appropriate from the time at which a party was deprived of the use of money.'" Calgon Carbon Corp. v. WDF, Inc., -- F. Supp. 2d --, 2010 WL 1244766, at *7 (S.D.N.Y. Mar. 25, 2010) (quoting Lawyers' Fund

for Client Prot. v. Bank Leumi Trust Co., 94 N.Y.2d 398, 407,
727 N.E.2d 563 (2000)); see also 155 Henry Owners Corp. v.
Lovlyn Realty Co., 647 N.Y.S.2d 30, 31, 231 A.D.2d 559 (App.
Div. 1996) ("'The award of interest is founded on the theory
that there has been a deprivation of use of money or its
equivalent and that the sole function of interest is to make
whole the party aggrieved.  It is not to provide a windfall for
either party.'" (quoting Kaiser, 590 N.Y.S.2d at 234)).

        In its April 27, 2009 decision, the Court made clear that
"damages should be calculated from the Conversion Date, which is
the day [Bondholders] expected to receive, but did not actually
receive, Aristocrat shares." Aristocrat Leisure, 618 F. Supp.
2d at 294 (emphasis added).  Aristocrat now argues that the
Court should afford different treatment to general damages,
which Aristocrat does not dispute run from the conversion date,
and to pre-judgment interest on those general damages, which
Aristocrat says should accrue from hedged Bondholders' cover
dates.  The Court sees no reason for this disparate treatment.
After Aristocrat breached the Indenture by failing to deliver
shares upon conversion, Aristocrat was holding shares that it no
longer was entitled to hold, thereby "realiz[ing] some profit,
tangible or otherwise, from having [the shares] in hand." Love,
78 N.Y.2d at 545 ("[D]efendant, who has actually had the use of
the money, has presumably used the money to its benefit and,

consequently, has realized some profit, tangible or otherwise,
from having it in hand during the pendency of the litigation.").
Thus, contrary to Aristocrat's argument, there is "nothing
unfair about requiring [Aristocrat] to pay over this 'profit' in
the form of interest to [Bondholders], the party who was
entitled to the [shares] from the date [Aristocrat's] liability
was fixed."  Id.  Indeed, because Aristocrat "was not entitled
to the use of the money [equivalent to the value of shares upon
conversion] from the moment that liability was established, a
rule that would permit [Aristocrat] to retain the cost of using
the money (i.e., interest) would provide [Aristocrat] with a
windfall." Id.

    Aristocrat's argument that hedged Bondholders did not lose
the use of money until they closed their short positions is
unavailing.  Bondholders lost the use of the shares on the
conversion date, as it is on that date that they were entitled
to the shares and, accordingly, entitled to decide what to do
with them—i.e., use them to close their short positions, sell
them, lend them, or hold them.  The fact that Bondholders
testified that they would have used Aristocrat conversion shares
to close their short positions does not lead to Aristocrat's
proffered conclusion that Bondholders were not deprived of the
use of those shares; on the contrary, Bondholders' testimony
illustrates that Bondholders were deprived of their intended use

of those shares.  In addition to loss of use of their conversion
shares, Bondholders had to re-mark their Aristocrat positions on
their books from parity (convertible bonds had a value equal to
the price of the shares into which they were convertible) to par
(bonds were not convertible and were worth no more than a non-
convertible bond).  (Bondholders' 54(b) Reply 17.)  In some
cases, Bondholders also had to post collateral to cover this re-
marking, requiring them to incur costs that they would not have
incurred absent Aristocrat's breach.  (Id. 17 n.5; Trial Tr.
721:8-726:24, 1607:2-11 (testimony of Patrick Patterson of KBC
AIM).)

        Aristocrat heavily relies on Bulk Oil (U.S.A.), Inc. v. Sun
Oil Trading Co. in support of its position that when a victim of
a breach intends to use money owed by the breaching party to pay
off a separate loan, "an award of statutory interest . . . on
that part . . . of the contract price which [plaintiff] would
have used to pay off the loan would be a windfall."  697 F.2d
481, 485-86 (2d Cir. 1983) (rejecting plaintiff's argument that
it was deprived of its ability to use nearly $4 million to which
it was entitled because plaintiff would have used the funds to
pay off a separate loan).  Unlike the instant case, where pre-
judgment interest is governed by section 5001(b), in Bulk Oil,
pre-judgment interest was determined under section 2-709 of the
N.Y. U.C.C.  See id. at 486 n.12 ("Plainly, UCC § 2-709 is

specifically applicable to contracts for the sale of goods, whereas CPLR § 5001 is of general application, among other things, to breach of any contract."). Therefore, Bulk Oil, the only case that Aristocrat proffers, and that the Court has found, that precludes pre-judgment interest for money meant to be used to pay off a separate loan, is inapplicable. Because the Court holds that hedged Bondholders were deprived of their use of property to which they were entitled upon Aristocrat's non-delivery of conversion shares, it is from this date that pre-judgment interest should accrue at a statutory rate of 9% simple interest per annum.

For the foregoing reasons, a pre-judgment interest rate of 7.5% applies to the payments Aristocrat made to Bondholders under the Receipt and Release Agreements for the period from May 31, 2006 through the date each Bondholder signed a Receipt and Release Agreement, and a 9% pre-judgment interest rate on general damages shall accrue for all Bondholders—whether fully hedged, partially hedged, or unhedged—as of each Bondholder's conversion date.

### 3. Coupon Payments on Deposit With the Court

Aristocrat contends that coupon payments that Aristocrat previously deposited with the Court in the amount of $7,859,300 million "should be distributed to the Bondholders and credited

against the overall damages award."  (Aristocrat's 54(b) Opp'n
20 & n.24.)  Aristocrat explains that such a calculation
"work[s] no unfairness on the Bondholders" because "[a]t the
Court's direction, the funds were deposited in an interest-
bearing account," and, as Aristocrat's "proposed judgments
reflect, the Bondholders will get the benefit of that interest."
(Id. 21.)

   Bondholders and the Trustee argue that the Trustee's senior
lien on the coupon payments precludes application of those funds
toward the judgments.  (See Bondholders' 54(b) Reply 19; DBAGL
Mem. 2 n.4; Trustee's Reply Mem. in Supp. of Its Mot. for Ct. to
Consider Whether to Issue J. in Favor of Add'l Non-Party
Bondholders ("Trustee's Reply") 4.)  The Trustee contends that
because Aristocrat's coupon payments "are on deposit in an
interest bearing account pursuant to Orders of the Court [that]
acknowledg[e] that the Trustee has a senior lien on all such
funds . . . [t]he funds on deposit with the Court are not
available for distribution as suggested by Aristocrat."
(Trustee's Reply 4.)  The Trustee insists that the Court should
reject Aristocrat's suggestion that, after the funds deposited
with the Court are applied to satisfy the claims of the various
Bondholders, Aristocrat "will promptly satisfy the Trustee's
fees out of separate funds," (Aristocrat's 54(b) Opp'n 20 n.25),
because "this Court has already ruled [that] the Trustee may

continue to incur recoverable costs and expenses through the end of this litigation." (Trustee's Reply 4.)  The Trustee, therefore, claims that its "entitlement to compensation, reimbursement and indemnification cannot be quantified until the end of this litigation, including any appeal." (Id.)

The Court holds that the coupon payments deposited with the Court shall not be applied to reduce the damages judgment Aristocrat must pay.  The Court previously held, and Aristocrat does not dispute, that the Trustee has a senior lien over the coupon payments deposited with the Court. (See Aristocrat's 54(b) Opp'n 20 n.25.)  Since the Trustee will incur additional fees on appeal, the Court agrees with the Trustee that "it is not possible to finally quantify the Trustee's claim at this time." (Trustee's Reply 5.)  Additionally, it would not serve the interests of judicial economy for the Court to require the Trustee to quantify its expenses to date, apply the coupon payments on deposit with the Court toward these expenses, apply any remaining funds on deposit toward the judgments in this case, and, subsequently, require the Trustee to obtain an alternate method of security from Aristocrat for expenses incurred on appeal, as Aristocrat suggests. (See Aristocrat's 54(b) Sur-Reply 13.)  The Court also rejects Aristocrat's request to pay the Trustee out of separate funds, as this approach ignores the Trustee's senior lien, which the Trustee is

entitled to pursuant to the terms of the Indenture.  See
Aristocrat Leisure, 618 F. Supp. 2d at 300 ("The Indenture . . .
dictates that the Trustee gets first priority in the
distribution of any funds that the Trustee collected for overdue
coupon or principal payments." (citing Indenture §§ 4.06 & 5.06
for the propositions that any funds that the Trustee collects
under Article 4 of the Indenture first should be distributed to
compensate the Trustee and that the Trustee can assert a senior
claim and lien upon all property or funds held or collected by
the Trustee)).  The Court concludes that the Trustee may
continue to assert its senior lien over the funds on deposit
with the Court and those funds shall not be made available to
Aristocrat at this time to satisfy Bondholders' judgments.


        4. Post-Judgment Interest

        Aristocrat contends that post-judgment interest should be
calculated according to the post-judgment interest rate set
forth in 28 U.S.C. § 1961(a), which, at the time of briefing the
instant motions, ranged from approximately 0.27-0.32%.  (See
Aristocrat's 54(b) Opp'n 21.)  Section 1961(a) of Title 28 of
the United States Code provides that "[i]nterest shall be
allowed on any money judgment in a civil case recovered in a
district court."  28 U.S.C. § 1961(a).  Bondholders, on the
other hand, contend that because this case is governed by New

                              100

York state law, post-judgment interest should be set at the 9%
rate provided in sections 5003 and 5004 of the N.Y. C.P.L.R.
(Bondholders' 54(b) Reply 20.)

        After the parties submitted briefing on this issue, the
Second Circuit rendered a decision resolving any ambiguity
regarding the applicable post-judgment interest rate, holding
that the federal post-judgment interest rate, as articulated in
28 U.S.C. § 1961(a), applies to civil judgments issued by
federal district courts sitting in diversity even where a
general choice-of-law provision in a contract giving rise to the
action calls for the application of New York law.  See FCS
Advisors, Inc. v. Fair Fin. Co., Inc., 605 F.3d 144, 145, 149
(2d Cir. 2010) (per curium) (holding that post-judgment interest
should be calculated at the federal rate provided for under 28
U.S.C. § 1961(a) where "jurisdiction is premised on the
diversity of the citizenship of the parties and the contract
giving rise to the action contains a general choice-of-law
provision requiring the application of New York law"), vacating
No. 07 Civ. 6456, 2009 WL 1616518, at *1 (S.D.N.Y. June 9, 2009)
(Chin, J.) (holding that the choice-of-law provision in the
parties' contract requires the application of New York law,
rather than 28 U.S.C. § 1961(a), to the calculation of post-

judgment interest).[14]  The Second Circuit in FCS Advisors
explained that while parties are free to contract to a different
interest rate, such an agreement must express a clear,
unambiguous, and unequivocal intent to deviate from the federal
rate, and must select a rate that would apply to judgments
rendered, not simply to contract debts.  FCS Advisors, 605 F.3d
at 148 ("If the parties intend[] to . . . specify an interest
rate that applies to judgment debts, . . . they [are] required
to 'express such intent through clear, unambiguous and
unequivocal language.'" (emphasis in original) (quoting
Westinghouse Credit Corp. v. D'Urso, 371 F.3d 96, 102 (2d Cir.
2004))).  Because the parties in this case did not clearly,
unambiguously, and unequivocally agree to a specific post-
judgment interest rate for judgment debts, the Court shall apply
the federal post-judgment interest rate articulated in 28 U.S.C.
§ 1961(a).

    For the foregoing reasons, post-judgment "interest shall be
calculated from the date of the entry of the judgment, at a rate
equal to the weekly average 1-year constant maturity Treasury
yield, as published by the Board of Governors of the Federal
Reserve System, for the calendar week preceding the date of the

---

[14] The Court notes that, by letter dated June 2, 2010, Bondholders—consistent
with their ethical obligations—informed the Court that FCS Advisors, 2009 WL
1616518, a case upon which they relied in their briefs, had been vacated by
the Second Circuit.  See N.Y. Rule of Prof'l Conduct 3.3(a)(2) (effective
Apr. 1, 2009); see also Great E. Shipping Co. Ltd. v. Phoenix Shipping Corp.,
No. 07 Civ. 8373, 2007 WL 4258238, at *2 (S.D.N.Y. Dec. 4, 2007).

judgment."  28 U.S.C. § 1961(a).  Pursuant to these guidelines,
the Court shall set the post-judgment interest rate upon entry
of judgment.  Because, as discussed below, the Court grants the
parties fourteen (14) days to exchange limited discovery
regarding the five non-party Bondholders for whom the Trustee
seeks entry of judgment, and seven (7) days thereafter to submit
joint revised proposed final judgments consistent with this
Opinion and Order, the Court shall enter final judgment at a
later date and set the post-judgment interest rate at that time.

### 5. Judgments for Non-Parties

The Trustee moves the Court to declare that Aristocrat is
in breach of its obligations under the Indenture to deliver
shares to five non-party bondholders (the "Non-Party
Bondholders") and to issue judgments in favor of each of the
Non-Party Bondholders on the same terms as other similarly
situated Bondholders.  (See Trustee's Mem. in Supp. of Its Mot.
for Ct. to Consider Whether to Issue J. in Favor of Add'l Non-
Party Bondholders ("Trustee's Mem.") 3; Trustee's Reply 2.)  The
five Non-Party Bondholders are:  (1) Sloan Financial Corp.
("Sloan"), the holder of $250,000 aggregate principal amount of
Aristocrat's 5% Convertible Subordinated Bonds due 2006, who
submitted conversion documents through its agent Clearstream
Banking Lux; (2) Flushing Enterprises ("Flushing"), the holder

of $250,000 aggregate principal amount of Aristocrat's 5%
Convertible Subordinated Bonds due 2006, who submitted
conversion documents through its agents Lombard Odier Darier
Hentsch & Cie and ANZ Bank; (3) P. Van Woerden and M. Van
Woerden-Visser ("Van Woerden"), the holders of $10,000 aggregate
principal amount of Aristocrat's 5% Convertible Subordinated
Bonds due 2006, who submitted conversion documents through their
agent Orbay; (4) UBS AG, the holder of $530,000 aggregate
principal amount of Aristocrat's 5% Convertible Subordinated
Bonds due 2006; and (5) Angus Barker, the holder of $120,000
aggregate principal amount of Aristocrat's 5% Convertible Bonds
due 2006.  (Trustee's Reply 1-2 n.1.)

    The Trustee submits to the Court copies of conversion
notices and Deposit/Withdrawal at Custodian ("DWAC") requests
from the Depository Trust Company ("DTC") for Sloan, Flushing,
and Van Woerden, evidencing the tender of their interests in the
Global Bond[15] for conversion, and asks the Court to declare that
Aristocrat is in breach of its obligation to deliver shares to
each of these Non-Party Bondholders. (See Second Decl. of Alec
G. Singh 8/18/06 ("Singh Decl. II") Exs. C-D (Sloan), E-F
(Flushing), and G-H (Van Woerden).)  The Trustee previously
submitted to the Court copies of conversion notices and DWAC

---

[15] The Bondholders' interests in the bonds are represented by interests in the
Global Bond held by the DTC.  See Aristocrat Leisure, 2006 U.S. Dist. LEXIS
34709, at *12.  The tender of interests in the Global Bond for conversion is
referred to as the DWAC process.  Id. at *13.

requests for Angus Barker and UBS AG, and the Court declared

that Aristocrat is in breach of its obligation to deliver shares

to Angus Barker and UBS AG.  See Aristocrat Leisure, 2006 U.S.

Dist. LEXIS 34709, at *14, 22-23; Decl. of Alec G. Singh 9/23/05

("Singh Decl. I") Exs. A & B).  The Trustee now submits proposed

final judgments for each of the five Non-Party Bondholders,

noting that these judgments mirror the proposed final judgment

for DBAGL and, other than being final rather than partial, also

mirror the proposed judgments of the other Bondholders that are

parties to this action.  (See Ltr. from Laura Fraher to the

Court, 11/13/09, at 1 & Exs. 1-2 (proposed final judgments for

UBS AG and Angus Barker); Fraher Decl. Exs. 2-4 (proposed final

judgments for Flushing, Sloan, and Van Woerden).)

　　　Aristocrat does not dispute that it has not delivered

shares to any of the Non-Party Bondholders.  (See Fraher Decl.

Ex. 1 (Ltr. from R. Beynon to L. Fraher 11/12/09).)  While

Aristocrat acknowledges the Trustee's authority to submit form

judgments on behalf of the five Non-Party Bondholders, it

opposes entry of judgment at this time because "[t]he current

record does not provide adequate information for calculation of

any damages that may be owed to the Non-Party Bondholders."

(Aristocrat's 54(b) Opp'n 3.)  Specifically, Aristocrat requests

that the Trustee provide "information about whether the Non-

Party Bondholders held short positions in [Aristocrat] stock,

and if so, when they closed those position(s) and at what price(s)" because "this information is essential to the proper calculation of damages and pre-judgment interest," (id. 3 n.3), and is "needed to assess whether [the Non-Party Bondholders] had gains that might affect their proposed judgments" (id. 7 n.8). See Ross Decl. ¶ 8 n.3; Sarratt Decl. Ex. A (Letter from R. Beynon to L. Fraher, 11/13/09).)

The Court first reiterates that the Trustee has standing to seek declaratory relief on behalf of converting bondholders. See Aristocrat Leisure, 2006 U.S. Dist. LEXIS 34709, at *22 (acknowledging that "the Trustee has provided evidence of conversion notices and DWAC requests" on behalf of non-party bondholders). Aristocrat and the Trustee also agree that the Trustee has authority to act on behalf of Non-Party Bondholders. (See Aristocrat's 54(b) Opp'n 3 n.3; Trustee's Reply 2 n.3.) The Trustee correctly states that the Court already has declared Aristocrat in breach of its obligation to deliver shares under the terms of the Indenture to UBS AG and Angus Barker, albeit without referencing them by name. See Aristocrat Leisure, 2006 U.S. Dist. LEXIS 34709, at *22-23. The Trustee does not object to Aristocrat's request that judgments for Non-Party Bondholders be entered in the name of the Trustee, who is a party to this action. (See Trustee's Reply 2 n.3; Aristocrat's 54(b) Opp'n 3 n.3.) The Trustee also does not dispute that it did not provide

106

information to Aristocrat regarding whether the five Non-Party

Bondholders held short positions in Aristocrat stock, whether

they closed any such short positions, and, if so, at what

prices. (Trustee's Reply 3 & n.4.) Likewise, the Court has no

record of this information. See Aristocrat Leisure, 2006 U.S.

Dist. LEXIS 34709, at *44 n.21 (noting "that the record includes

no evidence that any of the nonparty bondholders who have

submitted valid conversion notices and DWAC requests . . . have

taken any short positions"). The Trustee requests that, should

the Court accept "any of Aristocrat's arguments" regarding the

calculation of damages, the Court should grant the Non-Party

Bondholders "a reasonable amount of time to supplement the

record with additional relevant factual information." (Trustee

Reply 4.)

   The Court declares that Aristocrat is in breach of its

obligations to deliver shares under the terms of the Indenture

as to each of the five Non-Party Bondholders—Sloan, Flushing,

Van Woerden, UBS AG, and Angus Barker—who have satisfied the

Indenture's requirements regarding the submission of conversion

notices and tender of interests. Because Bondholders' judgments

shall be offset by earnings from closing short positions at a

favorable price and by interim trading gains earned as a result

of Aristocrat's breach, the Non-Party Bondholders' judgments

shall be afforded the same treatment. Therefore, the Court

orders the Trustee, on behalf of the five Non-Party Bondholders, to provide to Aristocrat within fourteen (14) days from the date of this Opinion and Order discovery regarding whether (1) any of the five Non-Party Bondholders held short positions in Aristocrat stock on each non-party's conversion date and, if so, (2) what interim trading on short positions each Non-Party Bondholder engaged in, if any, (3) when each Non-Party Bondholder closed its short position(s), and (4) at what price(s).

## CONCLUSION

For the foregoing reasons, Aristocrat's motion for judgment as a matter of law pursuant to Rule 50(b) is DENIED. Aristocrat's motion for a new trial pursuant to Rule 59 is DENIED.  Bondholders' motion for entry of partial judgment pursuant to Rule 54(b) is DENIED.  Bondholders' claims for violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 and for breach of the implied covenant of good faith and fair dealing are DISMISSED WITHOUT PREJUDICE. The Trustee's motion to enter final judgment for five Non-Party Bondholders—Sloan, Flushing, Van Woerden, UBS AG, and Angus Barker—is DENIED, pending discovery described herein.

The Court directs the Trustee, on behalf of the five Non-Party Bondholders, to provide to Aristocrat within fourteen (14) days from the date of this Opinion and Order discovery regarding:  whether (1) any of the five Non-Party Bondholders held short positions in Aristocrat stock on each non-party's conversion date and, if so, (2) what interim trading on short positions each Non-Party Bondholder engaged in, if any, (3) when each Non-Party Bondholder closed its short position(s), and (4) at what price(s).  Seven (7) days after the exchange of this limited discovery, the parties shall submit to the Court JOINT REVISED PROPOSED FINAL JUDGMENTS for all Bondholders, including the five Non-Party Bondholders in the name of the Trustee,

consistent with this Opinion and Order.  The Court further

directs that, with respect to Bondholder DBAGL, the parties

shall submit one joint revised proposed final judgment covering

both the OMNIS and Asian positions.  Upon receipt of the

parties' joint revised proposed final judgments, the Court shall

enter final judgment.

The Court reiterates below its holdings with respect to the

calculation of Bondholders' judgments:

(1)     For the judgments of DBAGL, Lehman, and QVT, Aristocrat

        is entitled to an offset to general damages in the

        amount of $16,834,376 for gains realized upon closing

        short positions.

(2)     For the judgments of Deephaven, KBC FP, and four of the

        five KBC AIM funds (ARB, MAC 28, Multi, and OPPS),

        Aristocrat is entitled to an offset of $1,093,358 for

        interim trading gains on short positions.

(3)     A pre-judgment interest rate of 7.5% per year applies

        to the principal payments Aristocrat made to

        Bondholders under the Receipt and Release Agreements

        for the period from May 31, 2006, through the date each

        Bondholder signed a Receipt and Release Agreement.

(4)     For all Bondholders, whether fully hedged, partially

        hedged, or unhedged, a pre-judgment interest rate of 9%

on general damages shall accrue from each Bondholder's conversion date.

(5)     Aristocrat is not entitled to an offset for bond interest coupon payments that Aristocrat previously paid to the Trustee, who paid them into the Court.

(6)     The post-judgment interest rate shall be set pursuant to 28 U.S.C. § 1961(a) upon entry of final judgment.

The Clerk of Court is directed to close docket numbers 325, 338, and 346.

**SO ORDERED.**
**New York, New York**

July 28, 2010

_____
                                   U.S.D.J.

Copies of this Opinion and Order have been e-mailed to:

Mark C. Hansen, Esq.
Rebecca A. Beynon, Esq.
Kellogg, Huber, Hansen, Todd, Evans, & Figel, PLLC
1615 M Street, N.W., Suite 400
Washington, D.C.  20036

Charles S. Gilman, Esq.
Cahill Gordon & Reindel LLP
80 Pine Street
New York, New York 10005

Evan A. Davis, Esq.
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006

James I. McClammy, Esq.
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017